## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------------x
                              :

In re:                            :

                             :      Chapter 11

                             :

GREEN FIELD ENERGY SERVICES, INC., *et al.*,   :      Case No. 13-12783 (KG)

                             :

               Debtors.       :      Jointly Administered

                             :

-------------------------------------------------------------------------x

-------------------------------------------------------------------------x
                             :

ALAN HALPERIN, AS TRUSTEE OF THE GFES   :

LIQUIDATION TRUST,                :

               Plaintiff,    :      Adv. Pro. No. _____

                             :

               vs.             :

                             :

MICHEL B. MORENO, MOR MGH HOLDINGS, LLC,  :

MOR DOH HOLDINGS, LLC, MOODY, MORENO    :

AND RUCKS, LLC, SHALE SUPPORT SERVICES,    :

LLC, DYNAMIC GROUP HOLDINGS, LLC, FRAC    :

RENTALS, LLC, TURBINE GENERATION SERVICES, :

LLC, AERODYNAMIC, LLC, CASAFIN II, LLC,     :

MORENO PROPERTIES, LLC, ELLE INVESTMENTS, :

LLC, LQT INDUSTRIES, LLC K/A DYNAMIC      :

ENERGY SERVICES INTERNATIONAL LLC      :

                             :

               Defendants.   :

-------------------------------------------------------------------------x

## COMPLAINT AND OBJECTION TO CLAIMS PURSUANT TO BANKRUPTCY CODE SECTIONS 502 AND 503 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 3007

## TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................1

JURISDICTION AND VENUE .................................................................................3

PARTIES ....................................................................................................................3

NON-PARTIES .........................................................................................................6

ALLEGATIONS APPLICABLE TO ALL CLAIMS ..............................................7

    A.    Moreno Acquires the Debtors and Bets Big on Fracking .................7

        (i)    Moreno Populates the GFES Board With Allies....................................7

        (ii)    Moreno Makes a Massive Bet on Fracking With GFES Debt Proceeds ................................................................................. 9

    B.    The Debtors' Fracking Business Fails to Take Off........................10

    C.    Moreno Strips the Debtor: PowerGen and the SPAs .....................10

        (i)    PowerGen: Moreno Transfers a $200 Million Business Away From GFES for No Consideration ....................... 11

        (ii)    The SPAs: Moreno Entities Breach Their Funding Contracts.......... 16

    D.    Moreno's Web of Affiliates Absorbs Millions from the Debtors as they Veer Towards Collapse.........................................19

    E.    The Debtors' Final Collapse ...........................................................21

    F.    The Moreno Party Proofs of Claim ................................................22

    G.    Moreno's Guarantee of the Debtors' Obligations to Shell ...........24

FIRST CAUSE OF ACTION Actual Fraudulent Transfer—11 U.S.C. §§ 548(a)(1)(A), 544(b), 550(a) (Against TGS and Moreno) ..............................................24

SECOND CAUSE OF ACTION Constructive Fraudulent Transfer—11 U.S.C. §§ 548(a)(1)(B), 544(b), 550(a) (Against TGS and Moreno)........................................26

THIRD CAUSE OF ACTION Breach of Fiduciary Duty (Against Moreno).......................27

FOURTH CAUSE OF ACTION Breach of the Fiduciary Duty of Loyalty—Usurpation of Corporate Opportunity (Against Moreno)..........................................................27

FIFTH CAUSE OF ACTION Unjust Enrichment (Against TGS) ............................................28

EIGHTH CAUSE OF ACTION Breach of Contract (Against MOR MGH and MMR)...........30

NINTH CAUSE OF ACTION Breach of Contract (Against MOR MGH) ..............................30

TENTH CAUSE OF ACTION Breach of the Fiduciary Duty of Loyalty (Against Moreno)........................................................................................................................30

ELEVENTH CAUSE OF ACTION Tortious Interference with Contract (Against Moreno)........................................................................................................................31

TWELFTH CAUSE OF ACTION Preferential Transfers (Against Moreno)..........................32

**THIRTEENTH CAUSE OF ACTION** Fraudulent Transfer—11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), 544(b), 550(a), Del C. 1301 *et seq.* (Against Moreno)...................33

**FOURTEENTH CAUSE OF ACTION** Preferential Transfer (Against Dynamic) ..................34

**FIFTEENTH CAUSE OF ACTION** Preferential Transfer (Against Frac Rentals and Moreno)......................................................................................................................35

**SIXTEENTH CAUSE OF ACTION** Preferential Transfer (Against S3 and Moreno) .............36

**SEVENTEENTH CAUSE OF ACTION** Preferential Transfer (Against TGS and Moreno)......................................................................................................................38

**EIGHTEENTH CAUSE OF ACTION** Preferential Transfer (Against MOR DOH and Moreno)......................................................................................................................39

**NINETEENTH CAUSE OF ACTION** Preferential Transfer – 11 U.S.C. §§ 547(b), 550(a) (Against Aerodynamic and Moreno) ...............................................................40

**TWENTIETH CAUSE OF ACTION** Preferential Transfer (Against Casafin and Moreno)......................................................................................................................42

**TWENTY-FIRST CAUSE OF ACTION** Preferential Transfer (Against Moreno Properties and Moreno)..............................................................................................43

**TWENTY-SECOND CAUSE OF ACTION** Constructive Fraudulent Transfer—11 U.S.C. §§ 548(a)(1)(B), 544(b), 550(a), Del C. 1301 *et seq.* (Against Elle and Moreno)............44

**TWENTY-FOURTH CAUSE OF ACTION** Subordination of Defendant Claims (Against Moreno and Defendant Moreno Affiliates)..................................................46

**TWENTY-FIFTH CAUSE OF ACTION** Objection to Defendant Claims (Against Moreno and Defendant Moreno Affiliates) ...............................................................47

**TWENTY-SIXTH CAUSE OF ACTION** Objection to Reimbursement Claims (Against Moreno)......................................................................................................................48

**TWENTY-SEVENTH CAUSE OF ACTION** Objection to Administrative Claim (Against Moreno)........................................................................................................49

**TWENTY-EIGHTH CAUSE OF ACTION** Objection to Claims (Against Certain Defendant Moreno Affiliates).....................................................................................50

**TWENTY-NINTH CAUSE OF ACTION** Objection to Claim (Against MMR).....................50

**THIRTIETH CAUSE OF ACTION** Declaratory Judgment (Against Moreno) ......................51

**THIRTY-FIRST CAUSE OF ACTION** Declaratory Judgment (Against Moreno) ................51

**REQUEST FOR RELIEF** .................................................................................................51

Plaintiff Alan Halperin, as Trustee of the GFES Liquidation Trust the ("Trust"), by and through his undersigned counsel, hereby alleges against the above-named, on personal knowledge as to all matters regarding himself and on information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      This action arises from the calculated decision by investor Michel B. Moreno ("Moreno"), upon realizing that the gigantic bet on "fracking" that he had made with a 44-year old energy company's debt proceeds was headed for failure, to use his position of control to loot the company.  As detailed herein, Moreno and a web of affiliated companies under his control (the "Defendant Moreno Affiliates," listed herein) engaged in a concerted campaign to strip the company, Green Field Energy Services, Inc. ("GFES"), of its most valuable asset and walk away from substantial contractual funding obligations, ensuring the company's swift demise—all while extracting massive payments from the company as it headed towards its final collapse.

2.      By this action, the Liquidation Trustee brings claims against Moreno and the Defendant Moreno Affiliates for fraudulent transfer, breach of fiduciary duty, breach of contract, preferential transfer, and related claims, seeking damages caused by Moreno's misconduct in excess of $230 million.  The Litigation Trustee by this pleading also objects to a series of claims filed by Moreno and certain Defendant Moreno Affiliates against the estate of GFES and its affiliates (the "Debtors," listed herein).

3.      In early 2011, seeing an opportunity to make a massive debt-fueled bet on certain speculative fracking technologies with other people's money, Moreno acquired a controlling interest in and became the CEO of GFES, which for many years had been engaged in a traditional well services business.  Causing GFES to increase its capital expenditures more than 50-fold from the previous year—funded by large incurrences of new debt—Moreno plunged

GFES into battle against formidable, established competition, tying the fate of its business largely to the success of its speculative fracking technologies.

4.     When it soon became clear that Moreno's bet on fracking was headed towards a spectacular failure, Moreno decided to make an entirely different kind of gamble:  that instead of working to shore up GFES's financial position (thereby at minimum preserving assets for creditors), he could strip hundreds of millions of dollars in value out of GFES and simply walk away.  In a calculated series of decisions, Moreno used his positions of trust and control to denude GFES of a $200 million business opportunity in power generation technologies, and to cause certain Defendant Moreno Affiliates—at a critical moment—to shirk over $20 million in contractual funding obligations to GFES.  As GFES then headed towards collapse, Moreno and the Defendant Moreno Affiliates continued to seize millions in payments from GFES, under terms and conditions that were anything but arms-length.

5.     Predictably, the conduct of Moreno and the Defendant Moreno Affiliates led to the filing by GFES under Chapter 11 on October 27, 2013 (the "Petition Date").

6.     By this action, the Litigation Trustee seeks:  (i) recovery of the value of the power generation business ("PowerGen") usurped by Moreno; (ii) damages for the breach by certain Defendant Moreno Affiliates of express contractual commitments to fund GFES, (iii) damages for Moreno's breach of his duty of loyalty relating to (and tortious interference in) his affiliates' performance of those funding contracts; (iv) the avoidance of over $14 million in additional transfers made to Moreno and the Defendant Moreno Affiliates by the Debtors during the year prior to the Chapter 11 filing; (v) disallowance or subordination of certain claims filed against the Debtors by Moreno and certain Defendant Moreno Affiliates; and (vi) declaratory relief

regarding certain claims filed against the Debtors by Moreno and certain Defendant Moreno Affiliates.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and Section 12.9 of the Plan (defined herein).  Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1409(a).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## PARTIES

8.       Plaintiff Alan Halperin, Trustee for the GFES Liquidating Trust, is a resident of New York, New York.  Plaintiff was appointed to serve as Trustee pursuant to the Liquidation Trust Agreement dated May 12, 2014, and is authorized under the Liquidation Trust Agreement and the Second Amended Joint Plan of Liquidation (the "Plan") of GFES, Hub City Tools, Inc. ("Hub City") and Proppant One, Inc. ("Proppant One" and, together with GFES and Hub City, the "Debtors"), to, *inter alia*, prosecute and resolve claims against the Defendants on behalf of the Trust.  Pursuant to the Plan: (i) all unreleased claims and causes of action belonging to the Debtors' Chapter 11 estates were vested in the Trust; and (ii) Plaintiff was appointed Trustee and authorized to prosecute such claims and causes of action vested in the Trust.

9.       Defendant Moreno is the former chairman and chief executive officer of GFES and, upon information and belief, resides and maintains his domicile in Lafayette Parish, Louisiana.

10.      Defendant MOR MGH Holdings, LLC ("MOR MGH") is a limited liability company registered in the state of Delaware.  Moreno indirectly owns 100% of MOR MGH.  As of October 11, 2011, MOR MGH owned 88.9% of GFES common stock.  In April 2013, and as

3

of the Petition Date, MOR MGH owned 81.634% of the common stock and 88.89% of the preferred stock of GFES.  The business address of MOR MGH is 4023 Ambassador Caffery Parkway, Lafayette, LA 70503.

11.     Defendant MOR DOH Holdings, LLC ("MOR DOH") is a limited liability company registered in the state of Delaware.  Until June 2013, MOR DOH was 100% owned by two trusts, MBM 2011 DOH GRAT and TCM 2011 DOH GRAT, both of which were, upon information and belief, owned and controlled by Moreno or his family members at all relevant times.  The trusts share a managing trustee, Dalis M. Waguespack.  In June 2013, Powermeister, LLC, an entity unrelated to the Debtors or to Moreno, purchased a 9.6% equity interest in MOR DOH.  Upon information and belief, Waguespack resides and maintains her domicile in Louisiana.  The business address of MOR DOH is 4023 Ambassador Caffery, Ste. 200, Lafayette, Louisiana 70503.

12.     Defendant Moody, Moreno and Rucks, LLC ("MMR") is a limited liability company registered in the state of Louisiana.  Elle Investments, LLC ("Elle"), which is owned by Moreno and his spouse Tiffany Moreno ("Ms. Moreno") hold a one-third interest in MMR.  As of October 11, 2011, MMR owned 11.1% of GFES common stock.  In April 2013, and as of the Petition Date, MMR held 10.2% of the common stock of GFES.  The business address of MMR is 600 Jefferson St. Suite 1500, Lafayette, LA 70501.

13.     Defendant Elle is a limited liability company registered in the state of Louisiana. The address of Elle is 4023 Ambassador Caffery Pkwy, Ste 200, Lafayette, LA 70503.

14.     Defendant Shale Support Services, LLC ("S3") is a limited liability company registered in the state of Mississippi.  S3 is 70% owned by MOR MGH.  The remaining 30% is

4

owned by Rowan Group, LLC (10%) and BBR Holdings, LLC (20%) each of which is owned by an unrelated third party.  The business address of S3 is 105 Street A, Picayune, MS 39466.

15.     Defendant Dynamic Group Holdings, LLC ("Dynamic") is a limited liability company registered in the state of Delaware.  Dynamic is the successor to Dynamic Industries, Inc. and is a corporation registered in the state of Louisiana.  Upon information and belief, Moreno served as CEO of Dynamic until June 2012 and continued to sit on its board as of the Petition Date.  Further, as of the Petition Date, Moreno, through MOR MGH, owned 97.46% of Dynamic's common units and 13.74% of its preferred units.  The business address of Dynamic is 400 Poydras St., Suite 1800, New Orleans, LA 70130.

16.     Defendant Frac Rentals, LLC ("Frac Rentals") is a limited liability corporation registered in the state of Louisiana.  As of the Petition Date, Frac Rentals was owned by MOR 2013 Holdings, LLC, a Moreno-controlled entity, and was previously owned by MOR DOH.  As of the Petition Date, the President of Frac Rentals was Moreno's brother, Jesus Moreno.

17.     Defendant Turbine Generation Services, LLC ("TGS"), formerly known as Green Field Power Generation, L.L.C., is a limited liability corporation registered in the state of Louisiana.  TGS is wholly owned by MOR DOH.

18.     Defendant Casafin II LLC ("Casafin") is a limited liability company registered in the state of Texas.  Moreno and Ms. Moreno are the managing members of Casafin and Moreno owned 100% of Casafin as of the petition date.

19.     Defendant Aerodynamic, LLC ("Aerodynamic") is a limited liability company registered in the state of Louisiana.  Defendant Moreno is the sole owner of Aerodynamic.

20.     Defendant Moreno Properties, LLC ("Moreno Properties") is a limited liability company registered in the state of Louisiana.  Defendant Moreno serves as the sole principal of Moreno Properties.

21.     LQT Industries, LLC ("LQT Industries") is a limited liability company registered in the State of Louisiana.  Upon information and belief, LQT Industries is a wholly-owned subsidiary of Dynamic Energy Services International LLC f/k/a Moreno Group, LLC ("Dynamic Energy Services"), a Delaware limited liability company.  Dynamic Energy Services is a subsidiary of Dynamic.  Upon information and belief, Michel Moreno served as Chairman and CEO of Dynamic Energy Services until June 2012 and continued to sit on the board as of the Petition Date.  The business address of LQT Industries is 400 Poydras St., Suite 1800, New Orleans, LA.

## NON-PARTIES

22.     Non-Party Alliance Consulting Group, LLC ("Alliance") is a limited liability company registered in the state of Louisiana.  Alliance is a sand supplier in which Elle (a Moreno-owned entity) held a 50% equity interest and a 40% senior debt interest as of the Petition Date.  The Debtors entered into a contract with Alliance pursuant to which Alliance received a $4.6 million prepayment for sand processing services, which Alliance was to use to assist in funding and operating a sand processing plant.  Before the Debtors ever received any sand processing service, Alliance filed a bankruptcy case in which a trustee was appointed.  The business address of Alliance is 3201 General DeGaulle Drive Suite 200, New Orleans, LA 70114.

23.     Non-Party Turbine Powered Technology, LLC ("TPT"), is a limited liability company registered in the state of Louisiana.  TPT was founded on September 22, 2011, as a

joint venture between GFES and MTT Properties, LLC, an entity owned by Mr. Ted McIntyre. As of the Petition Date, GFES and MTT Properties, LLC each owned 50% of TPT.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.    Moreno Acquires the Debtors and Bets Big on Fracking

24.    Formed in 1969, GFES (until September 2011 named Hub City Industries, LLC ("HCI")) was for many years engaged in a traditional well services business. In December 2010, HCI entered into the fracking business.

25.    In May 2011, Moreno took control of HCI by using MOR MGH and MMR to effect a recapitalization and buy-out of HCI's members. In the transaction, MMR and MOR MGH paid in approximately $27.9 million and $4.8 million respectively. MMR and a Moreno-controlled trust also took control of Turbine Technology of Louisiana, LLC ("TTL"), which had most of the same shareholders and key employees as HCI, among them Ted McIntyre, who held approximately 20% of TTL's equity and was the developer of the power generation technology subsequently usurped by Moreno.

### (i)    Moreno Populates the GFES Board With Allies

26.    Upon Moreno's acquisition of a controlling interest in GFES, he became a member of its board of directors (the "Board") and populated the Board and management with his friends and business affiliates. Moreno did so in his capacity as Incorporator of GFES, which gave him the power to appoint the directors, and also in his capacity as indirect majority shareholder of GFES.

A.    Mr. Rick Fontova, who was appointed to the Board by Moreno in October 2011 in connection with the Moreno takeover, had a long-standing relationship with Moreno and for many years relied upon Moreno in his professional and business career, including holding several positions in companies controlled or owned by

7

Moreno.  In 2009, Moreno appointed Fontova to serve as President of Dynamic Power, LLC, a builder in the nuclear industry, which, upon information and belief, is a subsidiary of Dynamic Energy Services.  As of the Petition Date, Fontova served as GFES's President and a director.  In this capacity, Fontova earned an annual salary of $375,000 and was eligible for an annual bonus of 50% to 100% of his annual salary, and upon information and belief, devoted all of his professional time to GFES.

B.  Upon information and belief, Messrs. Charlie Kilgore and Mark Knight, who served as directors from October 2011 through October 2013, were not independent of Moreno.[1]

C.  Earl Blackwell had been associated with HCI in his capacity as Managing Director of MMR, which first invested in HCI in 2005, and served as its Chief Financial Officer beginning in 2009.  Blackwell remained Chief Financial Officer of GFES after the Moreno takeover.

D.  Upon information and belief, Moreno, Kilgore, and Knight each have or had offices located at 600 Jefferson Street, Lafayette, LA 70501.  Kilgore served on the Board until October 16, 2013, and Knight served until October 21, 2013.

27.    Fontova, Kilgore, Knight and Blackwell all served at the whim of Moreno, who held control over the directors and officers under GFES's certificate of incorporation and bylaws. As an indirect majority shareholder (by virtue of his ownership of MOR MGH), Moreno, without the need of concurring shareholder votes, could elect the directors to one-year terms.  See Bylaws of Green Field Energy Services, Inc. ("Bylaws") § 2.2.  In addition, Moreno could at any

---

[1] Charles T. Goodson also joined the Board in November 2011, but resigned in May 2012.

time remove any director, with or without cause.    And by controlling the board, Moreno ultimately had an ability to elect and remove officers, including Fontova, with or without cause. See Bylaws § 4.1.  Ultimately, as the Debtors' Annual Report for the fiscal year ended December 31, 2012, stated, as a result of MOR MGH's ownership interest, "[MOR MGH] has significant influence over our decisions to enter into any corporate transaction regardless of whether others believe that the transaction is on our best interests."

**(ii)     Moreno Makes a Massive Bet on Fracking With GFES Debt Proceeds**

28.     Upon obtaining control of the Debtors, Moreno quickly redirected their business to go all-in on fracking, an area in which the Debtors had no customer base and would be competing against much larger and better capitalized companies.   Moreno's plan required a dramatic expansion in capital expenditures—funded by massive incurrences of new debt.   GFES capital expenditures increased 50-fold in the first 8 months of 2011, as compared to the entirety of 2010.  By December 31, 2011, GFES had taken title to $100.8 million worth of equipment for fracking operations, and had orders outstanding for $108.7 million of additional equipment. GFES's fleet of turbine-powered hydraulic-fracturing units expanded from 8 in late 2011 to 65 as of October 2013.  To finance these extraordinary capital expenditures, GFES borrowed heavily: $340 million (of which $250 million was in high interest (13%) secured notes) was incurred by GFES in thirteen months—*i.e.*, a 640% increase in funded debt load from its September 2011 level.

29.     Moreno not only tied the Debtors' business to a massive bet on fracking services—he tied it largely to a single customer.  Prior to Moreno's control, the Debtors' top five customers accounted for 38% of total revenues.   By the end of 2011, however, revenues attributable to the Debtors' top five customers had risen to 52%—and by the end of 2012, a single customer, SWEPI LP ("Shell"), accounted for 79% of the company's revenue.

9

Ultimately, over the course of the Debtors' active operations under Moreno's control, Shell accounted for 92% of the Debtors' fracking revenues.

**B.    The Debtors' Fracking Business Fails to Take Off**

30.    On both a cash and accrual basis, the GFES/Shell fracking business operated at a substantial loss from start to finish.  From April 2011 through June 30, 2013, aggregate operating revenues were approximately $285 million, while the Debtors incurred operating losses on an accrual basis of approximately $100 million and on a cash basis of approximately $53 million.[2]

31.    In July 2012, a GFES representative contacted Shell stating that GFES was losing "large sums of money" through its arrangements with Shell, and implored Shell to use its industry influence to enable GFES to obtain more beneficial pricing for the materials to be used to perform services for Shell.  Indeed, while GFES had become dependent on the relationship with Shell, it continually lost money under the arrangement.

32.    Throughout 2012, GFES had only a limited number of working fracking operations—most tied to Shell.  With decreased revenue opportunities, dependence on a money-losing relationship with Shell and increasing input costs, Moreno's big bet on fracking was looking like a major failure.

**C.    Moreno Strips the Debtor:  PowerGen and the SPAs**

33.    Faced with these dire circumstances, Moreno put his personal financial interests ahead of his fiduciary duties to the Debtors.  Using his control over GFES, he brazenly usurped a

---

[2] Further, page 28 of the Debtors' June 30, 2013 Quarterly Financial Report indicates that the increase in net cash flow for the first six months of 2013 had been "primarily due to a $49.6 million increase in accounts payable, accrued expenses and advances, as well as a $45.9 million decrease in accounts receivable and inventory between periods."    Thus, were it not for the Debtors' efforts to stretch out trade payables, obtain prepayment advances, and engage in similar measures, the amount of the cash loss during the period would have been substantially higher. Thus, the $100 million accrual basis loss more accurately represents the extent of the Debtors' operating losses during the stated fiscal period.

$200 million business opportunity in power generation services ("PowerGen") that was being developed by and belonged to GFES, and he caused his affiliated entities MOR MGH and MMR to breach multiple stock purchase agreements that obligated them to provide additional funding to the Debtors in the amount of over $20 million.

      **(i)**      **PowerGen:  Moreno Transfers a $200 Million Business Away From GFES for No Consideration**

34.      The PowerGen business involved the use of turbine engines to develop and generate portable electric power at well sites.  The engines were sold or rented by TPT (the 50-50 joint venture between the Debtors and Ted McIntyre (through MTT Properties, LLC), who developed the relevant technology).  What distinguished PowerGen's technology was that its turbines could run on field gas extracted onsite—*i.e.*, a self-powering operation—resulting in significantly lower costs (as compared to the traditional need to transport diesel to the well sites) and in reduced emissions.  Excess power produced through the PowerGen technology also could potentially be sold to local power grids, resulting in an additional revenue stream.

35.      The Debtors began their work on PowerGen in the summer of 2012.  Debtor employees worked on PowerGen's development, Debtor funds were expended to develop PowerGen, and the Debtors acquired engine inventory and other assets in support of the business.  Indeed, for the period of November 2012 through June 2013, the Debtors incurred substantial expenses in connection with their efforts to develop PowerGen, including expenses based upon services provided by various GFES employees, who worked to develop models for development of PowerGen.

36.      The Debtors began to manufacture units for the PowerGen business in the fall of 2012 and began to secure commitments from customers to conduct pilot programs.  At a November 21, 2012 bondholder call, Moreno explained that a fracking customer had "committed

to . . . taking a few of our PowerGen units that we're starting to manufacture now and do [a] pilot program where we're going to actually power a drilling rig using field gas."

37.     In bondholder conference calls and other communications, Moreno repeatedly played up PowerGen's potential economic benefit to GFES.  For example:

    A.  At an August 22, 2012 bondholder call, Moreno, in explaining why additional equity would only be brought in "as needed," noted the buzz around PowerGen.

    B.  At a November 21, 2012 bondholder call, Moreno referred to PowerGen as "a very exciting thing for the company."

    C.  Similarly, during Q1 2013, the Debtors made numerous presentations and issued press releases trumpeting the prospects for PowerGen for GFES.

    D.  In a press release dated January 7, 2013, Moreno stated that he believed the Debtors' "turbine driven systems [were] superior to other natural gas powered options."

38.     In the fall of 2012, General Electric Corporation ("GE") expressed interest in the Debtors' work with turbines, and began conversations regarding working together.  By January 2013, the Debtors had solicited several other potential investors for PowerGen.  Into May 2013, the Debtors were engaged in negotiations with GE and numerous other sources regarding an investment in PowerGen.   By early 2013, GE was contemplating an investment of $100 million in PowerGen █████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████.  At the time, GFES had the requisite infrastructure and employees, as well as an ownership interest in and working relationship and understanding with TPT.

39.   But Moreno chose a different path.  Well aware by the spring of 2013 that GFES's fracking business was headed towards collapse, and fully appreciative of the substantial value held by the PowerGen opportunity, he decided to simply take PowerGen for himself.  By taking PowerGen away from GFES and transferring it to a different entity under his control, he engineered the removal PowerGen from the reach of GFES creditors, thereby hindering, delaying or defrauding them.

40.   In March 2013, Moreno caused entities under his control to form TGS, as an entity separate from GFES rather than as a subsidiary of GFES.  Moreno then used his domination and control over the Board and GFES to cause GFES to waive the PowerGen business opportunity in favor of its pursuit by TGS and himself, *i.e.*, to transfer the resources and assets built by the Debtors through their work on PowerGen—and most importantly, the PowerGen business opportunity itself—to TGS.

41.   In May 2013, Moreno (on behalf of MOR MGH, a shareholder); Rick Fontova (individually, as a shareholder); William Rucks (on behalf of MMR, a shareholder) and Moreno, Fontova, Mark Knight, and Charlie Kilgore as directors of GFES, executed the Written Consent of the Stockholders and Directors of GFES (the "PowerGen Waiver"), formally waiving, "as if . . . at a duly convened meeting of the stockholders and directors," the opportunity for GFES to pursue the PowerGen business, and agreeing that Moreno, TGS, and TPT could pursue the

13

PowerGen business outside of GFES.    The PowerGen Waiver also authorized GFES to assist Moreno and/or TPT in various ways in connection with the PowerGen opportunity, "including but not limited to the transfer of inventory, construction contracts, intellectual property and know-how and the like."

42.    The Board of GFES utterly failed to inform itself or exercise meaningful oversight in connection with granting the PowerGen Waiver.    Upon information and belief, no financial or valuation expert was retained to evaluate the proposed transfer of PowerGen; no analysis or opinion regarding the proposed transfer was commissioned; no valuation opinion regarding the proposed transfer was in fact obtained (the Debtors' bondholders, concerned that the transfer violated a November 15, 2011, indenture governing their bonds (the "Indenture"), requested such an opinion); and no special committee was formed to investigate the terms and circumstances of the transaction and to report back to the Board.    Moreover, the purportedly independent members of the Board were not independent.    Indeed, upon information and belief, no materials, presentations, or other documents were reviewed by the Board before approving the PowerGen Waiver, and there was no substantive deliberation by the Board before approving the PowerGen Waiver.    Instead, the directors turned a blind eye to the reality of the usurpation and transfer of PowerGen, acting in bad faith and in intentional disregard of GFES's interests and the directors' duties to GFES, as they rubber-stamped the transfer of the corporation's most valuable asset for no consideration at the behest of Moreno.    Simply put, the directors' purpose in approving the PowerGen Waiver was not to advance GFES's interests, but to attempt to lend their misconduct an air of legitimacy.    Of course, as alleged above, none of the directors who approved the waiver were actually independent.

43.     Upon information and belief, GFES also made various transfers in connection with PowerGen.  That is, not only did Moreno loot the PowerGen business opportunity for his own benefit, he also raided GFES of its dwindling assets, for the benefit of TGS.

44.     In exchange for their transfer of PowerGen to TGS, the Debtors received no or virtually no consideration.  Indeed, compensation was limited to a small payment that was made for services rendered in connection with work on PowerGen, and related equipment—but no payment for PowerGen itself.  However, each of the directors who approved the PowerGen Waiver were aware that GFES's fracking business was headed towards collapse, and each director knew that through the PowerGen Waiver, GFES would be transferring a valuable asset for no consideration and that this asset would not be available to satisfy the claims of creditors.

45.     Following the transfer of PowerGen to TGS (which was 100% owned by MOR DOH), an unaffiliated third party, Powermeister, in June 2013 purchased a 9.6% equity interest in MOR DOH, for $20 million—implying an enterprise valuation of $208 million for PowerGen.

46.     It had always been clear that the PowerGen business opportunity carried tremendous value.  For example:

A. GE's contemplated investment of $100 million in PowerGen ██████████
████████████████████

B. A January 2013 presentation on PowerGen projected initial EBITDA of approximately $7 to 11.8 million in 2013 growing to approximately $102.9 to 142 million as early as 2015.

C. The Debtors consistently ascribed a value to the PowerGen business of approximately $180 million (if not higher), including in materials prepared in

15

financial updates produced prior to the Petition Date, and in post-petition emails regarding the structuring of the Plan.

47.     Following the PowerGen Transfer, the Debtors were failing to pay their debts as they came due and the sum of their debts exceeded their assets at fair valuation.  During June, July, and August of 2013, the Debtors failed to make an aggregate of $6 million of required principal payments on a credit facility that the Debtors had entered into with Shell in October 2012, and under which $78.2 million remained outstanding.  This triggered a default under the credit facility, which Shell did not waive, and a cross default under the indenture governing the Debtors' secured notes.  As a result of the defaults, Shell gained the right to demand immediate payment of all amounts due under the facility, and the Debtors were required to offer to repurchase up to $30 million of the notes at 108% of face value.  At the same time, the Debtors' quarterly report for the six-month period ended June 30, 2013, estimated that as of June 30, 2013, the Debtors had a net working capital deficiency of approximately $333.4 million and owed $20.9 million to its vendors and other third-party suppliers that had been outstanding for over 120 days.

**(ii)     The SPAs:  Moreno Entities Breach Their Funding Contracts**

48.     On October 24, 2012, GFES, MOR MGH and MMR entered into a written Share Purchase Agreement (the "2012 SPA") (attached hereto as Ex. 1) in connection with certain supplements to the Indenture.

49.     Under the 2012 SPA, GFES agreed to issue, and MOR MGH and MMR agreed to purchase, up to $25 million in preferred shares of GFES stock.

50.     The 2012 SPA required that GFES initially issue, and MOR MGH and MMR purchase, $10 million in preferred stock:

> Each Investor agrees to purchase from the Company, and the Company agrees to sell and transfer to the Investors, the number of Preferred Shares determined by multiplying (x) the quotient of $10,000,000.00 divided by the Per Share Purchase Price by (y) such Investor's Percentage Interest (the "Initial Purchase"). Each Investor shall pay the Initial Purchase Price for the Initial Purchase.

2012 SPA § 2.01(a).

51.     MOR MGH and MMR were obligated to purchase shares in accordance with their percentage interests in GFES.  See 2012 SPA §§ 2.01; 1.01 ("'Percentage Interest' means each Investor's ownership interest in the Company as of the date of the Initial Purchase or each Additional Purchase, as the case may be, as represented by the percentages appearing for each Investor on Exhibit A hereto.").  Thus, based on their respective ownership percentages, MOR MGH was obligated to purchase 88.9% of the shares and MMR was obligated to purchase 11.1%.

52.     In compliance with the 2012 SPA, GFES issued and MOR MGH and MMR purchased the initial $10 million of preferred stock.

53.     The 2012 SPA also required that at the end of each calendar quarter beginning in the fourth quarter of 2012, additional purchases by MOR MGH and MMR were required, with a maximum of an additional $15 million in purchases:

> On each Applicable Purchase Date prior to the earlier of (i) the date on which all outstanding Notes have been repaid in full and (ii) the date on which all outstanding Notes have been satisfied and discharged, each Investor shall purchase, and the Company shall sell and transfer to each Investor, such Investor's pro rata share based on its Percentage Interest of the number of Preferred Shares specified by the Board in a funding request (a "Funding Request") at a per share priced equal to the Per Share Purchase Price, subject to the terms and conditions of this Agreement (each such purchase, an "Additional Purchase" and, together with the Initial Purchase, the "Purchases"); provided that, the purchase price for all Preferred Shares purchased by the Investors pursuant to this Section 2.02 shall not exceed $15,000,000.00")

17

2012 SPA § 2.02(a); see also § 1.01 ("Applicable Purchase Date").  For each quarter, the total additional purchase was to equal the amount by which $10 million exceeded the amount of cash GFES held as of the final day of that quarter.  See 2012 SPA §§ 1.01, § 2.03(e).

54.    In accordance with this provision, following the end of the fourth quarter of fiscal 2012, MOR MGH and MMR purchased the requisite amount of preferred stock, in the amount of $1,566,461.

55.    However, despite funding requests from GFES under Section 2.03(e) for each of the first three fiscal quarters of fiscal 2013, MOR MGH and MMR did not purchase any of the preferred stock that they were obligated to purchase.  In total, MOR MGH was obligated to purchase preferred stock in the amount of $9,594,298 on account of these three quarters, but did not, and MMR was obligated to purchase $1,199,152, but did not.

56.    GFES and MOR MGH are also parties to a Share Purchase Agreement dated June 28, 2013 (attached hereto as Ex. 2) (the "2013 SPA," together with the 2012 SPA, the "Share Purchase Agreements").  Under the 2013 SPA, MOR MGH was obligated to purchase $10 million in preferred stock from GFES:

> The Investor agrees to purchase from the Company, and the Company agrees to sell and transfer to the Investor, the number of Preferred Shares determined by the quotient of $10,000,000.00 divided by the Per Share Purchase Price . . .

2013 SPA § 2.01(a); see also id. § 2.01(a).

57.     Under the 2013 SPA, payment was due on the date the 2013 SPA was entered into.  See 2013 SPA § 2.01(b).

58.    MOR MGH never paid the $10 million required under the 2013 SPA.

59.    Moreno through his ownership interests in and influence on MOR MGH and MMR was himself personally responsible for the breaches by those entities.  Moreno was aware

of MMR's and MOR MGH's obligations under the Share Purchase Agreements. Indeed, Moreno signed both the 2012 SPA and the 2013 SPA not only on behalf of GFES, but also on behalf of MOR MGH and MMR. Further, with regard to the breach of the 2012 SPA, Blackwell emailed Moreno during the first two quarters of 2012 regarding payment, but payment was not made.

60.     Moreno was also aware of the impact those entities' failures to fulfill such obligations would have on the Debtors. Using his control and influence over MOR MGH and MMR, Moreno favored their and his interests at the expense of the Debtors. This willful and intentional interference with performance of the Share Purchase Agreements was motivated by Moreno's personal desire to protect his personal financial interests in disregard of the impact on GFES.

61.     By preventing MOR MGH and MMR from complying with the Share Purchase Agreements, Moreno deprived the Debtor of over $20 million in contractually committed capital.

62.     The over $20 million in capital that MOR MGH and MMR failed to deliver could have been used to further GFES's business plans at a critical moment. Instead, Moreno ensured that it was never provided.

## D.     Moreno's Web of Affiliates Absorbs Millions from the Debtors as they Veer Towards Collapse

63.     Moreno erected around the Debtors a constellation of satellite companies to provide services to the Debtor in support of its business. As alleged above, Moreno held controlling interests in these Defendant and non-party entities, and the business relationships between them and the Debtors were not "open-market" or "arms-length" relationships.

64.     During the 12-month period preceding the Petition Date, Moreno and this web of affiliated entities collected approximately $14.6 million in additional value from the Debtors.

65.     Between October 27, 2012 and October 27, 2013, the Debtors made the following transfers (collectively, the "Defendant Affiliate Transfers") to the following Moreno-affiliated entities (collectively, the "Defendant Moreno Affiliates"):[3]

- payments totaling $605,000 to Defendant Aerodynamic (the "Aerodynamic Transfers") pursuant to a "dry" lease agreement dated June 1, 2011, for use of a Learjet 40 aircraft (FAA Tail #N404EL).

- payments totaling $1,391,158 to Defendant Casafin (the "Casafin Transfers") pursuant to a non-exclusive lease agreement dated June 1, 2011, for use of a Bombardier Challenger aircraft (FAA Tail # N300GM).

- $780,221 to Defendant Dynamic (the "Dynamic Transfers") pursuant to an agreement dated April 21, 2011, requiring Dynamic to provide material and labor for producing frack unit "skids" according to GFES design and specification.

- payments totaling $743,966 to Defendant Frac Rentals (the "Frac Rentals Transfers") for safety equipment rentals pursuant to a Master Service Agreement dated July 10, 2012, beginning in approximately January 2013.

- $4,614,310 to Defendant MOR DOH (the "MOR DOH Transfer"), which was the sole owner of Frac Rentals at all relevant times, in a November 1, 2012 sale/lease back transaction with Frac Rentals in which GFES agreed to sell certain fracking safety equipment to Frac Rentals.  No written agreement was ever entered into between MOR DOH and GFES regarding the sale/lease back transaction.

- payments totaling $239,588 to Defendant Moreno Properties (the "Moreno Properties Transfers") for maintenance services related to the Aerodynamic jet.

- payments totaling $3,444,411 to Defendant S3 (the "S3 Transfers") for refined fracturing sand.

- $2,210,883.76 to Defendant TGS (the "TGS Transfers") pursuant to a June 21, 2013 "Agreement for the Manufacture and Sale of Turbine Powered Generators" as a reimbursement in connection with the purchase of components for the manufacture of PowerGen equipment for TGS.

66.     In addition to transfers to the Defendant Moreno Affiliates, Moreno himself received approximately $571,897 from the Debtors in the year prior to the Petition Date for salary, bonuses and expense reimbursements (the "Moreno Transfers").    Moreno's

---

[3] Further details regarding these transfers are set forth in the attached Appendix A.

20

compensation, which was disproportionate to compensation that would normally be paid for such services in the marketplace, was paid despite the numerous instances in which Moreno engaged in self-dealing or otherwise breached his fiduciary duties to the Debtors and despite the fact that the Debtors' financial condition was steadily deteriorating during the year prior to the Petition Date.

67.    Further, payments were made totaling $24,918,682 to non-party TPT.

68.    Finally, $4,995,988 in payments to non-party Alliance (including the $4.6 million "pre-payment" discussed above) (the "Alliance Transfers") were made under a Sand Mining and Refining Agreement with Alliance (the "Alliance Agreement"), pursuant to which Alliance agreed to build and operate a Wet and Dry processing plant that would perform the mining, processing, transportation and refining of raw fracturing sand.  Alliance was never able to produce any meaningful amount of fracturing sand for GFES, and was made the subject of an involuntary Chapter 11 petition on October 3, 2013.

**E.    The Debtors' Final Collapse**

69.    Heavily dependent upon a speculative fracking bet largely tied to a single customer, and with Moreno usurping its $200 million PowerGen business opportunity and causing his entities to breach their remaining obligations to fund it, GFES was left with no means of survival.  The final collapse was rapid.

70.    In August 2013, Shell, informed GFES that it would terminate its use of the Debtors' fracking services.

71.    On October 8, 2013, Shell delivered a notice of loan default to GFES, stating that the Debtors failed to pay amounts outstanding under their agreement with Shell and demanded full payment of all indebtedness outstanding thereunder, estimated at approximately $80 million.

This default, leading to Shell's demand and acceleration of secured loans to the Debtors, also triggered a cross-default under the indenture governing the Debtors' secured notes.

72.    On October 27, 2013, the Debtors filed petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code" or "Code").

73.    On April 23, 2014, the Bankruptcy Court entered the confirmation order (the "Confirmation Order").  The effective date of the Plan occurred on May 12, 2014.

74.    The Debtors' pre-petition debt was estimated as follows:

| Nature of Prepetition Indebtedness | Approximate Amount of Outstanding Debt as of Petition Date |
|---|---|
| Shell Revolver | $80.0m |
| 2016 Senior Secured Notes | $255.9m |
| Trade Debt | $98.6m |
| **TOTAL** | **$434.5m** |

## F.    The Moreno Party Proofs of Claim

75.    The Defendants each filed one or more proofs of claim against one or more of the Debtors (collectively, the "Defendant Claims").  In particular:

- On January 13, 2014, S3 filed a proof of claim against GFES in the amount of $8,133.70 based on goods sold.

- On January 21, 2014, LQT Industries, LLC K/A Dynamic Energy Services International LLC, an affiliate of Dynamic Industries, filed a proof of claim against GFES in the amount of $21,068.19 based on goods sold.

- On January 24, 2014, MMR filed a proof of claim against GFES in the amount of $23,523,507.00, alleging that amount was due pursuant to an agreement under which GFES agreed to pay MMR cash based on the gross revenue of the company's fracking operations;[4]

- On January 31, 2014:

---

[4] MMR also filed, on April 11, 2014, a separate proof of claim, in the same amount, claiming damages from the Debtors' rejection of that same agreement.

- Aerodynamic filed a proof of claim against GFES in the amount of $165,000, asserting unpaid obligations under a lease of a Learcraft 45;

- Casafin filed a proof of claim against GFES in the amount of $436,951.97, asserting obligations under a lease of a Bombardier BD-100-1A10;

- Frac Rentals filed a proof of claim against GFES in the amount of $1,390,709.30 on the basis of allegedly unpaid rent;

- Moreno filed two proofs of claim against GFES and its Debtor affiliate, Hub City, each in the amount of $80 million, later amended to $81,539,023.41 (collectively, the "Reimbursement Claims") based on Moreno's co-liability with the relevant Debtors on Shell's $80 million claim;

- Moreno Properties filed a proof of claim against GFES in the amount of $633,869.56, asserting repair and maintenance expenses as the basis thereof; and

- TGS filed a proof of claim in the amount of $10,654,185.72 based on (i) a trade receivable in the amount of $766,000.00 for two turbines and (ii) allegedly advanced deposits in the amount of $9,888,186.00, both pursuant to tri-party agreement with GFES and TPT for the manufacture and sale of turbine powered generators.[5]

- On June 9, 2014, Moreno filed a request for payment of administrative claim and advancement of fees, for professional fees and expenses in the amount of $1,539,023.41 for his counsel and financial advisor, citing their work "to respond and defend against allegations raised by the Official Committee of Unsecured Creditors" (the "Administrative Claim");[6]

---

[5] In addition to the Defendant Claims, on January 22, 2014, non-party Alliance filed a proof of claim against GFES in the amount of $9,265,343.00, asserting that that amount represents the principal due under a Sand Mining and Refining Agreement to which GFES was party.

Further, on January 21, 2014, non-party TPT filed two proofs of claim for unliquidated amounts due to the breach of, respectively, an agreement for the installation of turbine engines and an agreement for the operation of turbine driven equipment and a proof of claim in the amount of $3,064,000, asserting GFES's breach of an agreement to purchase 200 turbine engines. On January 22, 2014, TPT filed a proof of claim in the amount of $9,440,172.96, asserting monies owed for services performed, materials and parts sales. Pursuant to the Plan, TPT has since released these claims. See Plan §§ 5.14, 12.06.

[6] The Administrative Claim represents the same claim amount as the additional $1,539,023.41 that was added by amendment to the Reimbursement Claims (as noted above), but asserts the claim on an administrative basis.

**G.**    **Moreno's Guarantee of the Debtors' Obligations to Shell**

76.    On October 22, 2012, Moreno and Ms. Moreno entered into a written guarantee agreement with Shell (the "Shell Guarantee"), pursuant to which they each guaranteed the Debtors' payment of obligations owed to Shell (which, at that time, totaled $94 million).

77.    Under the Shell Guarantee, Moreno also agreed to assign to Shell all of his rights against GFES's estate, and further agreed to waive and disclaim any rights or remedies that he had against GFES in connection with the Shell Guarantee, including "any right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy[.]"

78.    Under the Plan, Shell agreed to receive, in full satisfaction, settlement and release of its "secured" claims, $5 million in cash on the effective date. ("Shell Secured Claim"). In full satisfaction, settlement and release of certain other Shell claims consisting of excess distributions on account of Shell's secured claim ("Shell Other Claim"), Shell agreed to accept certain releases under the Plan. Confirmation of the Plan constituted a good faith compromise and settlement, among others, of all claims and controversies related to claims held by Shell– including all claims held by Shell assigned to it by Moreno.

**FIRST CAUSE OF ACTION**
Actual Fraudulent Transfer—11 U.S.C. §§ 548(a)(1)(A), 544(b), 550(a)
(Against TGS and Moreno)

79.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

80.    On or about May 13, 2013, GFES transferred interests in property, namely the business opportunity in PowerGen and the value created by GFES through its work on PowerGen, along with physical assets and other tangible property to support the business, to TGS (the "PowerGen Transfer").

81.    GFES undertook the PowerGen Transfer with the intent to hinder, delay or defraud the Debtors' creditors.

82.    Moreno, through MOR DOH, controlled and had an interest in TGS, and Moreno is a person for whose benefit the PowerGen Transfer was made.

83.    The PowerGen Transfer was made to an entity controlled by insiders of GFES.

84.    GFES received no consideration for the transfer of the PowerGen business opportunity.

85.    Alternatively, GFES did not receive reasonably equivalent value or fair consideration in exchange for the PowerGen Transfer.

86.    At the time of the PowerGen Transfer, GFES was insolvent or became insolvent as a result of the transfer at issue.

87.    At the time of the PowerGen Transfer, TGS had reasonable cause to believe that GFES was insolvent.

88.    Consequently, the PowerGen Transfer was fraudulent as to then present and future creditors.

89.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  As of the Petition Date, unsecured creditors with the right to avoid the transfer under state law existed.

90.    The PowerGen Transfer should be set aside pursuant to 11 U.S.C. §§ 548(a)(1)(A), §§ 544(b) and 550(a), and Del. C. § 1301 *et seq.*

91.    TGS and Moreno should be required to return the value they received pursuant to the PowerGen Transfer to the GFES Liquidation Trust.

## SECOND CAUSE OF ACTION
### Constructive Fraudulent Transfer—11 U.S.C. §§ 548(a)(1)(B), 544(b), 550(a)
### (Against TGS and Moreno)

92.     Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

93.     On or about May 13, 2013, GFES transferred interests in property to TGS through the PowerGen Transfer.

94.     Moreno, through MOR DOH, controlled and had an interest in TGS, and Moreno is a person for whose benefit the PowerGen Transfer was made.

95.     GFES received no consideration for the transfer of the PowerGen business opportunity.

96.     Alternatively, GFES did not receive reasonably equivalent value or fair consideration in exchange for making the PowerGen Transfer.

97.     At the time of the PowerGen Transfer, GFES was insolvent or became insolvent as a result of the PowerGen Transfer.

98.     At the time of the PowerGen Transfer, (i) GFES was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with GFES was an unreasonably small capital; and/or (ii) GFES intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

99.     Consequently, the PowerGen Transfer was fraudulent as to then present and future creditors.

100.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  As of the Petition Date, unsecured creditors with the right to avoid the transfer under state law existed.

26

101. The PowerGen Transfer should be set aside pursuant to 11 U.S.C. §§ 548(a)(1)(B), 544(b) and 550(a), and Del. C. § 1301 *et seq.*

102. TGS and Moreno should be required to return the value they received pursuant to the PowerGen Transfer to the GFES Liquidation Trust.

## THIRD CAUSE OF ACTION
### Breach of Fiduciary Duty (Against Moreno)

103. Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

104. Moreno, in his capacity as a director and officer of the Debtors, owed the Debtors duties of care and loyalty.

105. By causing GFES to transfer PowerGen to TGS for no or virtually no consideration, Moreno, who controlled both GFES and TGS and derived improper personal benefits from the transfer, acted in bad faith and in deliberate disregard of his duties to the Debtors, breaching his fiduciary duties of care and loyalty to the Debtors.

106. Moreno's breaches of his duties resulted in damages to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Breach of the Fiduciary Duty of Loyalty—Usurpation of Corporate Opportunity
### (Against Moreno)

107. Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

108. Moreno, in his capacity as a director and officer of the Debtors, owed the Debtors a duty of loyalty.

109. The PowerGen Business opportunity was presented to GFES.

110. As alleged above, (i) GFES or a wholly-owned subsidiary would have been able to undertake the PowerGen Business, (ii) the PowerGen Business was in the line of GFES's

business and was of practical advantage to it and (iii) the PowerGen Business was one in which GFES had an interest or a reasonable expectancy.

111.    Moreno caused GFES not to pursue the PowerGen Business, instead allowing TGS, another entity owned indirectly by Moreno, to pursue and develop the PowerGen Business.

112.    By embracing the PowerGen Business opportunity through TGS, Moreno's self-interest was brought into conflict with that of GFES.

113.    Moreno breached his duty of loyalty to GFES by usurping the PowerGen Business opportunity.

114.    Moreno's breach of the duty of loyalty resulted in damages to the Debtors and their businesses and prospects, in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
#### Unjust Enrichment (Against TGS)

115.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

116.    Pursuant to the PowerGen Transfer, by which PowerGen was transferred from GFES to TGS, TGS was enriched at the expense or impoverishment of GFES.

117.    Because PowerGen was transferred from GFES to TGS, there is a direct relation between the enrichment of TGS and the impoverishment of GFES.

118.    The PowerGen Transfer lacked justification.

119.    Due to the absence of an express contract governing the PowerGen Transfer, there is no remedy provided by law.

120.    It would offend principles of equity and good conscience to permit TGS to retain the benefits of the PowerGen Transfer.

121.    Plaintiff is entitled to recover from TGS an amount equal to any lost profits wrongfully gained by TGS on account of the PowerGen Transfer.

## SIXTH CAUSE OF ACTION
Aiding and Abetting Breach of Fiduciary Duty (Against TGS)

122.    Plaintiff incorporates paragraphs 1 through 78 and 103 through 114 as if fully re-alleged herein.

123.    Moreno, in his capacity as a director and officer of the Debtors, owed the Debtors duties of care and loyalty.

124.    By causing GFES to transfer PowerGen to TGS for no consideration, Moreno, who controlled both GFES and TGS and derived improper personal benefits from the transfer, acted in bad faith and in deliberate disregard of his duties to the Debtors, usurping the PowerGen Business opportunity and breaching his fiduciary duties of care and loyalty to the Debtors.

125.    TGS, knowing that Moreno was breaching his fiduciary duties of care and loyalty to the Debtors, gave substantial assistance or encouragement to Moreno to so act.

126.    Through its conduct, TGS aided and abetted Moreno's breach of fiduciary duty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
Corporate Waste (Against Moreno)

127.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

128.    Moreno, in his capacity as a director and officer of the Debtors, wasted corporate assets by causing GFES to transfer the PowerGen Business to TGS, another entity owned indirectly by Moreno, for no or virtually no consideration.

129.    The PowerGen Transfer served no corporate purpose and was so self-interested and one-sided that no person of ordinary, sound judgment could conclude that GFES received adequate consideration or any consideration in exchange for the PowerGen Transfer.

130.    Moreno's waste of corporate assets resulted in damages to the Debtors and their businesses and prospects, in an amount to be determined at trial.

### EIGHTH CAUSE OF ACTION
Breach of Contract (Against MOR MGH and MMR)

131.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

132.    MOR MGH and MMR entered into the 2012 SPA with GFES.

133.    GFES fully performed its obligations under the 2012 SPA, and all conditions precedent to the performance of MOR MGH and MMR were satisfied.

134.    MOR MGH and MMR breached the 2012 SPA by failing to pay GFES amounts unambiguously due and owing under the 2012 SPA for the first three fiscal quarters of fiscal 2013.

135.    As a result of such breaches, GFES has been damaged in an amount to be determined at trial, but that is in any event no less than $10,793,450.

### NINTH CAUSE OF ACTION
Breach of Contract (Against MOR MGH)

136.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

137.    MOR MGH entered into the 2013 SPA with GFES.

138.    GFES fully performed its obligations under the 2013 SPA, and all conditions precedent to the performance of MOR MGH and MMR were satisfied.

139.    MOR MGH breached the 2013 SPA by failing to pay GFES amounts unambiguously due and owing under the 2013 SPA.

140.    As a result of such breach, GFES has been damaged in an amount to be determined at trial, but that is in any event no less than $10,000,000.

### TENTH CAUSE OF ACTION
Breach of the Fiduciary Duty of Loyalty (Against Moreno)

141.   Plaintiff incorporates paragraphs 1 through 78 and 131 through 140 as if fully re-alleged herein.

142.   Moreno, in his capacity as a director and officer of the Debtors and in his capacity as a controlling shareholder, owed the Debtors a duty of loyalty.

143.   Moreno, who controlled and had interests in the entities on both sides of the Share Purchase Agreements, breached his duty of loyalty to GFES by causing MOR MGH and MMR to breach their respective obligations to GFES under the Share Purchase Agreements.

144.   Moreno failed to act in good faith, with the honest belief that his actions were in the best interest of the corporation, and/or on an informed basis.

145.   By placing his interest above those of GFES, Moreno's actions were in conflict with the interests of GFES.

146.   Moreno's breach of the duty of loyalty resulted in damages to the Debtors and their businesses and prospects, in an amount to be determined at trial.

### ELEVENTH CAUSE OF ACTION
Tortious Interference with Contract (Against Moreno)

147.   Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

148.   The 2012 SPA and 2013 SPA were valid contracts, subject to interference.

149.   Moreno knew about the 2012 SPA and 2013 SPA.

150.   Moreno willfully and intentionally, and without justification, interfered with the 2012 SPA and 2013 SPA, causing the breach of the 2012 SPA and 2013 SPA by preventing or failing to demand performance by MOR MGH and MMR.  In causing the breach, Moreno exceeded the scope of his agency, and he was motivated by his own personal goals and interests and not through a desire to further the best interests of any of the companies on behalf of which he was acting.

31

151.    MMR and MOR MGH breached the 2012 SPA, and MOR MGH breached the 2013 SPA, by failing to perform their respective obligations thereunder.

152.    As a result of such tortious interference, GFES has actually been damaged in an amount to be determined at trial.

### TWELFTH CAUSE OF ACTION
<u>Preferential Transfers (Against Moreno)</u>

153.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

154.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the Moreno Transfers were made.

155.    The Moreno Transfers constituted a transfer of property, or an interest in property, of the Debtors.

156.    At all relevant times, Moreno was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

157.    At all relevant times, Moreno was an "insider" of GFES, as defined by 11 U.S.C. § 101, due to his control of the Debtors.

158.    In the one year prior to the Petition Date, GFES transferred property or an interest in property (over $500,000 in cash) to Moreno.

159.    The Moreno Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Moreno Transfers were made.

160.    The Moreno Transfers were made while the Debtor was insolvent.

161.    As a result of the Moreno Transfers, Moreno received more than he would have received if:  (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Moreno

32

Transfers had not been made; and (iii) Moreno received payments of his debts to the extent provided by the provisions of the Bankruptcy Code.

162.     Moreno had reasonable cause to believe that the Debtors were insolvent.

163.     In accordance with the foregoing, the Moreno Transfers are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, and Del C. § 1301 *et seq*.  Moreno should be required to return the value he received pursuant to the Moreno Transfers to the GFES Liquidation Trust.

### THIRTEENTH CAUSE OF ACTION
Fraudulent Transfer—11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B), 544(b), 550(a), Del C. 1301 *et seq.*
(Against Moreno)

164.     Plaintiff incorporates Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

165.     Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the Moreno Transfers were made.

166.     GFES did not receive reasonably equivalent value or fair consideration in exchange for the Moreno Transfers.

167.     GFES intended to hinder, delay or defraud its creditors by making the Moreno Transfers, to Moreno's benefit, without consideration to GFES.

168.     At the time of the Moreno Transfers, (i) GFES was engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with GFES was an unreasonably small capital; and/or (ii) GFES intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

33

169.   At the time of Moreno Transfers, GFES was insolvent or became insolvent as a result of the obligations incurred or the payments made.

170.   At the time of the Moreno Transfers, Moreno had reasonable cause to believe that GFES was insolvent.

171.   Consequently, the Moreno Transfers were fraudulent as to then present and future creditors.

172.   The Moreno Transfers made to Moreno should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(A), 548(a)(1)(B), and 550(a), and Del. C. § 1301 *et seq.* Moreno should be required to return the value he received pursuant to the Moreno Transfers to the GFES Liquidation Trust.

**FOURTEENTH CAUSE OF ACTION**
Preferential Transfer (Against Dynamic)

173.   Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

174.   The Dynamic Transfers were transfers of property, or an interest in property, of the Debtors.

175.   Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Dynamic Transfers were made.

176.   At all relevant times, Dynamic was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

177.   At all relevant times, Dynamic was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to the common ownership between Dynamic and the Debtors.

178.    The Dynamic Transfers were made by the Debtors, specifically, GFES, to or for the benefit of Dynamic.

179.    The Dynamic Transfers, which totaled approximated $780,221 as set forth in the attached Appendix A, were made on or within one year before the Petition Date.

180.    The Dynamic Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Dynamic Transfers was made.

181.    The Dynamic Transfers were made while the Debtors were insolvent.

182.    As a result of the Transfer, Dynamic received more than it would have received if:  (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Dynamic Transfers had not been made; and (iii) Dynamic received payments of its debts to the extent provided by the provisions of the Bankruptcy Code.

183.    Dynamic had reasonable cause to believe that the Debtors were insolvent.

184.    In accordance with the foregoing, the Dynamic Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b), 547 and 550, and Del C. § 1301 *et seq*. Dynamic should be required to return the value it received pursuant to the Dynamic Transfers to the GFES Liquidation Trust.

## FIFTEENTH CAUSE OF ACTION
Preferential Transfer (Against Frac Rentals and Moreno)

185.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein..

186.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the Frac Rentals Transfers were made.

187.    The Frac Rentals Transfers were transfers of property, or an interest in property, of the Debtors.

35

188.    Moreno, through MOR 2013 Holdings, LLC, controlled and had an interest in Frac Rentals, and Moreno is a person for whose benefit the Frac Rentals Transfers were made.

189.    At all relevant times, Frac Rentals was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

190.    At all relevant times, Frac Rentals was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to the common ownership between Frac Rentals   and the Debtors.

191.    The Frac Rentals Transfers were made by the Debtors, specifically, GFES, to or for the benefit of Frac Rentals.

192.    The Frac Rentals Transfers, which totaled approximated $743,966 as set forth in the attached Appendix A, were made on or within one year before the Petition Date.

193.    The Frac Rentals Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Frac Rentals Transfers were made.

194.    The Frac Rentals Transfers were made while the Debtors were insolvent.

195.    As a result of the Frac Rentals Transfers, Frac Rentals received more than Defendant would have received if:   (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Frac Rentals Transfers had not been made; and (iii) Defendant received payments of its debts to the extent provided by the provisions of the Bankruptcy Code.

196.    Frac Rentals had reasonable cause to believe that the Debtors were insolvent.

197.    In accordance with the foregoing, the Frac Rentals Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b), 547 and 550, and Del C. § 1301 et seq.  Frac Rentals and Moreno should be required to return the value they received pursuant to the Frac Rentals Transfers to the GFES Liquidation Trust.

**SIXTEENTH CAUSE OF ACTION**
<u>Preferential Transfer (Against S3 and Moreno)</u>

36

198.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

199.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the S3 Transfers were made.

200.    The S3 Transfers were a transfer of property, or an interest in property, of the Debtors.

201.    Moreno, through MOR MGH, controlled and had an interest in S3, and Moreno is a person for whose benefit the S3 Transfers were made.

202.    At all relevant times, S3 was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

203.    At all relevant times, S3 was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to the common ownership between S3 and the Debtors.

204.    The S3 Transfers were made by the Debtors, specifically, GFES, to or for the benefit of S3.

205.    The S3 Transfers, which totaled approximated $3,444,411 as set forth in the attached Appendix A, were made on or within one year before the Petition Date.

206.    The S3 Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the S3 Transfers were made.

207.    The S3 Transfers were made while the Debtors were insolvent.

208.    As a result of the Transfer, S3 received more than it would have received if:  (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the S3 Transfers had not

been made; and (iii) S3 received payments of its debts to the extent provided by the provisions of the Bankruptcy Code.

209.    S3 had reasonable cause to believe that the Debtors were insolvent.

210.    In accordance with the foregoing, the S3 Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b), 547 and 550, and Del C. § 1301 *et seq.*  S3 and Moreno should be required to return the value they received pursuant to the S3 Transfers to the GFES Liquidation Trust.

## SEVENTEENTH CAUSE OF ACTION
### Preferential Transfer (Against TGS and Moreno)

211.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

212.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the TGS Transfers were made.

213.    The TGS Transfers were a transfer of property, or an interest in property, of the Debtors.

214.    Moreno, through MOR DOH, controlled and had an interest in TGS, and Moreno is a person for whose benefit the TGS Transfers were made.

215.    At all relevant times, TGS was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

216.    At all relevant times, TGS was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to the common ownership between TGS and the Debtors.

217.    The TGS Transfers were made by the Debtors, specifically, GFES, to or for the benefit of TGS.

218.    The TGS Transfers, which totaled approximated $2,210,884 as set forth in the attached Appendix A, were made on or within one year before the Petition Date.

219.    The TGS Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the TGS Transfers were made.

220.    The TGS Transfers were made while the Debtors were insolvent.

221.    As a result of the Transfer, TGS received more than it would have received if:  (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the TGS Transfers had not been made; and (iii) Defendant received payments of its debts to the extent provided by the provisions of the Bankruptcy Code.

222.    TGS had reasonable cause to believe that the Debtors were insolvent.

223.    In accordance with the foregoing, the TGS Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b), 547 and 550, and Del C. § 1301 *et seq*.  TGS and Moreno should be required to return the value they received pursuant to the TGS Transfers to the GFES Liquidation Trust.

### EIGHTEENTH CAUSE OF ACTION
Preferential Transfer (Against MOR DOH and Moreno)

224.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

225.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the MOR DOH Transfers were made.

226.    The MOR DOH Transfers were transfers of property, or an interest in property, of the Debtors.

227.    Moreno, through Moreno-controlled trusts, controlled and had an interest in MOR DOH, and Moreno is a person for whose benefit the MOR DOH Transfers were made.

39

228.    At all relevant times, MOR DOH was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

229.    At all relevant times, MOR DOH was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to the common ownership between MOR DOH and the Debtors.

230.    The MOR DOH Transfers were made by the Debtors, specifically, GFES, to or for the benefit of MOR DOH.

231.    The MOR DOH Transfers, which totaled approximated $4,614,310 as set forth in the attached Appendix A, were made on or within one year before the Petition Date.

232.    The MOR DOH Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Transfer was made.

233.    The MOR DOH Transfers were made while the Debtors were insolvent.

234.    As a result of the Transfer, MOR DOH received more than it would have received if:  (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the MOR DOH Transfers had not been made; and (iii) MOR DOH received payments of its debts to the extent provided by the provisions of the Bankruptcy Code.

235.    MOR DOH had reasonable cause to believe that the Debtors were insolvent.

236.    In accordance with the foregoing, the MOR DOH Transfers are avoidable pursuant to 11 U.S.C. §§ 547 and 550.  MOR DOH and Moreno should be required to return the value they received pursuant to the MOR DOH Transfers to the GFES Liquidation Trust.

**NINETEENTH CAUSE OF ACTION**
Preferential Transfer – 11 U.S.C. §§ 547(b), 550(a)
(Against Aerodynamic and Moreno)

237.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

238.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor

40

could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the Aerodynamic Transfers were made.

239.    The Aerodynamic Transfers were a transfer of property, or an interest in property, of the Debtors.

240.    Moreno controlled and had an interest in Aerodynamic, and Moreno is a person for whose benefit the Aerodynamic Transfers were made.

241.    At all relevant times, Aerodynamic was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

242.    At all relevant times, Aerodynamic was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to the common ownership between Aerodynamic and the Debtors.

243.    The Aerodynamic Transfers were made by the Debtors, specifically, GFES, to or for the benefit of Aerodynamic.

244.    The Aerodynamic Transfers, which totaled approximated $605,000 as set forth in the attached Appendix A, were made on or within one year before the Petition Date.

245.    The Aerodynamic Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Aerodynamic Transfers were made.

246.    The Aerodynamic Transfers were made while the Debtors were insolvent.

247.    As a result of the Transfer, Aerodynamic received more than it would have received if:  (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Aerodynamic Transfers had not been made; and (iii) Aerodynamic received payments of its debts to the extent provided by the provisions of the Bankruptcy Code.

248.    Aerodynamic had reasonable cause to believe that the Debtors were insolvent.

249.    In accordance with the foregoing, the Aerodynamic Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b) 547 and 550, and Del C. § 1301 *et seq*.  Aerodynamic and Moreno should be required to return the value they received pursuant to the Aerodynamic Transfers to the GFES Liquidation Trust.

## TWENTIETH CAUSE OF ACTION
### Preferential Transfer (Against Casafin and Moreno)

250.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

251.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the Casafin Transfers were made.

252.    The Casafin Transfers were a transfer of property, or an interest in property, of the Debtors.

253.    Moreno controlled and had an interest in Casafin, and Moreno is a person for whose benefit the Casafin Transfers were made.

254.    At all relevant times, Casafin was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

255.    At all relevant times, Casafin was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to the common ownership between Casafin and the Debtors.

256.    The Casafin Transfers were made by the Debtors, specifically, GFES, to or for the benefit of Casafin.

257.    The Casafin Transfers, which totaled approximated $1,391,158 as set forth in the attached Appendix A, were made on or within one year before the Petition Date.

258. The Casafin Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Casafin Transfers were made.

259. The Casafin Transfers were made while the Debtors were insolvent.

260. As a result of the Transfer, Casafin received more than it would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Casafin Transfers had not been made; and (iii) Casafin received payments of its debts to the extent provided by the provisions of the Bankruptcy Code.

261. Casafin had reasonable cause to believe that the Debtors were insolvent.

262. In accordance with the foregoing, the Casafin Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b) 547 and 550, and Del C. § 1301 *et seq*. Casafin and Moreno should be required to return the value they received pursuant to the Casafin Transfers to the GFES Liquidation Trust.

## TWENTY-FIRST CAUSE OF ACTION
### Preferential Transfer (Against Moreno Properties and Moreno)

263. Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

264. Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Moreno Properties Transfers were made.

265. The Moreno Properties Transfers were transfers of property, or an interest in property, of the Debtors.

266. Moreno controlled and had an interest in Moreno Properties, and Moreno is a person for whose benefit the Moreno Properties Transfers were made.

267.   At all relevant times, Moreno Properties was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

268.   At all relevant times, Moreno Properties was an "insider" of the Debtors, as defined by 11 U.S.C. § 101, due to the common ownership between Moreno Properties and the Debtors.

269.   The Moreno Properties Transfers were made by the Debtors, specifically, GFES, to or for the benefit of Moreno Properties.

270.   The Moreno Properties Transfers, which totaled approximated $239,588 as set forth in the attached Appendix A, were made on or within one year before the Petition Date.

271.   The Moreno Properties Transfers were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Transfer was made.

272.   The Moreno Properties Transfers were made while the Debtors were insolvent.

273.   As a result of the Transfer, Moreno Properties received more than it would have received if:  (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Moreno Properties Transfers had not been made; and (iii) Moreno Properties received payments of its debts to the extent provided by the provisions of the Bankruptcy Code.

274.   Moreno Properties had reasonable cause to believe that the Debtors were insolvent.

275.   In accordance with the foregoing, the Moreno Properties Transfers are avoidable pursuant to 11 U.S.C. §§ 544(b), 547 and 550, and Del C. § 1301 *et seq*. Moreno Properties and Moreno should be required to return the value they received pursuant to the Moreno Properties Transfers to the GFES Liquidation Trust.

## TWENTY-SECOND CAUSE OF ACTION
Constructive Fraudulent Transfer—11 U.S.C. §§ 548(a)(1)(B), 544(b), 550(a), Del C. 1301 *et*

<u>seq.</u>
<u>(Against Elle and Moreno)</u>

276.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

277.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law.  The claims of a number of existing unsecured creditors arose before the Alliance Transfers were made.

278.    In the year prior to the Petition Date, GFES through the Alliance Transfers transferred an interest in property, $4.6 million in "prepayments," to Alliance.

279.    Elle controlled and had an interest in Alliance, and Elle is an entity for whose benefit the Alliance Transfers were made.

280.    Moreno, through Elle, controlled and had an interest in Alliance, and Moreno is a person for whose benefit the Alliance Transfers were made.

281.    GFES did not receive reasonably equivalent value or fair consideration in exchange for the obligations it incurred or the payments made to enable the Alliance Transfers.

282.    At the time of the Alliance Transfers, (i) GFES was engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with GFES was an unreasonably small capital; and/or (ii) GFES intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

283.    At the time of the Alliance Transfers, GFES was insolvent or became insolvent as a result of the obligations incurred or the payments made.

284.    Consequently, the Alliance Transfers were fraudulent as to then present and future creditors.

45

285.    The Alliance Transfers should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), 544(b)) and 550(a), and Del. C. § 1301 *et seq.*  Elle and Moreno should be required to return the value they received pursuant to the Alliance Transfers to the GFES Liquidation Trust.

## TWENTY-THIRD CAUSE OF ACTION
### To Preserve Property—11 U.S.C. § 551

286.    Plaintiff incorporates paragraphs 1 through 102, 127 through 130, 153 through 285, as if fully re-alleged herein.

287.    The Defendant Affiliate Transfers, the Moreno Transfers, the Alliance Transfers, and the PowerGen Transfer, each transferred property of the estates of the Debtors.

288.    Therefore, the property transferred through the Defendant Affiliate Transfers, the Moreno Transfers, the Alliance Transfers, and the PowerGen Transfer, or the value thereof, should be preserved for the benefit of the Debtor's estate pursuant to Section 551 of the Bankruptcy Code.

## TWENTY-FOURTH CAUSE OF ACTION
### Subordination of Defendant Claims (Against Moreno and Defendant Moreno Affiliates)

289.    Plaintiff incorporates paragraphs 1 through 288 as if fully re-alleged herein.

290.    11 U.S.C. § 510(c) provides:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

291.    Moreno and the Moreno Affiliates are insiders of the Debtors.

292.    At all relevant times, Moreno (and by extension the Defendant Moreno Affiliates acting at the direction or under the control of or in concert with Moreno) engaged in inequitable conduct toward the Debtors by pilfering the assets of an undercapitalized and insolvent

46

corporation for their own benefit, including the wrongful conduct described throughout this Complaint, which has resulted in injury to the Debtors and their creditors.   Among other wrongful conduct, in breach of his fiduciary duties to the Debtors and their creditors, Moreno improperly placed his own interests (and the interests of the Defendant Moreno Affiliates acting at the direction or under the control of or in concert with Moreno) over the interests of the Debtors and their creditors.  This inequitable conduct has resulted in harm to the Debtors, their creditors and the Debtors' estates in that the Debtors' general unsecured creditors are less likely to recover the full amounts owed to them because of the wrongful conduct of Moreno.

293.    Principles of equitable subordination require that any and all claims, whether or not yet filed of record, of Moreno and the Defendant Moreno Affiliates against the Debtors be equitably subordinated to the allowed general unsecured claims against the Debtors, and such equitable subordination is consistent with the provisions and purposes of the Bankruptcy Code.

294.    Accordingly, the Court should equitably subordinate any and all claims, whether or not yet filed of record, of Moreno and the Defendant Moreno Affiliates against the Debtors to the allowed general unsecured claims against the Debtors pursuant to 11 U.S.C. § 510(c).

**TWENTY-FIFTH CAUSE OF ACTION**
Objection to Defendant Claims (Against Moreno and Defendant Moreno Affiliates)

295.    Plaintiff incorporates paragraphs 1 through 102 and 153 through 285 as if fully re-alleged herein.

296.    Moreno and the Defendant Moreno Affiliates are entities from which property is recoverable under 11 U.S.C. § 550.

297.    Moreno and the Defendant Moreno Affiliates are transferees of the Defendant Affiliate Transfers, the Moreno Transfers, the Alliance Transfers, and the PowerGen Transfer avoidable under 11 U.S.C. §§ 544(b), 547 and 548.

47

298.    Moreno and the Defendant Moreno Affiliates have not repaid the amount of the Defendant Affiliate Transfers, the Moreno Transfers, the Alliance Transfers, and the PowerGen Transfer, or turned over such property to the Debtors, for which Moreno and/or the Defendant Moreno Affiliates are liable under 11 U.S.C. § 550.

299.    Pursuant to 11 U.S.C. § 502(d), any and all Claims of Moreno and the Defendant Moreno Affiliates and/or their assignees, against the Debtors must be disallowed until such time as Moreno and the Defendant Moreno Affiliates pay to Plaintiff an amount equal to the aggregate amount owed with respect to the Defendant Affiliate Transfers, the Moreno Transfers, the Alliance Transfers, and the PowerGen Transfer, plus interest thereon and costs.

300.    Pursuant to 11 U.S.C. § 502(j), any and all Claims of Moreno and the Defendant Moreno Affiliates, and/or their assignees, against the Debtors previously allowed by the Debtors, must be reconsidered and disallowed until such time as Moreno and the Defendant Moreno Affiliates pay to Plaintiff amounts equal to the aggregate amount of the Defendant Affiliate Transfers, the Moreno Transfers, the Alliance Transfers, and the PowerGen Transfer.

### TWENTY-SIXTH CAUSE OF ACTION
#### Objection to Reimbursement Claims (Against Moreno)

301.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

302.    Upon information and belief, Moreno's Reimbursement Claims arise from his co-liability with the Debtors on the claims of a creditor, Shell.

303.    Moreno's liability on Shell's claims has never been established, and Moreno has never made any payment on behalf of Shell's claim.

304.    Shell's claims against the Debtors have been fully satisfied and/or released by the Debtors.

305.    Pursuant to 11 U.S.C. § 502(e), the Reimbursement Claims must be disallowed.

## TWENTY-SEVENTH CAUSE OF ACTION
Objection to Administrative Claim (Against Moreno)

306.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

307.    Moreno states that his Administrative Claim relates to work undertaken by his counsel and financial advisor "to respond to and defend against allegations raised by the Official Committee of Unsecured Creditors . . . in the Committee's contested proceeding to appoint an Examiner, the Committee's subsequent submissions to the Examiner which included threats of suit, and to defend extensive discovery demanded in connection with the Committee's articulated claims against and investigation of Moreno."  Moreno further states that "[t]he Committee's allegations relate to purported breaches of duty, and other acts and/or omissions by Moreno while he was an officer and director of the Debtor."

308.    The Administrative Claim arises from pre-petition conduct and not from post-petition conduct.

309.    The expenses underlying the Administrative Claim were not necessary to the preservation of the Debtors' estates.

310.    The expenses giving rise to the Administrative Claim did not confer a benefit on the Debtors.

311.    Upon information and belief, Moreno failed to exhaust insurance remedies pursuant to Section 5.12 of the Plan.

312.    Pursuant to the Shell Guarantee, Moreno assigned to Shell any and all rights he may have had against GFES in any proceeding under the Bankruptcy Code, including all rights to be paid by GFES.

313.    Shell compromised and settled all claims it had against GFES, including those taken by assignment from Moreno.

314.    The Administrative Claim must be disallowed pursuant to 11 U.S.C. § 503 and because Moreno has no claims to assert against GFES.

## TWENTY-EIGHTH CAUSE OF ACTION
### Objection to Claims (Against Certain Defendant Moreno Affiliates)

315.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

316.    Plaintiff objects to the claims of certain Defendant Moreno Affiliates listed on Appendix B (the "Inconsistent Claims") because such claims are neither supported by nor consistent with the Debtors' books and records.

317.    After reviewing the Debtors' books and records, Plaintiff has determined that the Debtors do not owe the claimed amounts with respect to the Inconsistent Claims.

318.    Failure to disallow the Inconsistent Claims would result in the applicable Defendant Moreno Affiliates receiving an unwarranted recovery against the estates, to the detriment of creditors holding valid claims against the Debtors.

319.    Accordingly, Plaintiff objects to the allowance of each of the Inconsistent Claims included on Appendix B.  The Inconsistent Claims must be disallowed in their entirety.

## TWENTY-NINTH CAUSE OF ACTION
### Objection to Claim (Against MMR)

320.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

321.    Plaintiff objects to the claim of Defendant MMR listed on Appendix C (the "Duplicate Claim") because it is duplicative of a separate proof of claim claim filed by MMR.

322.    Failure to disallow the Duplicate Claim would result in MMR receiving an unwarranted double recovery against the estates, to the detriment of creditors holding valid claims against the Debtors.

323.    Accordingly, Plaintiff objects to the allowance of the Duplicate Claim included on Appendix C.  The Duplicate Claim must be disallowed in its entirety.

## THIRTIETH CAUSE OF ACTION
### Declaratory Judgment (Against Moreno)

324.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

325.    There is an actual controversy between Plaintiff and Moreno as to the enforceability of Moreno's claims against the Debtors, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

326.    Plaintiff is entitled to a judicial declaration that: (i) pursuant to the Shell Guarantee, Moreno assigned to Shell any and all rights he may have had against GFES in any proceeding under the Bankruptcy Code, including all rights to be paid by GFES; (ii) under the Plan, Shell compromised and settled all claims it had against GFES, including those taken by assignment from Moreno; and (iii) Moreno has no claims to assert against GFES, and any claims asserted by Moreno are unenforceable.

## THIRTY-FIRST CAUSE OF ACTION
### Declaratory Judgment (Against Moreno)

327.    Plaintiff incorporates paragraphs 1 through 78 as if fully re-alleged herein.

328.    There is an actual controversy between Plaintiff and Moreno as to the enforceability of Moreno's claims against GFES, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

329.    Plaintiff is entitled to a judicial declaration that: (i) under the Shell Guarantee, Moreno waived, disclaimed and relinquished any and all claims he might have had against GFES arising in connection with the Shell Guarantee; and (ii) to the extent that any of the Moreno claims seek reimbursement, indemnification, contribution or other compensation in connection with the Shell Guarantee, such claims are unenforceable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(i)       On the First Cause of Action, entry of a judgment against TGS by this Court,  (I) finding that the PowerGen Transfer and any related transfers from the Debtor to TGS constituted fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 544(b), (II) avoiding the PowerGen Transfer and any related transfers from the Debtor to TGS pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 544(b), and (III) entering judgment against TGS and Moreno pursuant to 11 U.S.C. § 550.

(ii)       On the Second Cause of Action, entry of a judgment against TGS by this Court, (I) finding that the PowerGen Transfer and any related transfers from the Debtor to TGS constituted fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 544(b), (II) avoiding the PowerGen Transfer and any related transfers from the Debtor to TGS pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 544(b), and (III) entering judgment against TGS and Moreno pursuant to 11 U.S.C. § 550.

(iii)       On the Third Cause of Action, entry of judgment against Moreno by this Court in an amount to be determined at trial.

(iv)       On the Fourth Cause of Action, entry of judgment against Moreno by this Court in an amount to be determined at trial.

(v)       On the Fifth Cause of Action, entry of judgment against TGS by this Court in an amount equal to any lost profits wrongfully gained by TGS on account of the PowerGen Transfer, to be determined at trial.

(vi)       On the Sixth Cause of Action, entry of judgment against TGS by this Court in an amount to be determined at trial.

(vii)       On the Seventh Cause of Action, entry of judgment against Moreno by this Court in an amount to be determined at trial.

(viii)       On the Eighth Cause of Action, entry of judgment against MOR MGH and MMR by this Court in an amount to be determined at trial but that is in any event no less than $10,793,450.

(ix)       On the Ninth Cause of Action, entry of judgment against MOR MGH by this Court in an amount to be determined at trial but that is in any event no less than $10,000,000.

(x)       On the Tenth Cause of Action, entry of judgment against Moreno by this Court in an amount to be determined at trial.

(xi)       On the Eleventh Cause of Action, entry of judgment against Moreno by this Court in an amount to be determined at trial.

(xii)       On the Twelfth Cause of Action, entry of judgment against Moreno by this Court that the Moreno Transfers are avoidable under 11 U.S.C. § 547 in the total aggregate amount of not less than $500,000.

(xiii)     On the Thirteenth Cause of Action, entry of a judgment against Moreno by this Court,  (I) finding that the Moreno Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B) and 544(b), (II) avoiding the Moreno Transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A), 548(a)(1)(B) and 544(b), and (III) entering judgment against Moreno, pursuant to 11 U.S.C. § 550.

(xiv)     On the Fourteenth through Twenty-First Causes of Action, entry of judgment against Moreno and the Defendant Moreno Affiliates by this Court that the Moreno Transfers and the Defendant Affiliate Transfers are avoidable under 11 U.S.C. §§ 544(b), 547, and Del C. § 1301 *et seq.*, in the total aggregate amount of $14,601,434.76, and that the Moreno Transfers and the Defendant Affiliate Transfers, to the extent that they are avoided, be recovered by Plaintiff pursuant to 11 U.S.C. § 550.

(xv)     On the Twenty-Second Cause of Action, entry of a judgment against Elle and Moreno by this Court,  (I) finding that the Alliance Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 544(b), (II) avoiding the Alliance Transfers pursuant to 11 U.S.C. 548(a)(1)(B) and 544(b), and (III) entering judgment against Elle and Moreno, pursuant to 11 U.S.C. § 550.

(xvi)     On the Twenty-Third Cause of Action, entry of a judgment preserving the property transferred through the Defendant Affiliate Transfers, the Moreno Transfers, the Alliance Transfers, and the PowerGen Transfer, or the value thereof, for the benefit of the Debtor's estate pursuant to 11 U.S.C. § 551.

(xvii)     On the Twenty-Fourth Cause of Action, entry of judgment against Moreno and the Defendant Moreno Affiliates equitably subordinating all claims, whether or not yet filed of record, of the named defendants against the Debtors and/or their estates to the allowed general unsecured claims against the Debtors and/or their estates.

(xviii)     On the Twenty-Fifth Cause of Action, entry of judgment against Moreno and the Defendant Moreno Affiliates by this Court:

    a.  Disallowing, in accordance with 11 U.S.C. § 502(d), any Claims held by Moreno, the Defendant Moreno Affiliates and/or their assignees until Moreno and the Defendant Moreno Affiliates satisfy the judgment;

    b.  Disallowing, in accordance with 11 U.S.C. § 502(j), any Claims held by Moreno, the Defendant Moreno Affiliates and/or their assignees until Moreno and the Defendant Moreno Affiliates satisfy the judgment;

    c.  Requiring Moreno and the Defendant Moreno Affiliates to pay forthwith the judgment amount awarded in favor of Plaintiff; and

    d.  Granting Plaintiff such other and further relief as the Court deems just and proper;

(xix)     On the Twenty-Sixth Cause of Action, entry of judgment against Moreno by this Court disallowing, in accordance with 11 U.S.C. § 502(e), the Reimbursement Claims.

(xx)     On the Twenty-Seventh Cause of Action, entry of judgment against Moreno by this Court disallowing the Administrative Claim.

(xxi)     On the Twenty-Eighth Cause of Action, entry of judgment against the applicable Defendant Moreno Affiliates by this Court disallowing the Inconsistent Claims.

(xxii)     On the Twenty-Ninth Cause of Action, entry of judgment against MMR by this Court disallowing the Duplicate Claim.

(xxiii)     On the Thirtieth Cause of Action, enter judgment in favor of Plaintiff and further enter a declaration that:

   a. Moreno assigned all claims against GFES to Shell.

   b. Under the Plan, Shell agreed to compromise and release all such claims, including claims taken by assignment from Moreno.

   c. Claims asserted by Moreno are unenforceable.

(xxiv) On the Thirty-First Cause of Action, enter judgment in favor of Plaintiff and further enter a declaration that:

   a. Under the Shell Guarantee, Moreno waived, disclaimed and relinquished any and all claims he might have against GFES arising in connection with the Shell Guarantee.

   b. Claims asserted by Moreno seeking recovery in connection with the Shell Guarantee are unenforceable.

Dated:  Wilmington, Delaware
        April 6, 2015

WOMBLE CARLYLE SANDRIDGE
& RICE, LLP

/s/  Steven K. Kortanek
Steven K. Kortanek, Esquire (Del. Bar No. 3106)
222 Delaware Avenue, Suite 1501
Wilmington, Delaware 19801
Telephone: 302-252-4320
Facsimile: 302-252-4330
Email: skortanek@wcsr.com

BROWN RUDNICK LLP

Robert J. Stark (admitted *pro hac vice*)
Marek P. Krzyzowski (admitted *pro hac vice*)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

Joel S. Miliband (admitted *pro hac vice*)
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone:  (949) 752-7100
Facsimile:  (949) 252-1514

*Counsel for Alan Halperin, as Liquidation Trustee*
*of the GFES Liquidation Trust*

Appendix A:
Further Details Regarding Defendant Affiliate Transfers and Alliance Transfers

| Transferee | Debtor | Contract Date | Invoice Date(s) | Nature of Debt | Amount of Debt | Transfer Date(s) |
|---|---|---|---|---|---|---|
| Aerodynamic | GFES | Jun. 1, 2011 | 9/1/2012<br>10/1/2012<br>11/1/2012<br>12/3/2012<br>1/2/2013<br>2/1/2013<br>3/1/2013<br>4/1/2013<br>5/1/2013<br>6/3/2013<br>7/1/2013 | "Dry" lease agreement for use of a Learjet 40 aircraft (FAA Tail # N40EL) | $55,000<br>$55,000<br>$55,000<br>$55,000<br>$55,000<br>$55,000<br>$55,000<br>$55,000<br>$55,000<br>$55,000<br>$55,000<br><br>TOTAL:<br>$605,000.00 | 11/8/2012<br>12/10/2012<br>12/10/2012<br>1/4/2013<br>1/22/2013<br>4/8/2013<br>5/21/2013<br>5/31/2013<br>8/2/2013<br>8/29/2013<br>10/2/2013 |
| Casafin | GFES | Jun. 1, 2011 | 9/13/2012<br>10/26/2012<br>12/3/2012<br>12/20/2012<br>1/10/2013<br>4/11/2013<br>4/11/2013<br>4/11/2013<br>4/11/2013<br>4/11/2013<br>6/4/2013<br>6/4/2013<br>6/4/2013<br>6/4/2013<br>6/4/2013<br>7/18/2013 | Lease of a Bombardier Challenger aircraft (FAA Tail #N300GM) | $248,922<br>$67,410<br>$242,941.50<br><br>$194,976<br>$18,510.75<br>$34,098.75<br>$42,867<br>$125,678.26<br>$35,073.01<br><br>$19,417.61<br>$146,204.92<br>$55,000<br>$160,058.40<br><br>TOTAL:<br>$1,391,158.00 | 11/8/2012<br>12/10/2012<br>1/4/2013<br><br>1/22/2013<br>4/30/2013<br>5/14/2013<br>5/21/2013<br>5/31/2013<br>6/13/2013<br><br>6/17/2013<br>7/31/2013<br>8/20/2013<br>8/29/2013 |
| Dynamic | GFES | Apr. 21, 2011 | 5/3/2012<br>5/17/2012<br>5/31/2012<br>6/1/2012<br>6/5/2012<br>6/11/2012<br>6/25/2012<br>7/9/2012 | Dynamic's services to provide material and labor for producing frack unit "skids" | $780,221.00 | 12/13/2012 |

| | | | 7/10/2012 7/11/2012 7/19/2012 8/2/2012 8/7/2012 8/22/2012 9/6/2012 10/8/2012 11/2/2012 4/17/2013 | | | |
|---|---|---|---|---|---|---|
| Frac Rentals | GFES | Jul. 10, 2012 | 11/19/2012 11/30/2012 11/30/2012 12/31/2012 12/31/2012 1/31/2013 4/5/2013 4/5/2013 4/5/2013 4/5/2013 4/5/2013 4/5/2013 5/3/2013 | Safety equipment rentals pursuant to a MSA | $150,000 $49,483.11 $75,000 $173,996.66 $15,486.41 $40,000 $30,000 $70,000 $70,000 $70,000 TOTAL: $743,966.00 | 3/25/2013 5/16/2013 5/28/2013 6/11/2013 6/17/2013 8/16/2013 8/20/2013 9/10/2013 10/2/2013 10/22/2013 |
| MOR DOH | GFES | Nov. 1, 2012 | 11/1/2012 | Sale/lease back transaction where GFES agreed to sell certain fracking equipment to Frac Rentals | $4,614,310.00 | 11/1/2012 |
| Moreno Properties | GFES | Invoiced expenses for maintenance on the Learjet on a rolling basis throughout 2012 and 2013 | 9/12/2012 10/11/2012 11/13/2012 12/6/2012 | Maintenance services related to the Aerodynamic Learjet | $146,400.33 $85,060.73 $8,127.29 TOTAL: $239,588.00 | 11/8/2012 12/7/2012 6/17/2013 |
| S3 | GFES | Charged on a rolling basis from Jan.– Nov. 2013 | 2/7/2013 2/8/2013 2/28/2013 2/28/2013 2/28/2013 3/1/2013 | Refined fracking sand | $69,411 $140,000 $350,000 $350,000 $350,000 | 2/7/2013 2/8/2013 2/13/2013 2/21/2013 3/7/2013 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 3/4/2013 | | | |
| | | | 3/5/2013 | | | |
| | | | 3/7/2013 | | | |
| | | | 3/7/2013 | | $350,000 | 3/26/2013 |
| | | | 3/22/2013 | | | |
| | | | 3/22/213 | | $250,000 | 4/3/2013 |
| | | | 3/31/2013 | | | |
| | | | 3/31/2013 | | $300,000 | 4/15/2013 |
| | | | 4/3/2013 | | | |
| | | | 4/8/2013 | | | |
| | | | 4/8/2013 | | $30,000 | 4/24/2013 |
| | | | 4/9/2013 | | | |
| | | | 4/9/2013 | | $40,000 | 4/25/2013 |
| | | | 4/9/2013 | | $100,000 | 5/9/2013 |
| | | | 4/12/2013 | | | |
| | | | 4/12/2013 | | $330,000 | 5/14/2013 |
| | | | 4/17/2013 | | | |
| | | | 4/18/2013 | | | |
| | | | 4/18/2013 | | $250,000 | 5/20/2013 |
| | | | 4/19/2013 | | | |
| | | | 4/24/2013 | | | |
| | | | 4/30/2013 | | | |
| | | | 4/30/2013 | | $25,000 | 5/31/2013 |
| | | | 5/2/2013 | | $335,000 | 6/7/2013 |
| | | | 5/27/2013 | | | |
| | | | 5/28/2013 | | | |
| | | | 5/30/2013 | | | |
| | | | 5/30/2013 | | $175,000 | 6/20/2013 |
| | | | 5/31/2013 | | | |
| | | | | | TOTAL: $3,444,411.00 | |
| TGS | GFES | Jun. 21, 2013 | 9/11/2013 | Agreement for the Manufacture and Sale of Turbine Power Generators | $2,210,883.76 | 9/11/2013 |
| Alliance* | GFES | Jan. 23, 2012 | 1/23/2012 | Sand Mining and Refining Agreement | $4,000,000 | 1/23/2012 |
| | | | 1/19/2012 | | $232,250 | 3/1/2012 |
| | | | 5/9/2012 | | $100,000 | 5/9/2012 |
| | | | 4/16/2012 | | $14,610 | 5/11/2012 |
| | | | 1/10/2012 | | $149,128.32 | 8/10/2012 |
| | | | 8/17/2012 | | $500,000 | 8/17/2012 |
| | | | | | TOTAL: $4,995,988.00 | |

* Alliance is a non-party, and the Alliance Transfers are in addition to the Defendant Affiliate Transfers

Appendix B:
Further Detail Regarding Inconsistent Claims Made by Certain Defendant Moreno Affiliates

| Claim # | Creditor Name | Claim Amount | Notes |
|---|---|---|---|
| 400 | Casafin II, LLC | $436,951.97 | Inconsistent with Debtors' records |
| 235 | LQT Industries, LLC K/A Dynamic Energy Services International LLC | $21,068.19 | Inconsistent with Debtors' records |

Appendix C:
Further Detail Regarding Duplicate Claim Made by Defendant MMR

| Claim # | Creditor Name | Claim Amount | Notes |
|---------|---------------|--------------|-------|
| 451 | Moody Moreno & Rucks, L.L.C. | $23,523,507.00 | Duplicative of claim # 328 |

.