## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GREEN FIELD ENERGY SERVICES, INC., *et al.*, | Case No. 13-12783 (KG) |
| Debtors. | (Jointly Administered) |
| ALAN HALPERIN, AS TRUSTEE OF THE GFES LIQUIDATION TRUST, | |
| Plaintiff, | Adv. Pro. No. 15-50262 (KG) |
| vs. | |
| MICHEL B. MORENO, MOR MGH HOLDINGS, LLC, MOR DOH HOLDINGS, LLC, MOODY, MORENO AND RUCKS, LLC, SHALE SUPPORT SERVICES, LLC, DYNAMIC GROUP HOLDINGS, LLC, FRAC RENTALS, LLC, TURBINE GENERATION SERVICES, LLC, AERODYNAMIC, LLC, CASAFIN II, LLC, MORENO PROPERTIES, LLC, ELLE INVESTMENTS, LLC, LQT INDUSTRIES, LLC K/A DYNAMIC ENERGY SERVICES INTERNATIONAL LLC | |
| Defendants. | |

**OPPOSITION OF ALAN HALPERIN, AS TRUSTEE OF THE GFES LIQUIDATION TRUST, TO MOTION TO DISMISS FILED BY MICHEL B. MORENO, MOR MGH HOLDINGS, LLC, MOR DOH HOLDINGS, LLC, SHALE SUPPORT SERVICES, LLC, FRAC RENTALS, LLC, TURBINE GENERATION SERVICES, LLC, AERODYNAMIC, LLC, CASAFIN II, LLC, MORENO PROPERTIES, LLC, AND ELLE INVESTMENTS, LLC**

Dated: July 10, 2015

**WOMBLE CARLYLE SANDRIDGE**
    **& RICE, LLP**
Steven K. Kortanek (Del. Bar No. 3106)
Thomas M. Horan (Del. Bar No. 4641)
Morgan L. Patterson (Del. Bar No. 5388)
222 Delaware Avenue, Suite 1501
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: skortanek@wcsr.com
E-mail: thoran@wcsr.com
E-mail: mpatterson@wcsr.com

**BROWN RUDNICK LLP**

Robert J. Stark (admitted *pro hac vice*)
Marek P. Krzyzowski (admitted *pro hac vice*)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

Joel S. Miliband (admitted *pro hac vice*)
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone:  (949) 752-7100
Facsimile:  (949) 252-1514

*Counsel for Alan Halperin, as Trustee of the GFES Liquidation Trust*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iv

PRELIMINARY STATEMENT .................................................................................... 1

ALLEGATIONS OF THE COMPLAINT........................................................................ 5

I.      Moreno Acquires the Debtors and Bets Big on Fracking ................................. 5

II.     The Debtors' Fracking Business Fails to Take Off .......................................... 6

III.    PowerGen:  Moreno Transfers a $200 Million Business Away From GFES for No Consideration ............................................................................................... 7

IV.     Breach of The Share Purchase Agreements...................................................... 11

V.      Moreno's Affiliates Absorb Millions as the Debtors Veer Towards Collapse ................... 12

VI.     The Debtors' Final Collapse .......................................................................... 13

APPLICABLE LEGAL STANDARD .......................................................................... 14

ARGUMENT ............................................................................................................... 15

I.      The PowerGen Fraudulent Transfer Counts Are Adequately Pled.................... 16

        A.      Intentional Fraudulent Transfer (Count 1) ............................................ 16

        B.      Constructive Fraudulent Intent (Count 2) is Adequately Pled................. 24

II.     The PowerGen Fiduciary Duty Counts are Adequately Pled. ........................... 30

        A.      The Board Lacked Independence.......................................................... 31

        B.      Usurpation (Count 4) is Adequately Pled. ............................................ 34

        C.      Breach of Duty (Count 3) is Adequately Pled. ..................................... 36

        D.      Aiding and Abetting (Count 6) is Adequately Pled. .............................. 37

        E.      Corporate Waste (Count 7) is Adequately Pled..................................... 39

III.    Unjust Enrichment (Count 5) is Adequately Pled............................................ 41

IV.     The Contract Counts are Adequately Pled...................................................... 43

        A.      Breach of Contract (Counts 8 and 9) ................................................... 43

B.   Breach of Duty of Loyalty (Count 10) ...................................................................... 44

C.   Tortious Interference (Count 11) .............................................................................. 45

V.  The Affiliate Transfer Counts are Adequately Pled. .......................................................... 46

A.   The Preference Defendants Are Statutory Insiders ................................................... 46

B.   Counts 12 and 15 Through 21 (Preference Claims) ................................................. 47

C.   Defendants' Claim-Specific Preference Arguments Are Meritless. ......................... 50

    1.   Counts 16 (S3 Transfers) and 17 (TGS Transfers) ...................................... 50

    2.   Count 12 (Moreno Transfers) ....................................................................... 51

    3.   Count 18 (MOR DOH Transfers) ................................................................ 52

    4.   Counts 19 (Aerodynamic Transfers), 20 (Casafin Transfers) and 21 (Moreno Properties Transfers) ................................................................... 53

D.   Count 22 (Alliance Sand) is Adequately Pled. ........................................................ 54

E.   Count 13 (Moreno Transfers) is Adequately Pled. .................................................. 56

VI.  The Preservation Count is Adequately Pled. ..................................................................... 58

VII.  The Trustee Adequately Alleges Claims Seeking Subordination and Disallowance. ..................................................................................................................... 58

A.   Equitable Subordination (Count 24) ........................................................................ 59

B.   Inconsistent Claim of Casafin (Count 28) ............................................................... 62

C.   Administrative Claim of Moreno (Count 27) .......................................................... 63

D.   Reimbursement and Declaratory Judgment (Counts 26, 30, and 31) ...................... 64

VIII.  In the Alternative, Leave to Re-Plead Should be Granted. ................................................ 69

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Abry Partners V, L.P. v. F & W Acquis. LLC,
    891 A. 2d 1032 (Del. Ch. 2006)......................................................................46

Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia
    Commc'ns Corp.),
    365 B.R. 24 (Bankr. S.D.N.Y. 2007)............................................................60

Aronson v. Lewis,
    473 A.2d 805 (Del. 1984) ..............................................................................31

Arrow Oil & Gas v. SemCrude L.P. (In re SemCrude L.P.),
    407 B.R.112 (Bankr. D. Del. 2009) ..............................................................40

Ashall Homes, Ltd. v. ROK Enter. Grp. Inc.,
    992 A.2d 1239 (Del. Ch. 2010)......................................................................46

Bechtel v. Robinson,
    886 F.2d 644 (3d Cir. 1989)...........................................................................69

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007).................................................................................14, 17

Blasband v. Rales,
    971 F.2d 1034 (3d Cir. 1992).........................................................................31

Borden v. Sinsky,
    530 F.2d 478 (3d Cir. 1976)......................................................................18, 19

Borough of Moosic v. Darwin Nat'l. Assurance Co.,
    556 F. App'x 92 (3d Cir. 2014) .....................................................................14

Broz v. Cellular Info. Sys., Inc.,
    673 A.2d 148 (Del. 1996) ..............................................................................34

Buckley v. Merrill Lynch & Co. (In re DVI, Inc.),
    Case No. 03-12656, 2008 Bankr. LEXIS 2338 (Bankr. D. Del. Sept.
    16, 2008) ........................................................................................................53

Canal Corp. v. Finnman (In re Johnson),
    960 F.2d 396 (4th Cir. 1992) .........................................................................65

Cantor Fitzgerald, L.P. v. Cantor,
    724 A.2d 571 (Del. Ch. 1998)........................................................................37

Carlson v. Hallinan,
    925 A.2d 506 (Del. Ch. 2006) opinion clarified, No. CIV.A.19466,
    2006 WL 1510759 (Del. Ch. May 22, 2006) .................................................38

Charys Liquidating Trust v. McMahan Sec. Co., L.P (In re Charys
    Holding Co.),
    443 B.R. 628 (Bankr. D. Del. 2010) ............................................29, 48, 56

Dweck v. Nasser,
    C.A. No. 1353-VCL, 2012 WL 161590 (Del. Ch. Jan. 18, 2012) ..............35

Enzo Life Sciences, Inc. v. Adipogen Corp.,
    No. 1:11-CV-00088-RGA, 2015 WL 1137823 (D. Del. Mar. 12, 2015) ...................40

EPLG I, LLC. v. Citibank N.A. (In re Qimonda Richmond, LLC),
    467 B.R. 318 (Bankr. D. Del. 2012) ............................................................29

Family Golf Ctrs., Inc. v. Acushnet Co. and Fortune Brands, Inc. (In re
    Randall's Island Family Golf Ctrs., Inc.),
    290 B.R. 55 (Bankr. S.D.N.Y. 2003) ...........................................................52

Fliegler v. Lawrence,
    361 A.2d 218 (Del. 1976) .....................................................................18, 35

Foman v. Davis,
    371 U.S. 178 (1962) ......................................................................................69

Forman v. Deutsch Atkins, P.C. (In re Russ Cos.),
    Case No. 11-22471 (DHS), 2013 Bankr. LEXIS 3229 (Bankr. D.N.J.
    Aug. 5, 2013) .................................................................................................53

Forman v. HBK Master Fund L.P. (In re Glencoe Acquisition Inc.),
    No. 12–12071(KG), 2015 WL 3777972 (Bankr. D. Del. June 16, 2015)............ passim

Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus., Inc.),
    No. AP 14-50377 (MFW), 2015 WL 3827003 (Bankr. D. Del. June 19,
    2015) .............................................................................................................20

Frontier Ins. Co. v. Westport Ins. Corp. (In re Black, Davis & Shue
    Agency, Inc.),
    460 B.R. 407 (Bankr. M.D. Pa. 2011) ........................................................59

FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC),
    Case No. 10-10799 (KJC), 2013 Bankr. LEXIS 3404 (Bankr. D. Del.
    Aug. 19, 2013) ..............................................................................................25

Gaddis v. Allison,
    234 B.R. 805 (D. Kan. 1999) .......................................................................57

iv

GE Oil and Gas, Inc. v. TGS, LLC,
  No. 14-00760 (W. D. La.), Docket No. 202 ................................................................2

Gentile v. Rossette,
  C.A. No. 20213-VCN, 2010 Del. Ch. LEXIS 123 (May 28, 2010)............................33

Golden v. Cook,
  293 F. Supp. 2d 546 (W.D. Pa. 2003) ........................................................................48

Grunstein v. Silva,
  C.A. No. 3932-VCN, 2009 Del. Ch. LEXIS 206 (Del. Ch. Dec. 8,
  2009) ..............................................................................................................................45

Guth v. Loft,
  5 A.2d 503 (Del. Ch. 1939)................................................................................18, 35

Halpert v. Zhang,
  966 F. Supp. 2d 406 (D. Del. 2013)............................................................................42

Hildebrand v. Allegheny Cnty.,
  757 F.3d 99 (3d Cir. 2014)..........................................................................................44

Hoag v. Chancellor, Inc.,
  677 N.Y.S.2d 531 (App. Div. 1998) ............................................................................46

Howard Hess Dental Laboratories. Inc. v. Densply Intern. Inc.,
  602 F.3d 237 (3d Cir. 2010)........................................................................................14

In re Adams Golf, Inc. Sec. Litig.,
  381 F.3d 267 (3d Cir. 2004)........................................................................................53

In re Am. Bus. Fin. Servs.,
  375 B.R. ........................................................................................................................37

In re Am. Bus. Fin. Servs., Inc.,
  384 B.R. 66 (Bankr. D. Del. 2008) .............................................................................21

In re Amatex Corp.,
  110 B.R. 168 (Bankr. E.D. Pa. 1990) .........................................................................68

In re AstroPower Liquidating Trust,
  335 B.R. 309 (Bankr. D. Del. 2005) ...........................................................................50

In re Autobacs Strauss, Inc.,
  473 B.R. 535 (Bankr. D. Del. 2012) ...............................................................26, 60, 61

In re Baldwin-United Corp.,
  55 B.R. 885 (Bankr. S.D. Ohio 1985)..........................................................................68

In re Behr Contracting, Inc.,
    79 B.R. 84 (Bankr. S.D. Fla. 1987)..............................................................................50

In re Brooke Corp.,
    506 B.R. 560 (Bankr. D. Kan. 2014) ...........................................................................47

In re Buckhead Am. Corp.,
    178 B.R. 956 (D. Del. 1994) ........................................................................................41

In re Catholic Diocese of Wilmington, Inc.,
    437 B.R. 488 (Bankr. D. Del. 2010) ............................................................................19

In re Century Glove Inc.,
    73 B.R. 528 (Bankr. D. Del. 1987) ..............................................................................19

In re Chateaugay Corp.,
    116 B.R. 887 (Bankr. S.D.N.Y. 1990) .........................................................................67

In re CM Holdings, Inc.,
    264 B.R. 141 (Bankr. D. Del. 2000) .....................................................................51, 64

In re Direct Response Media, Inc.,
    466 B.R. 626 (Bankr. D. Del. 2012) ............................................................................41

In re eBay, Inc. S'holders Litig.,
    No. C.A. 19988-NC, 2004 WL 253521 (Del. Ch. Jan. 23, 2004)................................18

In re Friendship Dev. Ctr., Inc.,
    164 B.R. 625 (Bankr. D. Minn. 1992) .........................................................................68

In re Garden Ridge Corp.,
    338 B.R. 627 (Bankr. D. Del. 2006) ............................................................................39

In re Gen. Office Furniture Wholesalers, Inc.,
    37 B.R. 180 (Bankr. E.D. Va. 1984)............................................................................51

In re Global Link Telecom Corp.,
    327 B.R. 711 (Bankr. D. Del. 2005) ............................................................................25

In re Grosso,
    512 B.R. 768 (Bankr. D. Del. 2014) ............................................................................14

In re Hayes Lemmerz Int'l., Inc.,
    329 B.R. 136 (Bankr. D. Del. 2005) (Bankr. D. Del. 2005) .......................................50

In re Level III Trading Partners, L.P.,
    No. 13-12120, 2015 WL 475268 (Bankr. E.D. La. Feb. 3, 2015) ...............................66

In re Longview Aluminum, L.L.C.,
    657 F.3d 507 (7th Cir. 2011) ......................................................................47

In re Madoff Inv. Secs. LLC,
    458 B.R. 87 (Bankr. S.D.N.Y. 2011).............................................................57

In re Mall At One Assocs., L.P.,
    185 B.R. 1009 (Bankr. E.D. Pa. 1995) .........................................................63

In re MAXXAM, Inc.,
    659 A.2d 760 (Del. Ch. 1995)......................................................................32

In re McCook Metals, L.L.C.,
    319 B.R. 570 (Bankr. N.D. Ill. 2005) ...........................................................49

In re Mid-Am. Waste Sys., Inc.,
    284 B.R. 53 (Bankr. D. Del. 2002) ...........................................60, 61, 62, 64

In re Midway Games Inc.,
    428 B.R. 303 (Bankr. D. Del. 2010) (Gross, J.)............................................25

In re Mobilactive Media, LLC,
    Ca. No. 5725-VCP, 2013 WL 297950 (Del. Ch. Jan. 25, 2013) .................18

In re Morris Commc'ns NC, Inc.,
    914 F.2d 458 (4th Cir. 1990) (4th Cir. 1990) ..............................................55

In re Morse Tool, Inc.,
    148 B.R. 97 (Bankr. D. Mass. 1992) ...........................................................21

In re Musicland Holding Corp.,
    398 B.R. 761 (Bankr. S.D.N.Y. 2008).........................................................24

In re New Century TRS Holdings, Inc.,
    446 B.R. 656 (Bankr. D. Del. 2011) ............................................................63

In re Opus East.LLC,
    528 B.R. 30 (Bankr. D. Del. 2015) .......................................................47, 51

In re Pers. & Bus. Ins. Agency,
    334 F.3d 239 (3d Cir. 2003).........................................................................19

In re Petters Co., Inc.,
    495 B.R. 887 (Bankr. D. Minn. 2013) .........................................................56

In re Pillowtex Corp.,
    427 B.R. 301 (Bankr. D. Del. 2010) ............................................................25

In re Pitt Penn Holding Co.,
    484 B.R. 25 (Bankr. D. Del. 2012) ............................................................38

In re Primedia Inc. Derivative Litig.,
    910 A.2d 248 (Del. Ch. 2006)...............................................................31, 32

In re Residential Capital, LLC,
    524 B.R. 563 (Bankr. S.D.N.Y. 2015) .......................................................44

In re Ritz Camera & Image, L.L.C.,
    2014 WL 432192 (Bankr. D. Del. Feb. 4, 2014) (Gross, J.)........................25

In re RML, Inc.,
    92 F.2d 139 (3d Cir. 1996)..........................................................................55

In re Rutledge,
    510 B.R. 491 (Bankr. M.D.N.C. 2014)........................................................59

In re S&Y Enters., LLC,
    480 B.R. 452 (Bankr. E.D.N.Y. 2012).........................................................64

In re Sentinel Mgmt. Grp.,
    728 F.3d 660 (7th Cir. 2013) ......................................................................21

In re Shelter Enters., Inc.,
    98 B.R. 224 (Bankr. W.D. Pa. 1989), amended by 99 B.R. 668 (Bankr.
    W.D. Pa. 1989).............................................................................................66

In re Slatkin,
    243 F. App'x 255 (9th Cir. 2007) ...............................................................49

In re Student Loan Corp. Derivative Litig.,
    No. C.A. 17799, 2002 WL 75479 (Del. Ch. Jan. 8, 2002) .........................32

In re Touch Am. Holdings, Inc.,
    409 B.R. 712 (Bankr. D. Del. 2009) ................................................67, 68, 69

In re Tower Air, Inc.,
    416 F.3d 229 (3d Cir. 2005)..........................................................41, 53, 54

In re Trim-Lean Meat Prods., Inc.,
    4 B.R. 243 (Bankr. D. Del. 1980) .........................................................19, 36

In re Uni-Marts, LLC,
    404 B.R. 767 (Bankr. D. Del. 2009) .....................................................14, 16

In re USDigital, Inc.,
    443 B.R. 22 (Bankr. D. Del. 2011) .......................................................17, 41

In re Walt Disney Co. Derivative Litig.,
731 A.2d 342 (Del. Ch. 1998), rev'd on other grounds, Brehm v.
Eisner, 746 A.2d 244 (Del. 2000) ...............................................................39

In re Walt Disney Co. Derivative Litig.,
825 A.2d 275 (Del. Ch. 2003)......................................................................33

In re Worcester Quality Foods, Inc.,
152 B.R. 394 (Bankr. D. Mass. 1993) .........................................................50

In re Worldwide Direct, Inc.,
334 B.R. 112 (Bankr. D. Del. 2005) .............................................................64

IT Grp., Inc. v. Anderson Equip. Co. (In re IT Grp., Inc.),
332 B.R. 673 (Bankr. D. Del. 2005) .............................................................54

Jackson v. Mishkin (In re Adler Clearing Corp.),
263 B.R. 406 (Bankr. S.D.N.Y. 2001) .........................................................21

Kaymark v. Bank of Am., N.A.,
783 F.3d 168 (3d Cir. 2015)..........................................................................14

Kost v. Kozakiewicz,
1 F.3d 176 (3d Cir. 1993)..............................................................................15

Kotoshirodo v. Zapara (In re Lull),
Bankr. No. 06-00898, 2009 WL 3853210 (Bankr. D. Haw. Nov. 17,
2009) .............................................................................................................47

L&L Broad. LLC v. Triad Broad. Co.,
C.A. No. N13C-10-028 WCC, 2014 WL 1724769 (Del. Super. Ct.
Apr. 8, 2014) ................................................................................................43

Lebron v. Mechem Fin. Inc.,
27 F.3d 937 (3d Cir. 1994).............................................................................64

Linnemann v. Post (In re Mission Bay Ski & Bike, Inc.),
398 B.R. 250 (Bankr. N.D. Ill. 2008) ..........................................................65

Mach. Rental, Inc. v. Herpel (In re Multiponics, Inc.),
622 F.2d 709 (5th Cir. 1980) .......................................................................62

McCullough v. Garland (In re Jackson),
90 B.R. 793 (Bankr. D.S.C. 1988) ...............................................................54

McDermott Inc. v. Lewis,
531 A.2d 206 (Del. 1987) .............................................................................40

McMullin v. Beran,
    765 A.2d 910 (Del. 2000) ..........................................................................33

Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings,
    LLC),
    426 B.R. 488 (Bankr. D. Del. 2010) (Gross, J.).........................................20

Microsoft Corp. v. Amphus, Inc.,
    C.A. No. CV 8092-VCP, 2013 WL 5899003 (Del. Ch. Oct. 31, 2013) ..........37, 38, 39

Miller v. McCown DeLeeuw & Co. (In re Brown Schools),
    368 B.R. 394 (Bankr. D. Del. 2007) ..........................................................53

Molina Info. Sys., LLC v. Unisys Corp.,
    No. CV 12-1022-RGA, 2014 WL 4365278 (D. Del. Sept. 2, 2014) ..........................44

Nelson v. Fleet Nat. Bank,
    949 F. Supp. 254 (D. Del. 1996)................................................................46

Nemec v. Shrader,
    991 A.2d 1120 (Del. 2010) ......................................................................41

Nymex Shareholder Litig. v. New York Mercantile Exch., Inc.,
    C.A. No. 3621-VCN, 2009 Del. Ch. LEXIS 176 (Del. Ch. Sep. 30,
    2009) .................................................................................................39

Official Comm. of Unsecured Creditors of Integrated Health Services, Inc.
    v. Elkin,
    No. Civ. A. 20228-NC., 2004 WL 1949290 (Del. Ch. Aug. 24, 2004)......................41

Official Comm. of Unsecured Creditors of the IT Grp. v. Brandywine
    Apartments (In re IT Group, Inc.),
    313 B.R. 370 (Bankr. D. Del. 2004) ..........................................................52

Official Comm. of Unsecured Creditors v. Kittelson & Assoc. (In re IT
    Grp., Inc.),
    Adv. Pro. No., A 04-50217, 2005 Bankr. LEXIS 2296 (Bankr. D. Del.
    Nov. 17, 2005) ......................................................................................54

Official Committee of Unsecured Creditors of Fedders N. Am., Inc. v.
    Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),
    405 B.R. 527 (Bankr. D. Del. 2009) ............................................... *passim*

OHC Liquidation Trust v. Am. Bankers Ins. Co. (In re Oakwood Homes
    Corp.),
    2005 Bankr. LEXIS 429 (Bankr. D. Del. Mar. 18, 2005)...........................58

OHC Liquidation Trust v. Discover Re (In re Oakwood Homes Corp.),
    342 B.R. 59 (Bankr. D. Del. 2006) ......................................................................18, 29

Orman v. Cullman,
    794 A.2d 5 (Del. Ch. 2002).........................................................................................32

Parker v. Kolath (In re Fremont Hospitality Grp., LLC),
    Nos. 13-31005, 13-3127, 2014 WL 4796668 (Bankr. N.D. Ohio Sept.
    26, 2014) ................................................................................................................65, 67

Peltz v. Hatten,
    279 B.R. 710 (Bankr. D. Del. 2002) ..........................................................................55

Personnel Adm'r of Massachusetts v. Feeney,
    442 U.S. 256 (1979)...................................................................................................21

Phillips v. Cnty of Allegheny,
    515 F.3d 224 (3d Cir. 2008).................................................................................14, 15

Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.),
    107 B.R. 698 (B.A.P. 9th Cir. 1988)..........................................................................54

Ragnar Benson, Inc. v. Kassab,
    325 F.2d 591 (3d Cir. 1963).......................................................................................42

Rajala v. Gardner, No. 09-2482-EFM,
    2012 WL 1189773 (D. Kan. Apr. 9, 2012), aff'd, 709 F.3d 1031 (10th
    Cir. 2013) ...................................................................................................................19

Rapistan Corp. v. Michaels,
    511 N.W.2d 918 (Mich. 1994)...................................................................................36

Ritchie Capital Mgmt., L.L.C. v. Stoebner,
    No. 12-3038 (SRN), 2014 WL 1386724 (D. Minn. Jan. 6, 2014)
    (Minnesota UFTA)....................................................................................................21

Roth v. Jennings,
    489 F.3d 499 (2d Cir. 2007)......................................................................................14

S.E.C. v. Haligiannis,
    608 F. Supp. 2d 444 (S.D.N.Y. 2009).......................................................................21

Santiago v. Warminster Tp.,
    629 F.3d 121 (3d Cir. 2010)......................................................................................32

Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns),
    554 F.3d 382 (3d Cir. 2009)................................................................................60, 62

Searle & Co. v. Mediocore Commc'ns.,
    843 F. Supp. 895 (S.D.N.Y. 1994) ............................................................................46

Shamrock Holdings, Inc. v. Arenson,
    456 F. Supp. 2d 599 (D. Del. 2006) .........................................................................54

Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks),
    503 B.R. 820 (Bankr. W.D. Wash. 2013) ................................................................47

Solomon v. Barman (In re Barman),
    237 B.R. 342 (Bankr. E.D. Mich. 1999) ..................................................................47

Southland Corp. v. Kilgore & Kilgore (In re Southland Corp.),
    19 F.3d 1084 (5th Cir. 1994) ...................................................................................63

Stewart v. Wilmington Trust SP Servs., Inc.,
    112 A.3d 271 (Del. Ch. 2015) ................................................................................24

Stratton v. Mariner Health Care, Inc. (In re Mariner Post-Acute Network,
    Inc.),
    303 B.R. 42 (Bankr. D. Del. 2003) ........................................................................64

Tese-Milner v. TPAC, LLC (In re Ticketplanet.com),
    313 B.R. 46 (Bankr. S.D.N.Y. 2004) ......................................................................60

Travelers Indem. Co. v. Lake,
    594 A.2d 38 (Del. 1991) ..........................................................................................40

Tri-State Paving, Inc. v. Jones (In re Tri-State Paving, Inc.),
    32 B.R. 2 (Bankr. W.D. Pa. 1982) ..........................................................................57

Tronox, Inc. v. Kerr McGee Corp. (In re Tronox Inc.),
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) .........................................................21, 24, 57

United States v. Tabor Court Realty Corp.,
    803 F.2d 1288 (3d Cir. 1988) ...........................................................................20, 21

United States v. Webber,
    396 F.2d 381 (3d Cir. 1968) ....................................................................................48

Valley Media v. Borders (In Re Valley Media),
    288 B.R. 189 (Bankr. D. Del. 2003) .......................................................................52

VantagePoint Venture Partners v. Examen, Inc.,
    871 A.2d 1108 (Del. 2005) ...............................................................................39, 40

Vichi v. Koninklijke Philips Elects., N.V.,
    85 A.3d 725 (Del. Ch. 2013) ...................................................................................40

Xcell Energy & Coal Co., LLC v. Energy Inv. Grp., LLC,
    2014 WL 2964076 (Del. Ch. June 30, 2014) ............................................................40

Zazzali v. Mott (In re DBSI, Inc.),
    445 B.R. 344 (Bankr. D. Del. 2011) ..................................................................25, 58

**STATUTES**

6 Del. C. § 1301(10) ...........................................................................................19

6 Del. C. § 1304(a)(1) .........................................................................................19

6 Del. C. § 1305(b) .............................................................................................49

11 U.S.C. § 101 ...................................................................................................47

11 U.S.C. § 102(3) ..............................................................................................47

11 U.S.C. § 502 ......................................................................................... *passim*

11 U.S.C. § 503 .............................................................................................63, 64

11 U.S.C. § 544(b) ..............................................................................................24

11 U.S.C. § 547 ......................................................................................50, 51, 53

11 U.S.C. § 548 ..............................................................................................19, 24

11 U.S.C. § 550(a) ..........................................................................................49, 56

11 U.S.C. § 551 ...................................................................................................58

**RULES**

Fed. R. Bankr. P. 2007 .......................................................................................59

Fed. R. Bankr. P. 3007(b) ...................................................................................59

Fed. R. Bankr. P. 7008 .......................................................................................14

Fed. R. Bankr. P. 7012 .......................................................................................59

Fed. R. Bankr. P. 7015 .......................................................................................69

Fed. R. Civ. P. 8 ......................................................................................14, 18, 29

Fed. R. Civ. P. 9(b) .............................................................................................20

Fed. R. Civ. P. 9(c) .............................................................................................44

Fed. R. Civ. P. 12(b)(6)............................................................................................... *passim*

Fed. R. Civ. P. 15(a) ...............................................................................................69

Fed. R. Civ. P. 56(c) ...............................................................................................48

Fed R. Evid. 201 .....................................................................................................48

Del. Bankr. L. R. 7007-2(b)(ii) ..............................................................................19

Del. Ch. Ct. R. 23.1................................................................................................31

## PRELIMINARY STATEMENT

This action arises from the decision by investor Michel Moreno, upon realizing that the massive bet on fracking that he had made with the loan proceeds of GFES was headed for failure, to use his control over GFES to effectively loot the company.  As detailed in the Complaint, Moreno and his affiliates stripped GFES of its most valuable asset—a $200 million business in power generation services—while shirking tens of millions of dollars in contractual funding obligations and extracting massive payments from the company as it headed towards collapse.  Based on this conduct, the Trustee pleads 23 affirmative causes of action against Moreno and his affiliates, and lodges 8 objections to claims filed by them against the GFES estate.

Defendants argue that the action must be dismissed because (i) the term "PowerGen" is not adequately defined, (ii) "actual intent" is not adequately pled, (iii) lack of Board independence is not adequately pled, and (iv) insolvency is not adequately pled.  Defendants are wrong on all fronts.

First, while Defendants profess confusion over what the term "PowerGen" refers to ("a utility company, perhaps"), the allegations of the Complaint describe the nature of the business, the technology involved, its development by GFES, and its wrongful transfer.  This is more than adequate to give Defendants fair notice.  Further, that PowerGen is characterized as both a 'business opportunity" and an "ongoing business" is entirely proper, as a plaintiff may plead facts that may ultimately support multiple legal conclusions or causes of action.  And Defendants' contention that PowerGen was not in GFES's "line of business" likewise fails:  PowerGen was to be used for fracking, Moreno promoted it for and on behalf of GFES, he sought funding for its development by GFES—and GFES actually began work on it.

Of course, Moreno himself understands that his lead argument for dismissal is nonsense.  In a sworn counterclaim that he has filed in federal court as part of a suit by General Electric against him for failure to repay PowerGen loan proceeds, Moreno affirmatively alleges that "[t]he agreed upon plan was for GFES to divest itself of the power generation line of business," and that "[a]fter formal presentation of the 'corporate opportunity' to GFES, which GFES declined, Moreno formed [TGS]."[1]  That is, Moreno has affirmatively pled many of the same key factual allegations underlying the Trustee's claims here, and he is not actually confused about what PowerGen is.  Of course, it could hardly be otherwise:  Moreno participated in a months-long examiner process in which these transactions were exhaustively reviewed.  His professions of confusion here should be seen for what they are:  empty, wasteful litigation posturing.

Defendants' other arguments fare no better.  They contend that "actual intent" is not alleged, but the Complaint pleads nearly all of the badges of fraud cited by Defendants themselves, and also independently satisfies the "natural consequences" test articulated by the Third Circuit, under which actual intent is pled where a transferor intentionally undertakes an action the "natural consequence" of which is harm to creditors.  Indeed, it is unusual to find a case with allegations that so well match the "natural consequences" test—no doubt because it is unusual for a company to transfer away its best remaining chance for viability, for no consideration.

Moreover, the very fact that GFES effected such a transfer is itself a powerful contradiction of another of Defendants' "global" arguments, that GFES had an

---

[1] Defendants' Third Party Complaint Against General Electric Co., ¶¶ 2, 4, 16-18, <u>GE Oil and Gas, Inc. v. TGS, LLC</u>, No. 14-00760 (W. D. La.), Docket No. 202 ("<u>Moreno Third Party Complaint</u>").

independent, functional Board.  That argument also fails because it is premised on the assertion that the Board had 5 members and a 3-2 independent majority—one of many wholly inappropriate liberties Defendants take in re-writing the allegations of the Complaint.  In fact, the Complaint alleges that the Board had *4* members and, even under the most charitable reading of two Board members' independence, was split 2-2—*i.e.*, not an independent Board.  And as further alleged, whatever the Board's composition, the utter lack of any meaningful or informed board process or engagement before the transfer independently defeats any attempt to rely on the Board's "judgment."

Finally, Defendants' insolvency argument provides no basis for dismissal.  In a reflection of the permissive standard at the pleading stage, Defendants are reduced to attempting to rely primarily on a case that *denies* a motion to dismiss.  In any event, here the Complaint goes far beyond "alleging the statutory elements" and alleges considerable detail, including that GFES:  (i) consistently operated at loss, (ii) incurred massive liabilities and tied its business to a single, money-losing customer relationship, (iii) transferred away its best remaining chance for viability, (iv) repeatedly defaulted on millions in debt payments, (v) accumulated a massive net working capital deficiency, and (vi) was in arrears on tens of millions in third-party payments.  This is more than adequate to meet the pleading standard.

Defendants also assert a variety of claim-specific arguments, but these, too, lack merit.  They argue that the preference defendants are not "non-statutory insiders," but ignore the fact that those defendants are *statutory* insiders.  They argue that lack of "reasonably equivalent value" has not been pled, but in so doing conflate a payment for equipment and labor used in developing PowerGen with payment for PowerGen itself (of

which there was none).  They argue that claims for breach of contractual funding commitments fail because a Material Adverse Change occurred, but ignore law making clear that that is not a question for the pleading stage (and fail in any event to explain how a material adverse change occurred for a contract that was signed on the same date that payment was due).  And they meet the Trustee's bankruptcy claim objections with arguments that belong to a later stage of the process.

Ultimately, much of Defendants' 71-page brief (and 3-page errata statement) consists of arguments that have little relevance at the pleading stage, propped up by an aggressive effort to draw adverse inferences from, re-write, and make wholesale additions to (in Defendants' words, "provide . . . additional background" to) the allegations of the Complaint.  None of this provides any basis for dismissal under Rule 12(b)(6).

*     *     *

In the modern corporate environment, it is rare to find a case that so clearly echoes the classic fraudulent transfer scheme underlying enactment of the Statute of Elizabeth, where a debtor facing financial trouble attempts to place a valuable asset with a friendly third party to put it beyond the reach of his creditors.  It is likewise rare to find conduct that satisfies all of the modern and traditional tests for actual intent, and that marks such a clear-cut breach of fiduciary duty.  The allegations of the Complaint are unusually strong, and the notion that Moreno may obtain a dismissal of the claims at the pleading stage and simply walk away is absurd.  The Motion should be denied.

## ALLEGATIONS OF THE COMPLAINT

## I.    MORENO ACQUIRES THE DEBTORS AND BETS BIG ON FRACKING

GFES (previously named Hub City Industries, LLC) was formed in 1969 and was engaged for many years in a traditional well services business before in December 2010 entering into the fracking business.  Compl. ¶ 24.[2]  In May 2011, Moreno took control of GFES through a recapitalization and buy-out using entities in which he held interests, MOR MGH and MMR.  Id. ¶ 25.  MMR and a Moreno-controlled trust also took control of Turbine Technology of Louisiana, LLC, which had most of the same shareholders and key employees as HCI, among them Ted McIntyre, who was the developer of the power generation technology subsequently usurped by Moreno.  Id.

Upon taking control of GFES, Moreno became a member of its board of directors (the "Board") and populated it with his friends and business affiliates.  Id. ¶ 26.  The 4-member Board contained:  (i) Moreno; (ii) Rick Fontova, who for many years relied upon Moreno in his professional and business career, and now devoted all of his professional time to GFES, at an annual salary of $375,000, with eligibility for an annual bonus of 50% to 100% of his annual salary; (iii) Charlie Kilgore; and (iv) Mark Knight.  Id.[3]

Directors Fontova, Kilgore, Knight (and CFO Blackwell) all served at the whim of Moreno, who held control over the directors and officers under GFES's certificate of incorporation and bylaws.  Id. ¶ 27.  As an indirect majority shareholder (by virtue of his ownership of MOR MGH), Moreno, without the need of concurring shareholder votes, could elect the directors to one-year terms.  Id.  In addition, Moreno could at any time

---

[2] Defined terms have the meaning ascribed to them in the Complaint.

[3] Earl Blackwell, who had been associated with HCI in his capacity as Managing Director of MMR, which first invested in HCI in 2005, and who had served as its Chief Financial Officer beginning in 2009, remained Chief Financial Officer of GFES after the Moreno takeover.  Compl. ¶ 26.

remove any director, with or without cause.   Id.   By controlling the Board, Moreno also had an ability to elect and remove officers with or without cause.   Id.   As the Debtors acknowledged in their 2012 Annual Report, "[MOR MGH] has significant influence over our decisions to enter into any corporate transaction regardless of whether others believe that the transaction is in our best interests."   Id.

Upon obtaining control of the Debtors, Moreno quickly redirected their business to go all-in on fracking.   Id. ¶ 28.   Under Moreno's plan, GFES capital expenditures increased 50-fold in the first 8 months of 2011, as compared to the entirety of 2010.   To finance these capital expenditures, GFES borrowed heavily:  $340 million (of which $250 million was in high interest (13%) secured notes) was incurred by GFES in thirteen months—i.e., a 640% increase in funded debt load from its September 2011 level.   Id.

Moreno also tied the Debtors' business largely to a single customer:  over the course of the Debtors' active operations under Moreno's control, SWEPI LP ("Shell") accounted for 92% of the Debtors' fracking revenues.   Id. ¶ 29.

## II.    THE DEBTORS' FRACKING BUSINESS FAILS TO TAKE OFF

On both a cash and accrual basis, the GFES/Shell fracking business operated at a substantial loss from start to finish.   Id. ¶ 30.   From April 2011 through June 30, 2013, the Debtors incurred operating losses on an accrual basis of approximately $100 million and on a cash basis of approximately $53 million.   Id.   As of July 2012, GFES was losing "large sums of money" through its arrangements with Shell. Id. ¶ 31. Throughout 2012, GFES had only a limited number of working fracking operations—most tied to Shell.   Id. ¶ 32.   With decreased revenue opportunities, dependence on a money-losing relationship and increasing input costs, Moreno's big bet on fracking was looking like a major failure.   Id.

### III.    POWERGEN:  MORENO TRANSFERS A $200 MILLION BUSINESS AWAY FROM GFES FOR NO CONSIDERATION

PowerGen involved the use of turbine engines to develop and generate portable electric power at well sites.  Id. ¶ 34. The engines were sold or rented by TPT (the 50-50 joint venture between the Debtors and Ted McIntyre, who developed the relevant technology).  Id.  What distinguished PowerGen's technology was that its turbines could run on field gas extracted onsite—*i.e.*, a self-powering operation—resulting in significantly lower costs (as compared to the traditional need to transport diesel to the well sites) and in reduced emissions.  Id.  Excess power also could potentially be sold to local power grids, resulting in an additional revenue stream.  Id.

The Debtors had begun work on PowerGen in the summer of 2012.  Id. ¶ 35. Debtor employees worked on PowerGen's development, Debtor funds were expended to develop PowerGen, and the Debtors acquired engine inventory and other assets in support of the business.  Id.  For the period of November 2012 through June 2013, the Debtors incurred substantial expenses in connection with their efforts to develop PowerGen, including expenses based upon services provided by various GFES employees, who worked to develop models for development of PowerGen.  The Debtors began to manufacture units for PowerGen in the fall of 2012 and began to secure commitments from customers to conduct pilot programs.  Id. ¶ 36.

In bondholder conference calls and other communications, Moreno repeatedly played up PowerGen's potential economic benefit to GFES.  Id. ¶¶ 36-37.  For example: (i) at a November 21, 2012 bondholder call, Moreno referred to PowerGen as "a very exciting thing for the company" and explained that a fracking customer had "committed to . . . taking a few of our PowerGen units that we're starting to manufacture now and do

[a] pilot program where we're going to actually power a drilling rig using field gas"; (ii) at an August 22, 2012 bondholder call, in explaining why additional equity [for GFES] would be brought in only "as needed," Moreno noted the buzz around PowerGen; and (iii) in a press release dated January 7, 2013, Moreno stated that he believed the Debtors' "turbine driven systems [were] superior to other natural gas powered options."  Id. ¶ 37. Similarly, during Q1 2013, the Debtors made numerous presentations and issued press releases trumpeting the prospects for PowerGen for GFES.  Id.

In the fall of 2012, General Electric Corporation ("GE") expressed interest in the Debtors' work with turbines, and by May 2013, the Debtors were engaged in negotiations with GE and numerous other sources regarding an investment in PowerGen.    Id. ¶ 38. GE was contemplating an investment of $100 million in PowerGen for an approximately 50% stake.    Id.    GE's immediate concern was to not lose the opportunity to fund PowerGen.    In internal GE communications forwarded to Moreno, GE personnel expressed concern that GE's negotiating posture might lead the Debtors to reject GE and choose a different financing source, and GE personnel discussed the possibility of structuring the PowerGen businesses through use of a Debtor subsidiary.  Id.  GFES, which already begun work on PowerGen, had the requisite infrastructure and employees, and an ownership interest in and working relationship and understanding with TPT.  Id.

But Moreno chose a different path.    Well aware by the spring of 2013 that GFES's fracking business was headed towards collapse, and fully appreciative of the substantial value held by the PowerGen opportunity, he decided to simply take PowerGen for himself.  Id. ¶ 39.  By taking PowerGen away from GFES and transferring it to a different entity under his control, Moreno sought to remove it from creditors' reach.  Id.

8

In March 2013, Moreno caused entities under his control to form TGS, as an entity separate from GFES rather than as a subsidiary of GFES. <u>Id.</u> ¶ 40. Moreno then used his domination and control over the Board and GFES to cause GFES to waive the PowerGen business opportunity in favor of its pursuit by TGS and himself. <u>Id.</u> In May 2013, Moreno (on behalf of MOR MGH, a shareholder); Rick Fontova (individually, as a shareholder); William Rucks (on behalf of MMR, a shareholder) and Moreno, Fontova, Mark Knight, and Charlie Kilgore as directors of GFES, executed the Written Consent of the Stockholders and Directors of GFES (the "<u>PowerGen Waiver</u>"), formally waiving, "as if . . . at a duly convened meeting of the stockholders and directors," the opportunity for GFES to pursue the PowerGen business, and agreeing that Moreno, TGS, and TPT could pursue PowerGen outside of GFES. <u>Id.</u> ¶ 41.

The Board of GFES utterly failed to inform itself or exercise meaningful oversight in connection with granting the PowerGen Waiver. <u>Id.</u> ¶ 42. No financial or valuation expert was retained to evaluate the proposed transfer; no analysis or opinion regarding the proposed transfer was commissioned; no valuation opinion regarding the proposed transfer was in fact obtained (the Debtors' bondholders, concerned that the transfer violated a November 2011 indenture governing their bonds, requested such an opinion); and no special committee was formed to investigate the terms and circumstances of the transaction and to report back to the Board. <u>Id.</u>

No materials, presentations, or other documents were reviewed by the Board before approving the PowerGen Waiver, and there was no substantive deliberation by the Board before approving the PowerGen Waiver. <u>Id.</u> Instead, the directors turned a blind eye to the reality of the usurpation and transfer of PowerGen, acting in bad faith and in

intentional disregard of GFES's interests and the directors' duties to GFES, as they rubber-stamped the transfer of the corporation's most valuable asset for no consideration at the behest of Moreno.  Id.  Simply put, the directors' purpose in approving the PowerGen Waiver was not to advance GFES's interests, but to attempt to lend their misconduct an air of legitimacy.  Id.

In exchange for their transfer of PowerGen to TGS, the Debtors received no or virtually no consideration.  Id. ¶ 44.  Instead, compensation was limited to a small payment that was made for services rendered in connection with work on PowerGen, and related equipment—but no payment for PowerGen itself.  Id.  Each of the directors who approved the PowerGen Waiver were aware that (i) GFES's fracking business was headed towards collapse, and (ii) GFES would be transferring a valuable asset for no consideration and that this asset would not be available to satisfy creditor claims.  Id.

As of the time of the PowerGen Transfer, it was clear that PowerGen carried tremendous value.  Id. ¶ 46.  For example: (i) GE's contemplated investment of $100 million in PowerGen was for a minority stake, implying a valuation in excess of $200 million; and (ii) a January 2013 presentation on PowerGen projected initial EBITDA of approximately $7 to 11.8 million in 2013 growing to approximately $102.9 to 142 million as early as 2015.  Id.  Further, following the transfer of PowerGen to TGS (which was 100% owned by MOR DOH), an unaffiliated third party, Powermeister, in June 2013 purchased a 9.6% equity interest in MOR DOH, for $20 million—implying an enterprise valuation of $208 million for PowerGen.  Id. ¶ 45.  Indeed, the Debtors consistently ascribed a value to the PowerGen business of approximately $180 million (if not higher),

including in materials prepared in financial updates produced prior to the Petition Date, and in post-petition emails regarding the structuring of the Plan.  Id. ¶ 46.

## IV.    BREACH OF THE SHARE PURCHASE AGREEMENTS

On October 24, 2012, GFES, MOR MGH and MMR entered into a written Share Purchase Agreement (the "2012 SPA") under which GFES agreed to issue, and MOR MGH and MMR agreed to purchase, up to $25 million in preferred shares of GFES stock. Compl. ¶¶ 48, 49.  The 2012 SPA required that MOR MGH and MMR purchase $10 million in preferred stock, see id. ¶¶ 50, 51, and this $10 million purchase in fact was completed.  Id. ¶ 52.  The 2012 SPA also provided that at the end of each calendar quarter beginning in 4Q 2012, additional purchases by MOR MGH and MMR were required, with a maximum of an additional $15 million in purchases.  Id. ¶ 53.  While MOR MGH and MMR purchased the requisite amount of preferred stock at the end of the fourth quarter of fiscal 2012, see id. ¶ 54, for each of the first three fiscal quarters of fiscal 2013 it failed to do so, despite funding requests from GFES under Section 2.03(e). Id. ¶ 55.  In total, MOR MGH failed to purchase preferred stock in the amount of $9,594,298, and MMR failed to purchase $1,199,152.  Id.

GFES and MOR MGH are also parties to a Share Purchase Agreement dated June 28, 2013 (the "2013 SPA," together with the 2012 SPA, the "Share Purchase Agreements"), under which MOR MGH was obligated to purchase $10 million in GFES preferred stock.  Id. ¶ 56.  Under the 2013 SPA, payment was due on the date the 2013 SPA was entered into.  See id. ¶ 57.  MOR MGH never made this payment.  Id. ¶ 58.

Moreno through his ownership interests in and influence on MOR MGH and MMR was himself personally responsible for the breaches of the Share Purchase Agreements by those entities.  Moreno was aware of MMR's and MOR MGH's

obligations under the Share Purchase Agreements—indeed, Moreno signed both the 2012 SPA and the 2013 SPA not only on behalf of GFES, but also on behalf of MOR MGH and MMR.  Id. ¶ 59.  Moreno was also aware of the impact those entities' failures to fulfill such obligations would have on the Debtors.  Id. ¶ 60.

Using his control and influence over MOR MGH and MMR, Moreno favored their and his interests at the expense of the Debtors.  Id. This interference with performance of the Share Purchase Agreements was motivated by Moreno's personal desire to protect his personal financial interests in disregard of the impact on GFES.  Id. By preventing MOR MGH and MMR from complying with the Share Purchase Agreements, Moreno deprived the Debtor of over $20 million in contractually committed capital.  Id. ¶ 61.  The over $20 million in capital that MOR MGH and MMR failed to deliver could have been used to further GFES's business plans at a critical moment. Instead, Moreno ensured that it was never provided.  Id. ¶ 62.

## V.   MORENO'S AFFILIATES ABSORB MILLIONS AS THE DEBTORS VEER TOWARDS COLLAPSE

Moreno erected around the Debtors a constellation of satellite companies to provide services to the Debtor in support of its business.  Id. ¶ 63.  As detailed in the Complaint, Moreno held controlling interests in these Defendant and non-party entities, and the business relationships between them and the Debtors were not "open-market" or "arms-length" relationships.  Id. ¶¶ 9-21, 23, 63.

During the 12-month period preceding the Petition Date, Moreno and his web of affiliated entities collected approximately $14.6 million in additional value from the Debtors, as detailed in the Complaint, through the Defendants Affiliate Transfers to the Defendants Moreno Affiliates, see id. ¶¶ 64-65, as well as payments to himself for salary,

bonuses and expense reimbursements (the "Moreno Transfers"), see id. ¶ 66, and payments of nearly $30 million to non-parties TPT and Alliance, see id. ¶¶ 67-68.

## VI.    THE DEBTORS' FINAL COLLAPSE

Following the PowerGen Transfer, the Debtors were failing to pay their debts as they came due and the sum of their debts exceeded their assets at fair valuation.  Id. ¶ 47. During June, July, and August of 2013, the Debtors failed to make an aggregate of $6 million of required principal payments on a credit facility that the Debtors had entered into with Shell in October 2012, and under which $78.2 million remained outstanding. Id.  This triggered a default under the credit facility, which Shell did not waive, and a cross default under the indenture governing the Debtors' secured notes.  Id. ¶¶ 47, 71.  As a result of the defaults, Shell gained the right to demand immediate payment of all amounts due under the facility, and the Debtors were required to offer to repurchase up to $30 million of the notes at 108% of face value.  Id. ¶ 47.  At the same time, the Debtors' quarterly report for the six-month period ended June 30, 2013, estimated that as of June 30, 2013, the Debtors had a net working capital deficiency of approximately $333.4 million and owed $20.9 million to its vendors and other third-party suppliers that had been outstanding for over 120 days.  Id.

On October 27, 2013, the Debtors filed petitions for relief under Chapter 11 of Title 11 of the United States Code.  Id. ¶ 72.  On April 23, 2014, the Bankruptcy Court entered the confirmation order, and the effective date of the Plan occurred on May 12, 2014.  Id. ¶ 73.  Defendants filed one or more proofs of claim against one or more of the Debtors.  Id. ¶ 75.  On April 6, 2015, the Trustee filed the Complaint.

## APPLICABLE LEGAL STANDARD

Under Rule 8, applicable here pursuant to Federal Rule of Bankruptcy Procedure 7008, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." In re Grosso, 512 B.R. 768, 770 (Bankr. D. Del. 2014) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In deciding a motion to dismiss, the court "must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff." In re Uni-Marts, LLC, 404 B.R. 767, 783 (Bankr. D. Del. 2009) (citation omitted). The court "do[es] not inquire whether [the] plaintiff will ultimately prevail when considering a motion to dismiss, only whether the plaintiff is entitled to offer evidence to support his or her claims." Borough of Moosic v. Darwin Nat'l. Assurance Co., 556 F. App'x 92, 95 (3d Cir. 2014) (citation omitted); see also Phillips v. Cnty of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted) ("[O]n a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.").

Further, the court must read the factual allegations "as a whole and in context," see Howard Hess Dental Laboratories. Inc. v. Densply Intern. Inc., 602 F.3d 237, 256 (3d Cir. 2010) (citations omitted), and must "draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." See Phillips, 515 F.3d at 228; accord Kaymark v. Bank of Am., N.A., 783 F.3d 168, 174 (3d Cir. 2015) (citation omitted); see also Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007). The moving party must show that the plaintiff has failed to "set forth sufficient information to outline the elements of his claim

or to permit inferences to be drawn that those elements exist."  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted).

Thus, a motion to dismiss must be denied if the proffered grounds for dismissal require the court to "draw inferences against the [plaintiff]."  Forman v. HBK Master Fund L.P. (In re Glencoe Acquisition Inc.), No. 12–12071(KG), 2015 WL 3777972, at *4 (Bankr. D. Del. June 16, 2015); see also Phillips, 515 F.3d at 233 (citation omitted) (motion to dismiss must be denied if "under any reasonable reading of the complaint, the plaintiff may be entitled to relief").

## ARGUMENT

In their Motion, Defendants presents a series of "global" arguments and enumerate various counts to which those arguments purportedly relate, but often fail to explain how the global argument is relevant to the specific count.  For the sake of clarity, the Trustee addresses the counts in turn, discussing "global" arguments as appropriate.

Before addressing the counts, however, the Trustee is compelled to observe that Defendants in their Motion step well beyond the bounds of what is proper on a motion to dismiss, by revising, making additions to, and outright misstating the Complaint's factual allegations—on matters going to the very heart of the case.  For example:

- Defendants assert that "the Board understood that GFES did not have the ability or capacity to enter a new business industry" and cite paragraph 41 of the Complaint.  See MTD ¶ 21.  But paragraph 41 of the Complaint alleges nothing of the sort.  In fact, the Complaint alleges (in paragraph 38) that: "GFES had the requisite infrastructure and employees, as well as an ownership interest in and working relationship and understanding with TPT" to pursue PowerGen.  Compl. ¶ 38.

- Defendants assert that "there was no opportunity for GFES to receive funding directly from GE for a potential power generation business." MTD ¶ 19.  Defendants do not cite the Complaint, and the Complaint contains no such allegation.  Indeed, the Complaint alleges that: "GE was contemplating an investment of $100 million in PowerGen for an

15

approximately 50% stake," that "GE's immediate concern was to not lose the opportunity to fund PowerGen," and that "GE personnel discussed the possibility of structuring the PowerGen businesses through use of a Debtor subsidiary." Compl. ¶ 38.

- Defendants assert that "the Board recognized that GFES could benefit significantly by gaining the new business partnership as a customer." MTD ¶ 21. Defendants do not cite the Complaint, and the Complaint contains no such allegation.

- Defendants assert that the Board had 5 members, citing paragraph 26 of the Complaint. MTD ¶ 50. In fact, paragraph 26 alleges that the Board had 4 members. Compl. ¶ 26.

- Defendants describe facts regarding purported delays by GE in funding, see MTD ¶ 23, but do not cite the Complaint, and the Complaint contains no such allegations. Defendants then file an errata sheet purporting to correct a misstatement in paragraph 23 of their Motion and adding additional factual assertions regarding certain "rights of return" of capital in the PowerMeister agreement. Defendants do not cite the Complaint, and the Complaint contains no such allegation.

As even a cursory review of Defendants' "Factual Background" shows, there are many more such examples. While Defendants cite a desire to "provide the Court with additional background," Moreno Errata Memo ¶ 4, at the pleading stage a complaint must rise or fall based upon its own allegations. See Uni-Marts, LLC, 404 B.R. at 783-84. Defendants' attempt to re-write the Complaint is improper, creates confusion, and represents an unnecessary imposition on the parties and the Court.

## I. THE POWERGEN FRAUDULENT TRANSFER COUNTS ARE ADEQUATELY PLED.

### A.    Intentional Fraudulent Transfer (Count 1)

Count 1 alleges intentional fraudulent transfer against TGS and Moreno, arising from the transfer of PowerGen to TGS. Defendants argue that the count must be dismissed because:  (i) PowerGen is inadequately defined, (ii) actual intent is not adequately pled. See MTD ¶¶ 67-76. Both contentions are without merit.

1.      The "PowerGen" Allegations Provide Fair Notice.

Defendants argue that (i) "the term 'PowerGen' fails to specify particular assets and could be construed as including intellectual property and other rights or assets that GFES never owned," see MTD ¶ 35, and (ii) there is a "conflict" between PowerGen allegations suggesting "an ongoing business" and those suggesting a business "opportunity," see id. ¶ 32.  These arguments lack any substance.

First, while Defendants feign confusion over the defined term "PowerGen," see id. ¶ 32 ("a utility company, perhaps"), the Complaint is clear:  "The PowerGen business involved the use of turbine engines to develop and generate portable electric power at well sites."  Compl. ¶ 34.  As further alleged, PowerGen involved turbines that "could run on field gas extracted onsite—i.e., a self-powering operation—resulting in significantly lower costs (as compared to the traditional need to transport diesel to the well sites) and in reduced emissions."  Id.  Based upon these and additional allegations, see id. ¶¶ 36-46, the Trustee pleads seven affirmative causes of action arising from PowerGen's transfer.  See id. ¶¶ 79-130.  This is more than adequate to provide fair notice.  See Twombly, 550 U.S. at 555 (complaint must give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests"); see also In re USDigital, Inc., 443 B.R. 22, 53 (Bankr. D. Del. 2011) (rejecting argument that claim must be dismissed for failure to "specify what 'business opportunity/concept, intellectual property rights, all work product, and all software and hardware' was allegedly taken").

Second, Defendants' complaint about a "conflict" between "business opportunity" and "ongoing business" characterizations, see MTD ¶¶ 31-32, is unavailing.  The Complaint indeed alleges facts that, if proven, could satisfy multiple legal characterizations and support multiple causes of action.  The Complaint first alleges facts

supporting the conclusion that GFES had a corporate opportunity in the PowerGen business.  See Compl. ¶¶ 34, 36, 38, 40-42, 109-110.  The Complaint also alleges that GFES had already begun to work on and devote resources to the PowerGen line of business.  See id. ¶¶ 35-38.  At the pleading stage, where facts are alleged that could support multiple causes of action, a plaintiff may plead in the alternative.  See Fed. R. Civ. P. 8(a)(3); OHC Liquidation Trust v. Discover Re (In re Oakwood Homes Corp.), 342 B.R. 59, 71 (Bankr. D. Del. 2006) (Rule 8 "authorizes a plaintiff to plead inconsistent theories in the alternative").

Third, Defendants' assertion that the Trustee has failed to specify all the assets involved in the PowerGen business misses the mark.  It is in the nature of a corporate opportunity that the business may yet be incipient.  See Fliegler v. Lawrence, 361 A.2d 218, 220 (Del. 1976) (corporate opportunity was chance to acquire certain property, which was to be used to form a business exploring for potentially mineable antimony); Guth v. Loft, 5 A.2d 503, 515 (Del. Ch. 1939) (director usurped corporate opportunity to purchase formula and trademark, which were to be used to form a business).  Further, that an entity offered an opportunity does not yet hold underlying intellectual property hardly defeats the claim—a party offered a corporate opportunity often owns *none* of the underlying assets.  See Borden v. Sinsky, 530 F.2d 478, 497-99 (3d Cir. 1976) (director usurped corporation's opportunity to acquire controlling equity interest in certain banks); In re Mobilactive Media, LLC, Ca. No. 5725-VCP, 2013 WL 297950, at *21-23 (Del. Ch. Jan. 25, 2013) (member of LLC usurped its opportunity to acquire certain companies that operated within its line of business); In re eBay, Inc. S'holders Litig., No. C.A. 19988-NC, 2004 WL 253521, at *1, *4 (Del. Ch. Jan. 23, 2004).  Defendants'

18

implication that the Trustee must in effect catalogue the assets of a turn-key business fundamentally misconceives such claims.[4] What was transferred was PowerGen itself— whether ultimately proven to be a "corporate opportunity" or an "ongoing business."[5]

> 2.    "Actual Intent" is Adequately Pled.

Defendants also argue that Count 1 should be dismissed for failure to allege "actual intent."  See MTD ¶¶ 67-76.  This argument is meritless.

> (a)    "Actual Intent" Standard

A plaintiff may avoid transfers made with "actual intent" to "hinder, delay, or defraud" the transferor's creditors.  See 11 U.S.C. § 548(a)(1)(A); 6 Del. C. § 1304(a)(1). Because the statutory language refers to "hinder, delay or defraud" in the disjunctive, intending any of these results is sufficient to render a transfer fraudulent.  In re Pers. & Bus. Ins. Agency, 334 F.3d 239, 242-43 (3d Cir. 2003) ("Actual fraud occurs when the debtor makes the transfer with the intent to hinder, delay, or defraud creditors . . . .").

---

[4] Defendants' assertion that "the Trustee does not specify *whose* property GFES transferred" by the PowerGen Transfer, see MTD ¶ 69 (emphasis in original), is difficult to understand. Count 1 incorporates by reference the factual allegations of the Complaint, which include repeated allegations that PowerGen belonged to GFES.  See, e.g., Compl. ¶¶ 1, 4, 39, 40, 44.

[5] Defendants at times lace their arguments with rhetoric suggesting that PowerGen might not have constituted property of the Debtors.  See MTD ¶ 3 ("the transfer of assets the Debtors did not own"); id. ¶ 69 ("it does not appear that GFES owned an interest in the PowerGen, as defined").  But Defendants do not present a legal argument (or any legal authorities) in support of that rhetoric, presumably because it would directly contradict Moreno's sworn assertions elsewhere (Moreno: "[t]he agreed upon plan was for GFES to divest itself of the power generation line of business," Moreno Third Party Complaint ¶ 16).  Should Defendants introduce on reply an argument that PowerGen was not "property of the debtors," it should be disregarded, see Del. Bankr. L. R. 7007-2(b)(ii); In re Catholic Diocese of Wilmington, Inc., 437 B.R. 488, 492 n.19 (Bankr. D. Del. 2010), and the Trustee reserves all rights to respond to such argument, which in any event would fail.  See 6 Del. C. § 1301(10) (defining property as "anything that may be the subject of ownership"); In re Century Glove Inc., 73 B.R. 528 (Bankr. D. Del. 1987) (when a given opportunity satisfies the corporate opportunity test, "the opportunity is treated as a corporate asset . . . ."); accord Borden, 530 F. 2d at 490; In re Trim-Lean Meat Prods., Inc., 4 B.R. 243, 247 (Bankr. D. Del. 1980) (doctrine "essentially treats a corporation's expectations regarding certain business opportunities which are in the corporation's line of business and of practical advantage to it as a corporate property which may not be appropriated for personal gain"); Rajala v. Gardner, No. 09-2482-EFM, 2012 WL 1189773, at *15 (D. Kan. Apr. 9, 2012), aff'd, 709 F.3d 1031 (10th Cir. 2013) (finding that allegations regarding usurpation of wind energy corporate "opportunity" satisfied UFTA elements for fraudulent transfer).

Further, although Rule 9(b) applies to fraudulent transfer claims, see Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 498 (Bankr. D. Del. 2010) (Gross, J.), *intent* need only be alleged generally.  See Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.").   Thus, a plaintiff may satisfy the pleading standard for actual intent by alleging facts giving rise to an inference of such intent.  Glencoe, 2015 WL 3777972, at *5 (citation omitted).  Pleading the "badges of fraud" is a common way to plead this inference, see Official Committee of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.), 405 B.R. 527, 545 (Bankr. D. Del. 2009), but not the only way, see United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1305 (3d Cir. 1988) (citation omitted) (upholding finding of actual intent on the principle that "a party is deemed to have intended the natural consequence of his acts.").   Finally, "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where a trustee or a trust formed for the benefit of creditors . . . is asserting the fraudulent transfer claims."  Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus., Inc.), No. AP 14-50377 (MFW), 2015 WL 3827003, at *4 (Bankr. D. Del. June 19, 2015). "This is because the trustee often does not have all the facts that the debtor in possession would have about the conduct of the parties pre-petition."  Id.[6]

Here, the Complaint pleads actual intent in at least two independent ways:  (i) the Board (whether or not controlled by Moreno) made a decision the "natural consequence"

---

[6] Defendants assert that "[i]t is questionable whether the Trustee should be entitled to the same deference given the prior appointment of an examiner to investigate these claims and the related materials made available to the Trustee as a result of the examiner's efforts," see MTD ¶ 29 n.39, but they do not contend that the Trustee has "all the facts that the debtor in possession would have about the conduct of" Moreno and GFES employees.  In any event, the Complaint comfortably satisfies the ordinary Rule 9(b) standard, as discussed herein.

20

of which was to hinder, delay or defraud creditors, and (ii) multiple badges of fraud are alleged.

(b)    <u>"Natural Consequences"</u>

As numerous courts have explained, a finding of "actual intent" in the fraudulent conveyance context may be based on the principle that a transferor intends the "natural consequences" of its actions.  See <u>Tabor Court Realty Corp.</u>, 803 F.2d at 1305 (upholding finding of actual intent on the principle that "a party is deemed to have intended the natural consequence of his acts"); <u>In re Sentinel Mgmt. Grp.,</u> 728 F.3d 660, 667 (7th Cir. 2013) (citations omitted) (finding "actual intent" present in intentional fraudulent transfer case because "every person is presumed to intend the natural consequences of his acts").[7]

To be sure, it is uncommon to find facts that so well match the "natural consequences" principle as those alleged here.  No doubt this is because it is uncommon that a company will transfer away its best remaining chance for viability, for no consideration.  But that is what the Complaint alleges, and the "natural consequences" are exactly what is alleged to have happened:  GFES plunged into failure, with disastrous results for creditors.  This amply satisfies the "natural consequences" test.

---

[7] <u>See also</u> <u>In re Am. Bus. Fin. Servs., Inc.</u>, 384 B.R. 66, 75 (Bankr. D. Del. 2008) (citation omitted) (denying motion to dismiss intentional fraudulent transfer claims under New York law because the "natural consequence of its actions was to defraud the Debtor's creditors"); <u>Tronox, Inc. v. Kerr McGee Corp. (In re Tronox Inc.)</u>, 503 B.R. 239, 279-80 (Bankr. S.D.N.Y. 2013) (citations omitted); <u>In re Morse Tool, Inc.</u>, 148 B.R. 97, 138 (Bankr. D. Mass. 1992) (internal quotation marks omitted) ("[d]espite the strictures in the case law and in the statute against presumed intent, courts applying UFCA § 7 agree that, for purposes of determining fraudulent intent, a party is deemed to have intended the natural consequences of his acts"); <u>S.E.C. v. Haligiannis</u>, 608 F. Supp. 2d 444, 451 (S.D.N.Y. 2009) (citations omitted) (holding that actual intent element under Fair Debt Collection Procedures Act, which requires "actual intent to hinder, delay, or defraud a creditor" and "thus parallels the Uniform Fraudulent Transfer Act and the Bankruptcy Code" was satisfied, because the defendant "intended the natural consequence of his act—to 'hinder' and 'delay' other investors' ability to recover their funds upon [the] collapse"); <u>Jackson v. Mishkin (In re Adler Clearing Corp.)</u>, 263 B.R. 406, 491 (Bankr. S.D.N.Y. 2001) (quoting 11 U.S.C. § 548; N.Y. DCL § 276; <u>Personnel Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 278 (1979)); <u>Ritchie Capital Mgmt., L.L.C. v. Stoebner</u>, No. 12-3038 (SRN), 2014 WL 1386724, at *31 (D. Minn. Jan. 6, 2014) (Minnesota UFTA).

(c)    <u>Badges of Fraud</u>

The Complaint also independently pleads actual intent by pleading badges of fraud.  In arguing for dismissal, Defendants identify six badges.  <u>See</u> MTD ¶ 70.  Nearly all of these badges are in fact pled in the Complaint.

<u>First</u>, with respect to the "relationship between the debtor and the transferee," Defendants argue that "the Trustee fails to plead facts that would suggest Moreno actually controlled the Debtors," MTD ¶ 72, but later appear to concede that the Trustee has pled this badge.  <u>See</u> MTD ¶ 76 ("the Trustee is left with only a single badge of fraud: the connection between TGS and GFES through Moreno's indirect ownership").  And the Complaint's allegations of Moreno's control in any event are manifold, detailing his takeover of GFES, his reformulation of its business, his negotiations with GE, and, most critically, the transfer of PowerGen away from GFES for no consideration.  <u>See</u> Compl. ¶¶ 25-29, 33, 37-42, 44.  Indeed, that a corporation transferred away its best remaining chance for viability, for no consideration, is itself a powerful allegation of control.  If Defendants wish to contest the strength of these many allegations, they will have to present such fact-based arguments at a later stage.

<u>Second</u>, with respect to "consideration for the conveyance," Defendants argue that "the Trustee acknowledges that TGS did make some small payment," MTD ¶ 73, but that conflates consideration for certain GFES labor or equipment costs with consideration for PowerGen (the opportunity or business) itself—a conflation expressly contradicted by the Complaint.  <u>See</u> Compl. ¶ 44 ("compensation was limited to a small payment that was made for services rendered in connection with work on PowerGen, and related

22

equipment—but no payment for PowerGen itself").[8]   As the Complaint alleges, GFES simply "waived" PowerGen, rather than, *e.g.*, selling it for consideration.  See id. ¶ 41.[9]

Third, with respect to the "insolvency" badge, Defendants' argument that "the Trustee fails to establish insolvency," MTD ¶ 74, is unavailing.  See Part II.B.1, infra.

Fourth, with respect to "how much of the debtor's estate was transferred," Defendants argue that "the Trustee does not allege that the PowerGen was GFES's 'crown jewel,' nor explain what percentage the so-called PowerGen comprised of GFE's existing assets or future revenue sources."  MTD ¶ 75.  But there is no way around the fact that the Complaint alleges that, at a moment when GFES had no other prospects for viability, it transferred away a $200 million business opportunity.  To argue that the term "crown jewel" does not appear, or to complain about a lack of percentages, is to ignore the substance of the allegations:  the portion of the debtor's estate that was transferred is the very portion that constituted its best remaining chance for viability.

Fifth, with respect to "reservation of . . . control or dominion by the debtor over the property transferred," the Complaint alleges that PowerGen was transferred to TGS—another entity under Moreno's control.  While this is different from an allegation that TGS was under GFES's direct control, the fact that Moreno (who is alleged to have dominated GFES) would maintain control over PowerGen after its transfer (rather than

---

[8] Defendants also cite entry into the TGS Agreement, see MTD ¶ 73, but that agreement was entered into *after* the transfer had already taken place, and Defendants fail to explain its relevance.  If Defendants mean to suggest that the TGS Agreement is belated "consideration" for the transfer, their contention makes no sense, and moves well beyond anything alleged in the Complaint—*i.e.*, it is, at most, an entirely unsupported and *adverse* inference, improper at the pleading stage. See Glencoe, 2015 WL 3777972 at *4.

[9] Defendants also assert that "according to the Trustee's allegations . . . the opportunity was not transferred, it was abandoned."  MTD ¶ 73.  But Defendants cite no paragraph of the Complaint for that assertion, and the Complaint repeatedly alleges that PowerGen was "transferred."  Further, when discussing the constructive fraudulent transfer count—which concerns the same transfer as Count 1—Defendants concede that "a transfer within the time period" has been "adequately alleged."  See MTD ¶¶ 77-78.

transferring it to an independent third party), raises the same suspicions targeted by this badge of fraud.

Having pled multiple badges, the Complaint is adequate.  See Fedders, 405 B.R. at 545 ("the confluence of several [badges] in one transaction generally provides conclusive evidence of an actual intent to defraud") (citations omitted).  As the Complaint satisfies multiple independent tests (whether the "badges," the "natural consequences" test, or other tests[10]), actual intent is more than adequately pled.[11]

### B.    Constructive Fraudulent Intent (Count 2) is Adequately Pled.

Defendants argue that the constructive fraudulent transfer claim must be dismissed because the Trustee fails to adequately allege (i) insolvency and (ii) lack of reasonably equivalent value ("REV").  See MTD ¶¶ 77-83.[12]  Neither argument succeeds.

#### 1.    Insolvency

Defendants contend that the Complaint fails to adequately allege that the Debtors were insolvent, and fails to allege when the Debtors became insolvent.  See MTD ¶¶ 57-66.  Both contentions are unavailing.

---

[10] The Complaint also satisfies scienter pleading standards, employed recently in Section 548 intentional fraudulent transfer cases.  See, e.g., Tronox, 429 B.R. at 94 ("A strong inference of fraudulent intent may be established . . . by alleging facts to show that defendants had both motive and opportunity to commit fraud"); In re Musicland Holding Corp., 398 B.R. 761, 774 (Bankr. S.D.N.Y. 2008) (same).  Here, under the "motive and opportunity" test, there is little question that Moreno had both a "motive" to transfer himself PowerGen (to attempt to free it from the ties to creditors) and the "opportunity" to effect the transfer (accomplished through his control of the GFES Board, as described above), and his conduct, undertaken within the scope of his employment, is imputed to GFES.  See Stewart v. Wilmington Trust SP Servs., Inc., 112 A.3d 271, 302-03 (Del. Ch. 2015) ("the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself").

[11] Because the Delaware UFTA "mirror[s] the language of section 548(a)(1)(A) and (b) of the Code," the pleading standard on intentional fraudulent transfer and constructive fraudulent transfer (discussed in Part I herein), to the extent the claims arise under Section 544(b) and Delaware law, is also satisfied.  See Fedders, 405 B.R. at 547.

[12] Defendants' PowerGen definition argument also fails, as discussed above.  See Part I.A.1, supra.

"Insolvency is generally a factual determination not appropriate for resolution in a motion to dismiss." Glencoe, 2015 WL 3777972, at *4 (citing Zazzali v. Mott (In re DBSI, Inc.), 445 B.R. 344, 349 (Bankr. D. Del. 2011)); see also FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC), Case No. 10-10799 (KJC), 2013 Bankr. LEXIS 3404, at *12 (Bankr. D. Del. Aug. 19, 2013)).

While it is not sufficient to merely "allege the statutory elements" and "present no information on the Debtors' financial status," In re Global Link Telecom Corp., 327 B.R. 711, 718 (Bankr. D. Del. 2005); In re Pillowtex Corp., 427 B.R. 301, 311 (Bankr. D. Del. 2010), a plaintiff "is not required to include precise calculations evidencing balance sheet insolvency." Glencoe, 2015 WL 3777972, at * 4 (citation omitted).

To the contrary, where a plaintiff presents allegations regarding the debtors' financial condition sufficient to allow the court to plausibly infer insolvency, the pleading standard is satisfied—and the judges of this Bankruptcy Court do not engage in a lengthy, probing analysis at the pleading stage. See In re Ritz Camera & Image, L.L.C., 2014 WL 432192, at *3 (Bankr. D. Del. Feb. 4, 2014) (Gross, J.) (sustaining fraudulent transfer claim where "the Amended Complaint asserts that the Debtors were insolvent, as demonstrated by their operating losses"); Glencoe, 2015 WL 3777972, at *4 (Gross, J.) (complaint sustained where the plaintiff "provided sufficient allegations from which a reasonable person could infer" that the challenged conduct caused insolvency); Centaur, 2013 Bankr. LEXIS 3404, at *11 (concluding after brief analysis that pleading standard was satisfied where plaintiff alleged incurrence of massive debt and overestimation of value of certain assets); In re Midway Games Inc., 428 B.R. 303, 321 (Bankr. D. Del. 2010) (Gross, J.) (insolvency adequately pled based on allegations including, *inter alia*,

large trade debt, liabilities far exceeding assets, debtor not paying debts as came due).

Indeed, even in Defendants' primary case, where Judge Sontchi criticizes what he calls a

"where there is smoke there is fire" pleading approach and comments that plaintiffs

"have much work left to do," he finds the pleading standard satisfied. See In re Autobacs

Strauss, Inc., 473 B.R. 535, 555 (Bankr. D. Del. 2012).

Here, the Complaint pleads considerable factual detail. The Complaint first traces

how Moreno's bet on fracking threw the Company into financial disrepair:

- Post-Takeover, the Debtors Consistently Operate at a Loss. "From April 2011 through June 30, 2013, aggregate operating revenues were approximately $285 million, while the Debtors incurred operating losses on an accrual basis of approximately $100 million and on a cash basis of approximately $53 million." Compl. ¶ 30.

- The Debtors Incur Massive New Liabilities. In the first 8 months of 2011, GFES's capital expenditures increased 50 fold. Compl. ¶ 28. To finance these expenditures, GFES borrowed heavily. $340 million (of which $250 million was in high interest (13%) secured noted) was incurred by GFES in thirteen months—a 640% increase in funded debt load from its September 2011 level. Id.

- The Debtors' Business is Tied a Single, Money-Losing Customer Relationship. By the end of 2012, Shell, GFES's single largest customer, accounted for 79% of the company's revenue. Id. ¶ 29. By July 2012, GFES was losing "large sums of money" through its arrangements with Shell, due in part to the increasing cost of materials used by GFES to perform services for Shell. Id. ¶ 31.

Then, with the Debtors in such financial condition:

- The Debtors Transfer Away PowerGen. As set forth above, with consistent operating losses, massive debt and no prospect for success in its core fracking business, PowerGen represented the Debtors' best remaining chance for viability. In May 2013, however, GFES transferred PowerGen away for no consideration.

- The Debtors Repeatedly Default on Debt Payments. During June, July, and August of 2013, the Debtors failed to make an aggregate of $6 million of required principal payments on a credit facility that the Debtors had entered into with Shell in October 2012 and under which $78.2 million remained outstanding. Id. ¶ 47. This triggered a default under the credit

facility and a cross default under the indenture governing the Debtors' secured notes, giving Shell the right to demand immediate payment of all amounts due under the facility, and the Debtors were required to offer to repurchase up to $30 million of the notes at 108% of face value. <u>Id.</u>

- <u>The Debtors' Massive Net Working Capital Deficiency Accumulates</u>. The Debtors' report for the 6-month period ended June 30, 2013, estimated that as of June 30, 2013, the Debtors had a net working capital deficiency of approximately $333.4 million and owed $20.9 million to its vendors and other third-party suppliers that had been outstanding for over 120 days. <u>Id.</u> ¶ 47.

- <u>The Debtors' Primary Customer Terminates the Account</u>. Shell, the parent company of Shell, terminated the use of GFES's fracking services in August 2013. <u>Id.</u> ¶ 70.

Based on such allegations, the Complaint alleges that: "(i) GFES was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with GFES was an unreasonably small capital; and/or (ii) GFES intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured." <u>Id.</u> ¶ 98; <u>see also</u> <u>id.</u> ¶¶168, 282.

The foregoing series of detailed factual allegations goes far beyond merely "alleg[ing] the statutory elements" or "present[ing] no information on the Debtors' financial status." Where a complaint alleges that the debtors (i) consistently operated at loss, (ii) incurred massive liabilities and tied their business to a single, money-losing customer relationship, (iii) transferred away a $200 million business opportunity that represented their best remaining chance for viability, (iv) repeatedly defaulted on millions in debt payments,[13] (v) accumulated a massive net working capital deficiency, and (vi)

---

[13] Defendants' implication that certain defaults could have been motivated by the end of the Shell relationship, <u>see</u> MTD ¶ 64, would appear to be irrelevant, but at most constitutes an adverse inference providing no basis for dismissal.

were in arrears over 120 days for tens of millions of third-party payments, there is little question that the pleading standard has been satisfied. The only question becomes, at what point did insolvency begin?

That question—*i.e.*, the precise timing of the onset of insolvency—is most usefully analyzed with respect to particular causes of action. For the PowerGen constructive fraud count (Count 2), it is necessary to allege that GFES was insolvent at the time of or as a result of the PowerGen Transfer. Given the allegations above, there is no question that under the facts alleged, if GFES was not already insolvent as of the time of the transfer, it became insolvent as a result of transferring away the $200 million PowerGen business.[14] For that reason, it is not necessary to the determination of Count 2 to determine if GFES was already insolvent as of the time of the transfer.

For the preference and other fraudulent transfer counts, the Debtors must have been insolvent as of (or as a result of) transfers some of which occurred prior to the PowerGen Transfer. While the Complaint makes no global allegation that GFES was insolvent prior to the PowerGen Transfer, each of these counts (within the count itself) alleges insolvency as of (or as a result of) the date of transfer. Further, each count incorporates the factual allegations of the Complaint, including that, even prior to the PowerGen Transfer, the Debtors (i) consistently operated at loss, and (ii) incurred massive liabilities and tied their business to a single, money-losing customer relationship. Such allegations amount to more than merely "alleg[ing] the statutory elements" or "present[ing] no information on the Debtors' financial status."

---

[14] Defendants' argument that PowerGen could not have caused the insolvency is premised on the notion that the Complaint does not adequately allege the value of PowerGen. See MTD ¶ 65. That premise is false. See Part I.B.2, *infra*.

28

At the pleading stage, this approach is sufficient—*i.e.*, a single, global date of insolvency that applies to all counts need not be alleged.  See Fed. R. Civ. P. 8(a)(3); Oakwood Homes, 342 B.R. at 71 (Rule 8 "authorizes a plaintiff to plead inconsistent theories in the alternative").  The question of when insolvency began ultimately may become a disputed question of fact, but the Trustee is not required to forego pleading valuable claims before the date of insolvency is later determined based upon those facts.

2.    Reasonably Equivalent Value

Defendants also argue that Count 2 must be dismissed for failure to plead lack of "reasonably equivalent value," because it "does not allege what the market price . . . was at the time of the transfer," and "does not allege what value TGS paid to GFES in exchange for the so-called PowerGen." MTD ¶¶ 80-81.  This argument is unavailing.

"Given the wide number of variables to consider, and the less stringent pleading requirements of Fed. R. Civ. P. 8 to constructive fraud claims, the issue of reasonably equivalent value requires a factual determination that cannot be made on a motion to dismiss."  Glencoe, 2015 WL 3777972, at *3 (Gross, J.) (citing EPLG I, LLC. v. Citibank N.A. (In re Qimonda Richmond, LLC), 467 B.R. 318, 327 (Bankr. D. Del. 2012)); Charys Liquidating Trust v. McMahan Sec. Co., L.P (In re Charys Holding Co.), 443 B.R. 628, 638 (Bankr. D. Del. 2010) ("reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process").

Here, the Complaint alleges considerable detail regarding the value of PowerGen at the time of its transfer, including market data.  Following the transfer of PowerGen to TGS (which was 100% owned by MOR DOH), unaffiliated third party Powermeister in June 2013 purchased a 9.6% equity interest in MOR DOH, for $20 million—implying an enterprise valuation of $208 million.  Compl. ¶ 45.  Defendants attempt to downplay this

market data point by in effect asking the Court to infer that that the payment was for something other than PowerGen, see MTD ¶ 80, but the drawing of *adverse* inferences is not permitted at the pleading stage.    In any event, the Powermeister data point is consistent with the other allegations.    GE's contemplated investment of $100 million in PowerGen was for a minority stake, implying a valuation in excess of $200 million.    Id. ¶ 46.    A January 2013 presentation on PowerGen projected EBITDA growing to approximately $102.9 to 142 million as early as 2015.    Id.    And the Debtors ascribed a value to the PowerGen business of approximately $180 million (if not higher) in materials prepared in financial updates produced prior to the Petition Date, and in post-petition emails regarding the structuring of the Plan.    Id.[15]

Further, whether the precise value of PowerGen at the time of transfer was $180 million or $208 million is immaterial where the consideration alleged to be received was zero.    Defendants again attempt to conflate the payment made for labor or equipment costs with payment for PowerGen itself, but the Complaint is clear:    "[C]ompensation was limited to a small payment that was made for services rendered in connection with work on PowerGen, and related equipment—but no payment for PowerGen itself."    Compl. ¶ 44.[16]    Lack of reasonably equivalent value has been adequately pled.

## II.    THE POWERGEN FIDUCIARY DUTY COUNTS ARE ADEQUATELY PLED.

Defendants enumerate Count 3 (breach of duty of loyalty) and Count 4 (usurpation of corporate opportunity) among the counts that purportedly must be

---

[15] While beyond the scope of this Motion, Moreno himself has affirmatively alleged that GE planned to invest $100 million for a 50% share in PowerGen.    See Moreno Third Party Complaint ¶¶ 15, 20.

[16] Defendants' further argument that the Complaint does not allege how Moreno benefited from the transfer, see MTD ¶ 84, fails for reasons discussed below.    See Part V.B.3, infra.

dismissed for failure to adequately allege facts that "establish that the Board lacked independence." MTD ¶ 56. But nowhere in their brief do Defendants present a legal argument—or even an explanation—regarding the relevance of Board independence to Counts 3 and 4. For this reason, their motion must be denied as to Counts 3 and 4. In an effort to avoid a waste of Court and party resources, the Trustee assumes that Defendants' argument is intended to relate to the principle that a lack of Board independence is a basis for declining to apply the business judgment rule.

### A.    The Board Lacked Independence

Defendants' argument regarding lack of director independence, see MTD ¶¶ 50-56, fails because (i) it misstates the relevant standard, which the Complaint comfortably satisfies, and (ii) it would not, in any event, secure application of the business judgment rule, in light of the utter absence of any meaningful or informed Board process.

### 1.    The Complaint Comfortably Satisfies the Relevant Standard.

Defendants' argument regarding pleading lack of independence relies entirely upon Blasband v. Rales, 971 F.2d 1034, 1047 (3d Cir. 1992), and Aronson v. Lewis, 473 A.2d 805, 816 (Del. 1984). But these cases involve motions to dismiss under Delaware Court of Chancery Rule 23.1 for failure to plead demand futility—a considerably more exacting standard than that which applies on a motion to dismiss under Rule 12(b)(6). See In re Primedia Inc. Derivative Litig., 910 A.2d 248, 261 n.45 (Del. Ch. 2006) ("The court must apply the deferential Rule 12(b)(6) standard to the question of independence, since the defendants have not moved to dismiss the complaint under Rule 23.1.") Unlike in the Rule 23.1 context, where a plaintiff must "state with particularity" how demand was made or why it is excused, see Del. Ch. Ct. R. 23.1, under federal pleading standards a plaintiff need merely allege facts that if proven would plausibly give rise to an

entitlement for relief.  See Santiago v. Warminster Tp., 629 F.3d 121, 130 (3d Cir. 2010).

The Rule 12(b)(6) standard is satisfied here.

Under Delaware law,

> [a] director may be considered beholden to, and controlled
> by, another entity when that entity, directly or indirectly,
> has the unilateral power to decide whether the director
> continues to receive a benefit, financial or otherwise, upon
> which the challenged director is so dependent or is of such
> material importance to him that the threatened loss of that
> benefit might create a reason to question whether the
> controlled director is able to consider the corporate merits
> of the challenged transaction objectively.

Primedia, 910 A.2d at 261 n.45 (citing Orman v. Cullman, 794 A.2d 5, 25 n. 50 (Del. Ch.

2002)).   Thus, in Primedia, the Delaware Court of Chancery explained that certain

directors were sufficiently alleged to lack independence where "their continued

employment depended on the good graces of" the allegedly controlling party.  Id.

Here, the Complaint alleges that Moreno could remove *any* of his fellow directors

at will.  See Compl. ¶ 27.  Further, the Complaint pleads that Fontova, in his capacity as

GFES president and a director, received an annual salary of $375,000, was eligible for an

annual bonus of 50% to 100% of his annual salary, and devoted all of his professional

time to GFES, see id. ¶ 26, compounding his lack of independence.  See In re Student

Loan Corp. Derivative Litig., No. C.A. 17799, 2002 WL 75479, at *3 n.3 (Del. Ch. Jan.

8, 2002) (compensation from one's full-time employment is "typically of great

consequence" and directors who were full-time managerial employees were beholden to

employer); In re MAXXAM, Inc., 659 A.2d 760, 774 (Del. Ch. 1995) (special committee

members were beholden to controlling shareholder because they were each employed by

controller's other company at high compensation levels).

32

Second, Defendants' arguments regarding a 3-2 independent majority misstates the Complaint.  Citing paragraph 26 of the Complaint, Defendants assert that "[t]he Trustee acknowledges that GFES was managed by its Board, which was *comprised of five members*."  MTD ¶ 50 (emphasis added).  But the Complaint alleges four members: Moreno, Fontova, Kilgore and Knight.  Earl Blackwell (who Defendants treat as a member of the Board) is alleged to be the CFO.  Compl. ¶ 26.  Thus, even if Defendants were correct that the lack of independence of Kilgore and Knight is insufficiently alleged, the Board would be split 2-2 between interested and non-interested directors.  "A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested." Gentile v. Rossette, C.A. No. 20213-VCN, 2010 Del. Ch. LEXIS 123, at *30-*31 n.36 (May 28, 2010).

> 2.    Even if the Board Were Independent, Defendants are Not Entitled to the Business Judgment Rule.

In any event, even if GFES had had a disinterested Board, the business judgment rule still would not apply, because the directors utterly failed to inform themselves or engage in any process regarding the PowerGen Transfer, instead acting in bad faith and in disregard of GFES's interests.  See In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 289 (Del. Ch. 2003) (business judgment protection not available where the "directors knew that they were making material decisions without adequate information and without adequate deliberation"); McMullin v. Beran, 765 A.2d 910, 922 (Del. 2000) ("The business judgment rule is rebutted if the plaintiff shows that the directors failed to exercise due care in informing themselves before making their decision.").  In particular, the Complaint alleges (i) that the Board "utterly failed to inform itself or exercise meaningful oversight in connection with granting the PowerGen Waiver," Compl. ¶

42, (ii) that "no financial or valuation expert was retained to evaluate the proposed transfer of PowerGen[,] no analysis of opinion regarding the proposed transfer was commissioned[,] no valuation opinion regarding the proposed transfer was in fact obtained," (iii) that "there was no substantive deliberation by the Board before approving the PowerGen Waiver," and (iv) that the directors "act[ed] in bad faith and in intentional disregard of GFES's interests" and simply "rubber-stamped" the transaction.  Id.

### B.    Usurpation (Count 4) is Adequately Pled.

Count 4 alleges that Moreno usurped the PowerGen corporate opportunity.  Under Delaware law, a director may not seize a business opportunity for himself where:  "(1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation."  See Broz v. Cellular Info. Sys., Inc., 673 A.2d 148, 154-55 (Del. 1996).  Defendants argue that the usurpation claim must be dismissed because (i) the Complaint does not adequately define "PowerGen," and (ii) PowerGen was not within GFES's "line of business."  See MTD ¶¶ 30-42; 85-89.[17]  As discussed above, Defendants' first argument is unavailing.  See Part I.A.1, supra.  Defendants' "line of business" argument also is devoid of merit.

Of course, Moreno already has alleged under oath—albeit in a different court of law—that "[t]he agreed upon plan was for GFES to divest itself of the power generation line of business."  Moreno Third Party Complaint ¶ 16.  But the argument fails in any

---

[17] Defendants address the substance of Count 3 (breach of loyalty) and Count 4 (usurpation) together, in a few short sentences.  See MTD ¶¶ 87-88.  They appear to incorporate their "PowerGen definition" and "line of business" arguments by reference.

event.  Defendants' premise is that PowerGen was not part of the existing "well services" or "fracking" components of GFES's business.  See MTD ¶ 37.  That adopts an unduly constrictive view of "fracking" (i.e., it ignores that power generation would be used in fracking), but the Trustee in any event need only allege facts showing that PowerGen was within GFES's overall line of business, and the relevant test is less restrictive than Defendants imply.  See Dweck v. Nasser, C.A. No. 1353-VCL, 2012 WL 161590, at *13 (Del. Ch. Jan. 18, 2012) ("When determining whether a corporation has an interest in a line of business, the nature of the corporation's business should be broadly interpreted.").  In particular, as the Delaware Supreme Court has explained, "latitude should be allowed for development and expansion.  To deny this would be to deny the history of industrial development."  Guth, 5 A.2d at 514 (Del. 1939); see also Dweck, 2012 WL 161590, at *13 ("Although Kids primarily operated in the private label business, Kids easily and readily could have expanded into the branded business."); Fliegler, 361 A.2d at 220.[18]

Thus, even if Defendants were correct that PowerGen is not within the scope of fracking (and they are not), their argument still would fail because the "line of business" test expressly encompasses and anticipates expansions.  Further, here the Complaint alleges that Moreno had been touting PowerGen *on behalf of and for GFES*.  See Compl. ¶ 37.  Further still, Defendants' argument is contradicted by the Complaint's allegations that GFES had already begun work on PowerGen.  See Compl. ¶¶ 35-36.  In light of

---

[18] See also Guth, 5 A.2d at 514 ("Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is *adaptable to its business* having regard for its financial position, and is one that is consonant with its reasonable needs and *aspirations for expansion*, it may be properly said that the opportunity is in the line of the corporation's business.") (emphasis added).

Delaware's broad view of what constitutes an opportunity, Defendants' argument that PowerGen was not within GFES's line of business is unsustainable.

Finally, because GFES had already begun work on PowerGen, even if PowerGen did not satisfy the "line of business" test, it still would be treated as a "corporate opportunity" under Delaware law.  See Trim-Lean Meat Prods., 4 B.R. at 247 ("a business opportunity falling outside a corporation's line of business and which would not otherwise be considered a corporate opportunity, nevertheless, will be deemed a corporate opportunity if developed or financed with corporate funds") (citation omitted); Rapistan Corp. v. Michaels, 511 N.W.2d 918, 925 (Mich. 1994) (citations omitted) (under Delaware law, where corporate funds are used to make acquisition, fiduciary is estopped from denying that transaction was corporate opportunity).

### C.      Breach of Duty (Count 3) is Adequately Pled.

Defendants' argument for dismissal of Count 3 is largely unintelligible.  See MTD ¶¶ 87-89.  Defendants state that the Complaint does not "allege any material facts that were not disclosed to the Board" before the PowerGen Transfer, and they make statements concerning usurpation of corporate opportunity.  See id. ¶ 88.  But usurpation is a different cause of action (Count 4), and it is not clear what relevance Defendants believe non-disclosure has to Count 3.  Count 3 alleges breach of fiduciary duty against Moreno based upon his action of (while being on both sides of the transaction) transferring PowerGen from GFES (to which he owed duties) to a different entity under his control for no consideration.  See Compl. ¶ 105 ("By causing GFES to transfer PowerGen to TGS for no or virtually no consideration, Moreno, who controlled both GFES and TGS and derived improper personal benefits from the transfer, acted in bad faith and in deliberate disregard of his duties to the Debtors").  To the extent Defendants

incorporate their "inadequate definition" and "Board independence" arguments, those arguments fail for the reasons set forth above.  Beyond that, Defendants articulate no basis for, and present no legal argument in support of, dismissal of Count 3.

### D.    Aiding and Abetting (Count 6) is Adequately Pled.

In pleading a claim for aiding and abetting a breach of a fiduciary duty, a plaintiff must allege (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, and (iii) a knowing participation in that breach.  See Cantor Fitzgerald, L.P. v. Cantor, 724 A.2d 571, 584 (Del. Ch. 1998).  Defendants argue that Count 6, which charges TGS with aiding and abetting Moreno's breaches of fiduciary duty in connection with the PowerGen Transfer, must be dismissed for (i) failure to plead an underlying breach of duty, and (ii) failure to plead facts amounting to "knowing participation" by TGS.  See MTD ¶¶ 90-94.  The first argument fails for reasons discussed above.  See Part II.A-C, supra.  The "knowing participation" argument also fails.

Defendants cite no law in their brief explaining what "knowing participation" means.  "Knowing participation" is adequately pled where allegations give rise to an inference that the defendant acted with knowledge that the conduct advocated or assisted amounted to a fiduciary duty breach.  See In re Am. Bus. Fin. Servs., 375 B.R. at 117; see also Microsoft Corp. v. Amphus, Inc., C.A. No. CV 8092-VCP, 2013 WL 5899003, at *14 (Del. Ch. Oct. 31, 2013) ("[T]he alleged aider and abettor must know of the wrongful act and know that their conduct has assisted or facilitated the wrongful act.").

As the Delaware Court of Chancery has explained, a corporate entity established as a vehicle for a director to usurp a corporate opportunity "knowingly participates" in such usurpation.  See Microsoft, 2013 WL 5899003, at *14.  In Microsoft, the court held that where the alleged usurper created an operating subsidiary to transfer the usurped

assets to, "knowing participation" of the usurper was adequately pled.  Id.  The court

explained that "assistance" could be inferred from allegations tending to show that the

subsidiary "was Fung's instrumentality for maintaining a larger share of the Vadem

Patent revenues than he would have been entitled to had he honored his fiduciary duties

to Vadem," id., and "knowledge" was established because "Fung managed and controlled

[the subsidiary]," and his knowledge could be imputed to it.  Id.  The complaint thus

made a prima facie showing of knowing participation.  Id.

 The same analysis applies here.  The Complaint alleges that Moreno breached

fiduciary duties and usurped a corporate opportunity belonging to GFES by engineering

the removal of PowerGen, which he knew held substantial value, from the reach of GFES

creditors and taking it for himself.  Compl. ¶ 39.  To accomplish this, Moreno formed

TGS (of which he was the indirect sole owner at the time of the transfer) to receive

PowerGen upon its transfer from GFES.  See id. ¶¶ 11, 17, 39-40.  Thus, TGS facilitated

Moreno's breaches in the same manner that the subsidiary in Microsoft facilitated Fung's

breach.  Further, the Complaint's allegations give rise to a reasonable inference that TGS

knew that Moreno's conduct amounted to a fiduciary duty breach.  As the sole owner of

TGS as of the date of the PowerGen Transfer, Moreno's knowledge is imputed to TGS.

See In re Pitt Penn Holding Co., 484 B.R. 25, 41 (Bankr. D. Del. 2012) (knowledge and

conduct of corporation's sole shareholder automatically imputed to corporation); Carlson

v. Hallinan, 925 A.2d 506, 542 (Del. Ch. 2006) opinion clarified, No. CIV.A.19466, 2006

WL 1510759 (Del. Ch. May 22, 2006) (knowing participation element satisfied by

imputing corporate agent's knowledge to corporate defendant).  Accordingly, TGS is

deemed to have known all that Moreno knew regarding the transfer, including that

PowerGen held substantial value and that GFES transferred it for no consideration.  This is more than sufficient for "knowing participation."  Cf. Microsoft, 2013 WL 5899003, at *14 ("A party that aids and abets a breach of a fiduciary duty need not actually participate in the underlying act that constitutes the breach of fiduciary duty to be liable. Rather, the alleged aider and abettor must know of the wrongful act and know that their conduct has assisted or facilitated the wrongful act.").[19]  Count 6 is adequately pled.

### E.    Corporate Waste (Count 7) is Adequately Pled.

Directors are liable for waste when they authorize an exchange that is "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."  In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 362 (Del. Ch. 1998) (citation omitted), rev'd on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  Count 7 charges Moreno with wasting corporate assets by causing GFES to transfer the PowerGen Business to TGS for no consideration.  Defendants argue that (i) Louisiana law (which purportedly does not recognize a waste claim) may apply, and (ii) even under Delaware law, the count must be dismissed.  See MTD ¶¶ 95-101.  Neither argument has any merit.

First, under Delaware's approach to choice of law, the internal affairs doctrine governs the choice of law question.[20]  The internal affairs doctrine "recognizes that only one state should have the authority to regulate a corporation's internal affairs—the state of incorporation."  VantagePoint Venture Partners v. Examen, Inc., 871 A.2d 1108, 1112-

---

[19] Defendants' citation of Nymex Shareholder Litig. v. New York Mercantile Exch., Inc., C.A. No. 3621-VCN, 2009 Del. Ch. LEXIS 176, at *47 (Del. Ch. Sep. 30, 2009), for the proposition that conclusory allegations are insufficient is thus unavailing, given the factual allegations detailing the role of TGS.

[20] Because this Court is located in Delaware, Delaware choice-of-law rules govern the determination of which state's substantive law applies.  See In re Garden Ridge Corp., 338 B.R. 627, 632 (Bankr. D. Del. 2006) ("To determine which state's law to apply, the Court turns to Delaware choice of law rules.").

13 (Del. 2005); <u>VantagePoint</u>, 871 A.2d at 1113 (emphasizing that directors and officers have a right to know what law will be applied to their actions); <u>accord</u> <u>McDermott Inc. v. Lewis</u>, 531 A.2d 206, 215 (Del. 1987) (citation omitted).  It is well established that the choice of law determination for corporate waste claims is governed by the internal affairs doctrine.  <u>See</u> <u>Enzo Life Sciences, Inc. v. Adipogen Corp.</u>, No. 1:11-CV-00088-RGA, 2015 WL 1137823, at *22 (D. Del. Mar. 12, 2015) (quoting <u>Xcell Energy & Coal Co., LLC v. Energy Inv. Grp., LLC</u>, 2014 WL 2964076, at *3 (Del. Ch. June 30, 2014)) ("Claims implicating an entity's internal affairs include . . . waste.").  This is because, "[m]uch like a claim for breach of fiduciary duty, a waste claim implicates a matter peculiar to corporations . . . ."  <u>Fedders</u>, 405 B.R. at 549 (applying internal affairs doctrine to determine law governing waste claim).  Here, GFES was incorporated in Delaware at all relevant times, so the waste claim is governed by Delaware law.[21]

    <u>Second</u>, the Complaint satisfies the standard for pleading a waste claim under Delaware law.  While Defendants offer a series of fact-intensive justifications for the PowerGen Transfer,[22] such justifications have little relevance to the pleading standard.  As this Court has explained, "[t]here are two ways for a corporate waste claim to survive a motion to dismiss: (1) the complaint alleges facts showing that [the company] received

---

[21] As Defendants' own cases show, their preferred "most significant relationship test" is applied in ordinary tort or contract actions.  <u>See</u> <u>Travelers Indem. Co. v. Lake</u>, 594 A.2d 38, 46 (Del. 1991) (holding that "the most significant relationship test" applies in both contract and tort causes of action); <u>Vichi v. Koninklijke Philips Elects.</u>, N.V., 85 A.3d 725, 773 (Del. Ch. 2013) (considering whether Delaware law or Italian law governed the plaintiff's common law fraud and negligent misrepresentation claims); <u>Arrow Oil & Gas v. SemCrude L.P. (In re SemCrude L.P.)</u>, 407 B.R.112, 134 (Bankr. D. Del. 2009) (considering which state's law governed the issue of whether certain security interests had been perfected).

[22] Defendants assert, for example, that GFES lacked the financial means to continue developing PowerGen, that no investor was willing to fund future development, that the venture was not realizing a return for the Debtors, and that this justifies the transfer.  <u>See</u> MTD ¶ 101.  Beyond raising issues of fact not suitable for resolution now, some of these contentions are drawn from outside of the Complaint.  <u>See id.</u> (asserting that GFES lacked financial means to continue developing PowerGen and that no investor was willing to fund future development).  As discussed above, such an approach is not proper on a motion to dismiss.

no consideration, or (2) the complaint alleges that a transfer of corporate assets served no corporate purpose."  In re Direct Response Media, Inc., 466 B.R. 626, 657 (Bankr. D. Del. 2012) (citing Official Comm. of Unsecured Creditors of Integrated Health Services, Inc. v. Elkin, No. Civ. A. 20228-NC., 2004 WL 1949290, at *17 (Del. Ch. Aug. 24, 2004)); see also In re Buckhead Am. Corp., 178 B.R. 956, 969 (D. Del. 1994) (denying motion to dismiss waste claim where complaint alleged that debtor "did not receive any consideration for assuming obligations of $130 million and paying $8.9 million in cash to finance the . . . LBO.").  Here, the Complaint alleges that a $200 million business was transferred away for no consideration.  At this stage, nothing more is required.[23]

## III.    UNJUST ENRICHMENT (COUNT 5) IS ADEQUATELY PLED.

Count 5 pleads unjust enrichment against TGS, based on its receipt of PowerGen upon its transfer from GFES.  Unjust enrichment requires "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  Nemec v. Shrader, 991 A.2d 1120, 1130-31 (Del. 2010).  Defendants argue that Count 5 must be dismissed because (i) PowerGen is not adequately defined, (ii) impoverishment has not been "truly established," because GFES was devoting resources to PowerGen while PowerGen was not generating income, (iii) "absence of justification . . . cannot [be] plead" due to a "lack of revenue" and "ongoing costs" associated with PowerGen, and

_____

[23] Defendants' reliance on Fedders, 405 B.R. 527, is misplaced.  In Fedders, there was no allegation that the company received no consideration.  Defendants' other cases likewise do not help them.  In USDigital, 443 B.R. at 47, cited by Defendants for the proposition that "[t]he test for corporate waste is an extreme test" and is "rarely satisfied," the court denied the motion to dismiss a corporate waste claim.  Id. at 47-48.  And in In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005), cited by Defendants for the proposition that stating a claim for corporate waste is a "near-Herculean task," see MTD ¶ 99, the court was not even considering the plaintiff's waste claim (which was not on appeal), and the task that the court deemed to be "near-Herculean" was "[o]vercoming the presumptions of the business judgment rule *on the merits*."  See Tower Air, 416 F.3d at 235 (emphasis added).

(iv) a contract governs the parties' relationship and absence of an adequately remedy at law "cannot [be] allege[d]" because other counts seek the same relief.  See MTD ¶¶ 164-170.  None of these arguments have any merit.

First, Defendants' argument that an enrichment has not been pled because PowerGen is not adequately defined fails because, as discussed above, PowerGen is adequately defined.  See Part I.A.1.  Receipt of a corporate opportunity constitutes enrichment, see Ragnar Benson, Inc. v. Kassab, 325 F.2d 591 (3d Cir. 1963), particularly where, as here, it is alleged to be worth approximately $200 million.

Second, Defendants' argument that impoverishment has not been "truly established" has no relevance at the pleading stage.  The Trustee need not "truly establish" the element, he need only allege facts that if proven would constitute impoverishment.  He has done so:  as discussed, the PowerGen Transfer deprived GFES of a $200 million business that represented its best remaining chance for viability.[24]

Third, Defendants' argument that the Trustee "cannot plead" the absence of justification, because PowerGen was not generating revenue and ongoing costs were required, is supported by no case law.  In any event, the argument at most raises fact issues.  See Halpert v. Zhang, 966 F. Supp. 2d 406, 416 (D. Del. 2013) ("[a]t the motion to dismiss stage, the court cannot conclude that there is no conceivable set of circumstances under which defendants unjustifiably retained something of value").

---

[24] Further, Defendants' notion that GFES's transfer of a $200 million business for nothing cannot constitute impoverishment because GFES had spent money developing GFES makes no sense—if anything, losing an asset into which one has sunk resources is *more* of an impoverishment.  Likewise, the notion that impoverishment has not been "truly established" because PowerGen was not yet generating money would require the Court to ignore the Trustee's valuation allegations or draw adverse inferences, neither of which provides a basis for dismissal.

Fourth, Defendants' arguments that a contract governs the relationship, and that there are adequate remedies at law, both fail.[25]  The Complaint does not allege that the TGS Agreement governs the transfer of PowerGen.  Indeed, it alleges that the TGS Agreement was entered into *after* the PowerGen Transfer, and concerned equipment for use by TGS.  See Compl. ¶ 65.[26]  At best, Defendants are asking the Court to draw an adverse (and dubious) inference regarding the contract's subject matter.  Further, invoking other counts misses the mark, because unjust enrichment may be pled in the alternative.  See L&L Broad. LLC v. Triad Broad. Co., C.A. No. N13C-10-028 WCC, 2014 WL 1724769, at *4 n.18 (Del. Super. Ct. Apr. 8, 2014) (citations omitted).

## IV.    THE CONTRACT COUNTS ARE ADEQUATELY PLED.

### A.    Breach of Contract (Counts 8 and 9)

Counts 8 and 9 allege that Moreno entities MOR MGH and MMR breached their obligations under the Share Purchase Agreements to provide approximately $20 million in funding to GFES through the purchase of preferred shares.  Defendants' sole argument for dismissal is that it is a condition precedent to payment that no "Material Adverse Change" has occurred, while certain allegations of the Complaint purportedly constitute a "tacit acknowledge[ment]" that a Material Adverse Change occurred in the second half of 2012.  MTD ¶ 106.  This argument fails for two reasons.

First, although a complaint seeking damages for breach of contract must allege compliance with conditions precedent, it "suffices to allege generally that all conditions

---

[25] Defendants describe their argument regarding the TGS Agreement as relating to "the third element," see MTD ¶ 167, but as noted above, that element concerns the relationship between the enrichment and impoverishment, which Defendants do not and cannot contest.

[26] Citing paragraphs 65 and 75 of the Complaint, Defendants appear to invoke two separate contracts, see MTD ¶ 167, but paragraphs 65 and 75 refer to the same contract:  the TGS Agreement.

precedent have occurred or been performed."  Fed. R. Civ. P. 9 (c).  Thus, a complaint alleging that the conditions precedent have been performed will survive a motion to dismiss.  See In re Residential Capital, LLC, 524 B.R. 563, 584-85 (Bankr. S.D.N.Y. 2015); see also Hildebrand v. Allegheny Cnty., 757 F.3d 99, 112 (3d Cir. 2014) (pleading the occurrence of conditions precedent not subject to Iqbal/Twombly standard).  Here, the Complaint alleges that "all conditions precedent to the performance of MOR MGH and MMR were satisfied."  Compl. ¶¶ 133, 138.  Nothing further is required.

Second, Defendants' argument in any event raises a question of fact that cannot be determined on a motion to dismiss.  See Molina Info. Sys., LLC v. Unisys Corp., No. CV 12-1022-RGA, 2014 WL 4365278, at *4 (D. Del. Sept. 2, 2014) (citation omitted) ("Whether the various problems with the Idaho MMIS qualify as a Material Adverse Effect or could reasonably be expected to result in one is not something the Court can adequately address on a motion to dismiss").[27]

## B.    Breach of Duty of Loyalty (Count 10)

Count 10 alleges that Moreno, standing on both sides of the Share Purchase Agreements, breached his duty to GFES by causing entities under his control to fail to make required payments to GFES.  See Compl. ¶¶ 141-146.  Defendants argue that this count must be dismissed because it is duplicative of the breach of contract claims.  See MTD ¶¶ 108-110.  This argument fails for multiple reasons.

First, Count 10 does not even name the same parties as the breach of contract counts.  Compare Compl. ¶¶ 131-140 (naming MOR MGH and MMR) with id. ¶¶ 141-

---

[27] While the fact issue raised by Defendants is a matter for a later stage, it bears noting that the 2013 SPA was signed on the same date that payment was due.  See Compl. ¶ 57.  Putting aside whether a material change could occur within a matter of hours, the factual allegations that Defendants point to occurred months earlier, in the second half of 2012—not during the course of a couple hours on June 28, 2013.

146 (naming Moreno).  This fact alone distinguishes the counts.  See Grunstein v. Silva, C.A. No. 3932-VCN, 2009 Del. Ch. LEXIS 206, at *21 (Del. Ch. Dec. 8, 2009) (distinguishing case where "the contractual obligations only implicated one of the defendants while fiduciary duties extended to the remaining defendant").

Second, even under the test that Defendants cite, namely that "the principal inquiry is whether the fiduciary duty in the complaint arises from general fiduciary principles or from specific contractual obligations agreed upon by the parties," MTD ¶ 109 (citing Grunstein v. Silva, C.A. No. 3932-VCN, 2009 Del. Ch. LEXIS 206, at *17, *18 (Dec. 8, 2009)), it cannot be concluded at this stage that there is no set of facts under which Count 10 does not arise from general fiduciary principles.  Count 10 is asserted against Moreno, a non-party to the contract, and it alleges that he undertook conduct (not required by the contract) to cause the contracting party to fail to make a payment to GFES at a critical moment for GFES—thereby causing it harm.  See Compl. ¶ 60.

Third, it cannot be assumed at this stage that the damages proven for the contract counts would be identical to those proven for the breach of fiduciary duty count.  For example, although the Complaint's Request for Relief is not so limited, it is conceivable that only expectation damages would be awarded under the contract counts, but additional damage amounts would be awarded under the fiduciary duty counts.

### C.      Tortious Interference (Count 11)

Count 11 alleges that Moreno tortiously interfered with the Share Purchase Agreements by causing MOR MGH and MMR to breach them.  Defendants' request for dismissal on the ground that Moreno was "not a stranger" to the contracts, see MTD ¶¶ 111-113, should be rejected.

Under both New York and Delaware law,[28] a corporate agent may be liable for tortiously interfering with a contract entered into by the corporation when he or she acts for personal profit.  See Hoag v. Chancellor, Inc., 677 N.Y.S.2d 531, 533-34 (App. Div. 1998); see also Nelson v. Fleet Nat. Bank, 949 F. Supp. 254, 263, 264 (D. Del. 1996).  Here, the Complaint alleges that Moreno caused MOR MGH to breach its obligations as part of his campaign to strip GFES of assets in order to advance his personal interests.  See Compl. ¶¶ 39, 61-62, 64-65.  At the pleading stage, the Trustee is entitled to the inference that Moreno's interference was motivated by his own personal interests rather than the interests of MOR MGH.  Cf. Nelson, 949 F. Supp. at 264; Searle & Co. v. Mediocore Commc'ns., 843 F. Supp. 895, 912 (S.D.N.Y. 1994) (holding that whether corporate insiders tortiously interfered with corporation's contract to improperly enrich themselves was issue of fact for trial).

## V.    THE AFFILIATE TRANSFER COUNTS ARE ADEQUATELY PLED.

### A.    The Preference Defendants Are Statutory Insiders.

Defendants first argue that most of the Trustee's preference claims must be dismissed because the Preference Defendants are not "non-statutory insiders."  See MTD ¶¶ 43-49.  But their argument is beside the point, because the Preference Defendants[29] are statutory insiders.

---

[28] While Defendants apply Delaware substantive law to Count 11, under Delaware choice-of-law principles contract-related tort claims including tortious interference claims may be governed by the law selected in a choice of law provision. See Ashall Homes, Ltd. v. ROK Enter. Grp. Inc., 992 A.2d 1239, 1252-53 (Del. Ch. 2010); Abry Partners V, L.P. v. F & W Acquis. LLC, 891 A. 2d 1032, 1048 (Del. Ch. 2006).  Here, the contracts contain a choice of law provision providing that New York law shall govern "[t]his Agreement and the performance of the transactions and the obligations of the parties hereunder . . . .".

[29] The "Preference Defendants" are those identified in the Complaint as recipients of preferential transfers, specifically:  Moreno, Frac Rentals, S3, TGS, MOR DOH, Aerodynamic, Casafin, Moreno Properties.

"Insider" includes "affiliates" of the debtor.  See 11 U.S.C. § 101(31)(B), (E). "Affiliate" includes a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ."  11 U.S.C. § 101(2)(B).[30]  This Court has held that certain targets of preference actions were statutory insiders because trusts "own, directly or indirectly, more than 20% of them and the [t]rusts also indirectly own more than 20% of the Debtor."  Opus East, 528 B.R. at 91-92.  Here, each Preference Defendant is either wholly or mostly "owned by an entity [*i.e.*, Moreno] that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor," see Compl. ¶¶ 10-20, and therefore is a statutory insider under Section 101(2)(B).

### B.    Counts 12 and 15 Through 21 (Preference Claims)

Defendants raise three further issues allegedly warranting the dismissal of all of the Trustee's preference claims, but none actually provides a basis for dismissal.

---

[30] "Entity" is defined to include "person," which term itself includes individual.  See 11 U.S.C. §§ 101(15), 101(41).  "Corporation" is defined to include (i) association having a power or privilege that a private corporation, but not an individual or a partnership, possesses; (ii) partnership association organized under a law that makes only the capital subscribed responsible for the debts of such association; (iii) joint-stock company; (iv) unincorporated company or association; or (v) business trust; but (B) does not include limited partnership. § 101(9).  Although LLCs are not included in the enumerated entities, it is nevertheless well-settled that LLCs are "corporations" for purposes of the Code.  As the United States Bankruptcy Court for the District of Kansas has explained, "[t]he term 'corporation' only 'includes' the entities enumerated in the statute."  In re Brooke Corp., 506 B.R. 560, 566 (Bankr. D. Kan. 2014).  The Code's rules of construction as stated in § 102(3), dictate that the terms "'include' and 'including' are not limiting.  Thus, entities not "entities not enumerated in the statute may also be considered 'corporations.'" Id.  Indeed, a number of courts, including this Court, have concluded that limited liability companies fit within the definition of "corporation."  See In re Opus East.LLC, 528 B.R. 30 (Bankr. D. Del. 2015) (concluding that a limited liability was an affiliate of the debtor); see also In re Longview Aluminum, L.L.C., 657 F.3d 507 (7th Cir. 2011); Solomon v. Barman (In re Barman), 237 B.R. 342 (Bankr. E.D. Mich. 1999); Kotoshirodo v. Zapara (In re Lull), Bankr. No. 06-00898, 2009 WL 3853210 (Bankr. D. Haw. Nov. 17, 2009); Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks), 503 B.R. 820 (Bankr. W.D. Wash. 2013).

1.    Each of the Preference Defendants Received More From GFES
Than They Would Have in a Chapter 7 Liquidation.

Defendants contend that the Trustee fails to "specify any factual basis" upon which to conclude that the Preference Defendants received more than they would have in a Chapter 7 liquidation.  See MTD ¶¶ 120-21.  But as reflected in the Liquidation Analysis attached to the Disclosure Statement, GFES itself concluded that in a Chapter 7 liquidation, unsecured creditors would likely have received distributions equaling between 0-10% of their allowed claims.[31]  The Complaint alleges that each Preference Defendant received in excess of that amount on account of their alleged pre-petition claims against GFES.  See Compl. ¶¶ 161, 182, 195, 208, 221, 234, 247, 260, 273.

2.    The Complaint Adequately Puts the Moreno Defendants on Notice
of the Trustee's Preference Claims Under Delaware Law.

The Moreno Defendants also assert that the Trustee's references to Delaware state law are insufficient to put those Defendants on notice of the claims against them.  See MTD ¶ 114.  But taken together, (i) the Trustee's citation to Del. C. § 1301, the Delaware fraudulent transfer statutes, (ii) the context in which that state law is cited, and (iii) the factual allegations made in connection with the Preference Defendants are sufficient to inform the Preference Defendants that the Trustee seeks to avoid the subject transfers under Delaware preference law in addition to federal law.  See In re Charys, 443 B.R. at

---

[31] The Court may take judicial notice of the fact of the Debtor's conclusion on this point, as set forth in the Disclosure Statement. Under Fed. R. Evid. 201(b)(1)-(2), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  It is well-settled that a court may take notice of docket filings pursuant to Rule 201. See, e.g., United States v. Webber, 396 F.2d 381, 386 (3d Cir. 1968) ("the court can take judicial notice under Fed. R. Civ. P. 56(c) of the documents and other material of record in [a prior case concerning the parties].");  Golden v. Cook, 293 F. Supp. 2d 546, 551 (W.D. Pa. 2003) ("courts are permitted to consider . . . publicly available records and transcripts from judicial proceedings in related or underlying cases which have a direct relation to the matters at issue.").

636 ("Plaintiffs have alleged that the Transfers are avoidable under 'applicable state law, including . . . the Delaware Fraudulent Transfer Act, 6 Del. C. § 1301 et seq . . . .' Plaintiffs have properly pled various state laws in the alternative and put Defendant on adequate notice of what claims Plaintiffs are asserting.").[32]

> 3. The Transfers to the Preference Defendants Can be Recovered From Moreno Because they Were Made "For His Benefit."

Defendants argue that the Trustee has not alleged sufficient facts on which to hold Moreno personally liable for the transfers to the Preference Defendants because the Trustee "does not allege how Moreno benefited from any of the transfers to these entities." See MTD ¶ 139. This argument is without merit.

The Complaint alleges that Moreno controlled the Preference Defendants. See MTD ¶ 139 n.26 (citing Compl. ¶¶ 188, 227). Courts have held that individuals (like Moreno) that exercise control over a company that received an initial transfer from the debtor (like the Preference Defendants) are "beneficiaries" of that transfer under Bankruptcy Code Section 550(a). See, e.g., In re Slatkin, 243 Fed. App'x 255, 257-59 (9th Cir. 2007) (upholding determination that transfer to corporation was for benefit of sole shareholder, director, and officer who directed use of funds received by corporation); In re McCook Metals, L.L.C., 319 B.R. 570, 592 (Bankr. N.D. Ill. 2005) (transfer to limited liability company was for benefit of individual who was managing member, chairman, and owner of 56% equity interest because transfer was quantifiable benefit that

---

[32] The standards for pleading a preference claim under Delaware law are substantially identical to those under the Bankruptcy Code, except that a plaintiff must also allege the insider transferee had "reasonable cause" to believe that the debtor was insolvent. See Del. C. § 1305(b). Here, whether by way of (i) express allegations, see, e.g., Compl. ¶ 183 ("Dynamic had reasonable cause to believe that the Debtors were insolvent"), (ii) imputation, see Part II.D, supra, or (iii) inference, each of the Preference Defendants, wholly or majority owned by Moreno, had reasonable cause to believe that the Debtors were insolvent at the time of the relevant transfers.

individual could access based on controlling interest); <u>In re Worcester Quality Foods, Inc.</u>, 152 B.R. 394, 403-04 (Bankr. D. Mass. 1993) (transfers to corporations were for the benefit of the owners of the corporations); <u>In re Behr Contracting, Inc.</u>, 79 B.R. 84, 87 (Bankr. S.D. Fla. 1987) (transfer to corporation that was fully owned by stockholder and had no assets or liabilities was for the benefit of the stockholder).  Further, "[t]o dismiss the Complaint merely because it does not allege a *specific* benefit received by [defendant] would be inappropriate in light of the liberal pleading standard applicable to avoidance actions brought by estate representatives."  <u>In re AstroPower Liquidating Trust</u>, 335 B.R. 309, 334-35 (Bankr. D. Del. 2005) (emphasis added and citation omitted).

## C.    <u>Defendants' Claim-Specific Preference Arguments Are Meritless.</u>

Defendants four claim-specific arguments for dismissal likewise lack merit.[33]

### 1.    Counts 16 (S3 Transfers) and 17 (TGS Transfers)

Defendants contend that Counts 16 and 17 must be dismissed because the transfers at issue were made on or before the date that GFES's obligations were invoiced by S3 and TGS, respectively.  <u>See</u> MTD ¶¶ 125, 127.  Accordingly, Defendants argue, the Trustee does not allege that the S3 Transfers and the TGS Transfers were made "for or on account of antecedent debt" as required by Section 547(b)(2).  This argument conflates invoice dates with the date a debtor legally became bound to pay.

The proper focus of a preference analysis is when the debtor became legally bound to pay.  <u>See</u> <u>In re Hayes Lemmerz Int'l., Inc.</u>, 329 B.R. 136, 141 (Bankr. D. Del. 2005) (Bankr. D. Del. 2005) (a debt is antecedent when the debtor becomes legally bound

---

[33] To the extent that Defendants repeat arguments already discussed above, the Trustee does not repeat his response.  For this reason, Count 15 (for which Defendants seek dismissal solely based upon such arguments) is not separately discussed.

to pay before the transfer is made).  A debtor becomes legally bound to pay a debt when the relevant services are performed or goods delivered—even if payment is not yet due according to a transferee's invoice.  See Opus East, 528 B.R. at *85 (Bankr. D. Del. Mar. 23, 2015) (payments made for services performed where for an antecedent debt owned by debtor); In re CM Holdings, Inc., 264 B.R. 141, 153 (Bankr. D. Del. 2000) (payments made in satisfaction of invoices were made "on account of an antecedent debt owed by the debtor" because they were "made on account of services rendered by the creditor to the debtor before payment was made" even though payment was not yet due according to the terms of the invoices); In re Gen. Office Furniture Wholesalers, Inc., 37 B.R. 180, 182 (Bankr. E.D. Va. 1984) ("[D]ebts are incurred when services are rendered, not when an invoice is sent or even when a party is billed.").

Because the Complaint alleges that GFES became legally obligated to make the S3 Transfers and the TGS Transfers before those Transfers were actually made, Defendants' argument for dismissal of Counts 16 and 17 is without merit.

### 2.    Count 12 (Moreno Transfers)

Defendants suggest that the Trustee does not adequately allege that the $571,897 in Moreno Transfers were made at such times as to be avoidable.  See MTD ¶ 122.  This is not correct.  Section 547(b)(4)(B) provides in relevant part that the trustee may avoid any transfer of an interest of the debtor in property made to a creditor (i) while the debtor was insolvent and (ii) between 90 days and one year before the date of the bankruptcy filing (where the creditor was an insider).  See 11 U.S.C. § 547(b).  Here, the Complaint alleges that the Moreno Transfers were made in the year prior to the Petition Date, during which time the Debtors were insolvent.  See Compl. ¶ 65; see also Part I.B.1, supra.

Further, Defendants' reliance on <u>Valley Media v. Borders (In Re Valley Media)</u>, 288 B.R. 189 (Bankr. D. Del. 2003), is misplaced.  There, the complaint asserted only that "during the ninety day preference period Defendant received preferential payments totaling 'not less than $624,627.18,'" and provided no further information.  <u>Id.</u> at 191. Here, the Complaint alleges not only a dollar amount for the Moreno Transfers (approximately $571,897), but also why the transfers were made (for Moreno's salary, bonuses and expense reimbursements) and by whom.  It cannot fairly be said that the Trustee has not provided Moreno with "fair notice of the transfers [he] seeks to avoid." <u>Valley Media</u>, 288 B.R. at 193.  Moreover, this and other Bankruptcy Courts have subsequently criticized <u>Valley Media</u>'s approach to preference pleading as too restrictive. <u>See, e.g.</u>, <u>Official Comm. of Unsecured Creditors of the IT Grp. v. Brandywine Apartments (In re IT Group, Inc.)</u>, 313 B.R. 370, 373 (Bankr. D. Del. 2004) ("While plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them to do so in their initial pleading in all cases, particularly with the specificity demanded by <u>Valley Media</u>, is in this court's view inappropriate and unnecessarily harsh"); <u>Family Golf Ctrs., Inc. v. Acushnet Co. and Fortune Brands, Inc. (In re Randall's Island Family Golf Ctrs., Inc.)</u>, 290 B.R. 55, 65 (Bankr. S.D.N.Y. 2003) ("[W]hile the information identified by <u>Valley Media</u> might ultimately be necessary to adjudicate the preference claims, it does not follow that it must be pleaded on pain of dismissal.").

### 3.   Count 18 (MOR DOH Transfers)

With respect to Count 18, through which the Trustee seeks to recover a preferential transfer made to MOR DOH, Defendants contend that the Trustee alleges that the obligation and payment arose simultaneously at the closing of the alleged

sale/leaseback transaction, and accordingly, and that the MOR DOH Transfer was not made pursuant to an "antecedent debt." See MTD ¶ 129.  In fact, the Trustee alleges that the transfer was made on November 1, 2012, and alleges that the obligation was incurred before that date.  See id. ¶¶ 65, 232.  The factual allegations in the Complaint must be accepted as true, and Defendants in any event offer no basis for concluding that the obligation was instead incurred on or after November 1, 2012.

4.      Counts 19 (Aerodynamic Transfers), 20 (Casafin Transfers) and 21 (Moreno Properties Transfers)

Defendants argue that the regularity of the Aerodynamic Transfers, the Casafin Transfers and the Moreno Properties Transfers, respectively, establishes that the payments were made "in the ordinary course" of GFES's business.  See MTD ¶¶ 132, 135, 138.  This contention provides no basis for dismissal.

"The ordinary course of business defense is an affirmative defense, which is not a proper basis for a motion to dismiss."  Buckley v. Merrill Lynch & Co. (In re DVI, Inc.), Case No. 03-12656, 2008 Bankr. LEXIS 2338, at*20 (Bankr. D. Del. Sept. 16, 2008); see also Forman v. Deutsch Atkins, P.C. (In re Russ Cos.), Case No. 11-22471 (DHS), 2013 Bankr. LEXIS 3229, at *16 (Bankr. D.N.J. Aug. 5, 2013) ("[C]ourts have specifically determined that preference exceptions listed under 11 U.S.C. § 547(c) cannot be used to dismiss a plaintiff's complaint under Rule 12(b)(6)"); In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 277 (3d Cir. 2004) ("[A]n affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)"); Miller v. McCown DeLeeuw & Co. (In re Brown Schools), 368 B.R. 394, 401 (Bankr. D. Del. 2007).[34]

---

[34] Defendants' attempt to invoke Tower Air 416 F.3d at 238, which case involves the situation where "an unanswered defense appears on its face," see MTD ¶ 135, is well off the mark.  In Tower Air, the

Further, in attempting to prevail on the ordinary course defense, Defendants would in any event only raise issues of fact—indeed, the defense is so fact-intensive that it often cannot be resolved even *on summary judgment*. See IT Grp., Inc. v. Anderson Equip. Co. (In re IT Grp., Inc.), 332 B.R. 673, 676 n.7 (Bankr. D. Del. 2005) ("the ordinary course of business defense is a highly fact-intensive issue, and it is rare indeed for it to be resolved in defendant's favor on a motion for summary judgment"); Official Comm. of Unsecured Creditors v. Kittelson & Assoc. (In re IT Grp., Inc.), Adv. Pro. No., A 04-50217, 2005 Bankr. LEXIS 2296, at *8 (Bankr. D. Del. Nov. 17, 2005) (noting "the highly fact-intensive nature of the ordinary course of business defense" and denying summary judgment on preference claim.[35] The defense provides no basis for dismissal.

### D.      Count 22 (Alliance Sand) is Adequately Pled.

Defendants contend that Count 22, which seeks to recover approximately $4.6 million in prepayments to Alliance from Moreno and Elle as constructively fraudulent transfers, must be dismissed because: (i) GFES does not plead lack of reasonably equivalent value, (ii) the Trustee fails to adequately allege insolvency, and (iii) Moreno and Elle are not proper defendants.  For reasons discussed in Section I.B.1, supra, the

---

complaint expressly alleged "that the business judgment rule d[id] not vitiate any of [the plaintiff's] claims." Tower Air, 416 F.3d at 238.  Where, as here, the affirmative defense is not expressly invoked by the plaintiff, Tower Air does not require dismissal. See, e.g., Shamrock Holdings, Inc. v. Arenson, 456 F. Supp. 2d 599, 609 (D. Del. 2006) (declining to "dismiss claims under Rule 12(b)(6) based on unanswered affirmative defenses which are raised only implicitly on the face of the complaint").

[35] Here, for example, the Complaint details an entangled relationship between GFES and the Moreno Entities (including Aerodynamic, Casafin, and Moreno Properties) see, e.g., Compl. ¶¶ 9-21—*i.e.*, exactly the sort of atypical, non-arms-length relationship under which the "ordinary course" defense does not succeed.  See 5 Collier on Bankruptcy, ¶ 547.04[2][a][i] (courts "generally are interested in whether the debt was incurred in a typical, arms-length commercial transaction . . . or . . . whether it was incurred as an insider arrangement with a closely held entity"); Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.), 107 B.R. 698, 702 (B.A.P. 9th Cir. 1988) (rejecting ordinary course defense due to, *inter alia*, close nature of the relationship between appellant and debtor); McCullough v. Garland (In re Jackson), 90 B.R. 793, 794-97 (Bankr. D.S.C. 1988).

Complaint alleges facts sufficient to create an inference that GFES was insolvent as of the date of the Alliance Transfer.  Defendants' other arguments also fail.

First, the Complaint satisfies the standard for pleading lack of reasonably equivalent value.  In determining whether a transferor received reasonably equivalent value, courts evaluate the "totality of the circumstances."  See Fedders, 405 B.R. at 547. Defendants' argument for dismissal disregards this principle by ignoring key aspects of the Trustee's allegations:  in addition to alleging that the sand was not ever received, the Trustee alleges that (i) Moreno controlled GFES, and indirectly held a 50% ownership interest in Alliance, see Compl. ¶ 22, which creates an inference that the arrangement was not entered into at arm's length, see Peltz v. Hatten, 279 B.R. 710, 736 (Bankr. D. Del. 2002) (a factor in REV determination is "whether the transaction was at arm[']s length"); In re Morris Commc'ns NC, Inc., 914 F.2d 458, 467 (4th Cir. 1990) (4th Cir. 1990) (whether transfer was "an arm's length transaction" is of "considerable importance" to REV determination); and (ii) the payment was made to Alliance in part to help it build and operate a Wet and Dry processing plant that was to be owned by Alliance, see Compl. ¶¶ 22, 68.  Further, Defendants' argument that GFES received "value" in the form of a new supplier for sand misses the mark, because "value" and "reasonably equivalent value" are distinct concepts.  See In re RML, Inc., 92 F.2d 139, 148 (3d Cir. 1996) (while debtor received "value" in the form of a "chance of obtaining financing" in the future, "th[e] minimal 'value' was not 'reasonably equivalent'") (citation omitted). Ultimately, Defendants' fact-driven argument underscores what this Court has repeatedly held: "the issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss."  Glencoe, 2015 WL 3777972, at *3 (citations

omitted); see also Charys, 443 B.R. at 638 ("reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process.").

Second, that neither Elle nor Moreno were initial or subsequent transferees is irrelevant, because the Complaint alleges that the transfer was made for their benefit. See Compl. ¶ 12 (alleging that Moreno and spouse were the sole owners of Elle); id. ¶ 22 (alleging that Elle held 50% equity interest and 40% senior debt interest in Alliance). As discussed above, this is sufficient to plead under Section 550(a) that they are parties "for whose benefit" the transfer was made. See Part V.B.3, supra.

### E.    Count 13 (Moreno Transfers) is Adequately Pled.

Defendants contend that Count 13, which seeks to avoid as a constructive and/or actual fraudulent transfer $571,897 in salary, bonus and expense-reimbursement payments made to Moreno,[36] must be dismissed because the Trustee fails to adequately allege lack of reasonably equivalent value, insofar as the Complaint does not specify the amount by which the Moreno Transfers exceeded the market rate for similar services, and because it otherwise offers nothing by conclusory allegations. See MTD ¶ 142.[37] This argument is without merit.

At the pleading stage, it is sufficient to allege that salary payments exceeded the standard market rate for similar services, see In re Petters Co., Inc., 495 B.R. 887, 921-22 (Bankr. D. Minn. 2013), and there is no requirement to allege the amount by which the payments exceeded the market rate, see Charys, 443 B.R. at 637 (allegation that payment

---

[36] The Trustee seeks avoidance of these transfers on a preference theory in Count 12.

[37] Defendants also seek dismissal of the constructive fraudulent transfer claim for failure to adequately plead insolvency. Defendants' argument fails because, as discussed above, the Trustee's approach to pleading insolvency is sufficient not only as to the PowerGen Transfer but also as to transfers that are the subject of preference counts, including the Moreno Transfers. See Part I.B.1, supra.

"exceeded the prevailing market rate for comparable . . . services" created inference of lack of reasonably equivalent value by "showing a gap between market rates and the amounts paid").  Further, where a plaintiff states a prima facie case that a corporate insider breached his or her duty of loyalty to the debtor, courts have held that the plaintiff also states a prima facie case that the debtor did not receive "reasonably equivalent value" for salary payments made to the unfaithful insider.  See, e.g., In re Madoff Inv. Secs. LLC, 458 B.R. 87, 112-13 (Bankr. S.D.N.Y. 2011)  (denying motion to dismiss, because Trustee "sufficiently alleged that [employees] breached fiduciary duties to BLMIS, and thus did not provide services that might otherwise have constituted adequate consideration in exchange for their receipt of salaries and bonuses").  Here, the Complaint catalogues a litany of instances in which Moreno engaged in self-dealing or otherwise breached his fiduciary duties to GFES, and pleads that such breaches show that the Debtors did not receive reasonably equivalent value in exchange for Moreno's services.  See Compl. ¶¶ 66, 103-114, 127-130, 141-146.  This is sufficient to plead lack of reasonably equivalent value.[38]

---

[38] Defendants also argue that the actual fraudulent transfer claim in Count 13 should be dismissed for failure to plead actual intent.  See MTD ¶ 141.  This is incorrect for two reasons.  First, more than one badge of fraud is pled:  (i) the Complaint alleges that Moreno sat on the Board, indirectly owned more than 90% of GFES's equity and controlled GFES, cf. Gaddis v. Allison, 234 B.R. 805, 812 (D. Kan. 1999) (badge pled where the transferee was the debtor's "sole shareholder, officer and director"); Tri-State Paving, Inc. v. Jones (In re Tri-State Paving, Inc.), 32 B.R. 2, 4 (Bankr. W.D. Pa. 1982) ("Corporate directors enjoy privileged access to the company's financial accounts and inside information, a situation ripe for abuse"); (ii) the Complaint pleads facts sufficient to create a plausible inference that GFES was insolvent as of the date of the Moreno Transfers, see Part I.B.1, supra; and (iii) courts often conclude that large salary payments to corporate directors made as the corporation's finances are languishing raises a suspicion of impropriety sufficient to deny a motion to dismiss, see Tri-State Paving, 32 B.R. at 4 ("Trainor and Jones controlled the checkbook. Paying themselves in full by taking unfair advantage of their special positions and knowledge to save themselves from being prejudiced and simultaneously leaving their other creditors with nothing constituted an actual intent to defraud"); accord Gaddis, 234 B.R. at 812.  Second, the allegations concerning the Moreno Transfers satisfy the alternate "motive and opportunity" means of pleading an inference of fraudulent intent.  See Tronox, 429 B.R. at 94 ("A strong inference of fraudulent intent may be established . . . by alleging facts to show that defendants had both motive and opportunity to

## VI.     THE PRESERVATION COUNT IS ADEQUATELY PLED.

Defendants argue that Count 23 (preservation of property under Code Section 551) must be dismissed because (i) the avoidance actions in Counts 1, 2, 12, 13, and 15-22 are not adequately pled, (ii) the Trustee does not allege that Moreno personally benefitted from those transfers, and (iii) "the estates presumably do not exist now that the liquidation trust has been established." See MTD ¶ 154.  The first two arguments fail for reasons already discussed.  The third argument also fails.  As alleged in the Complaint (and as is typical in large Chapter 11 cases in this District where a post-confirmation liquidation or litigation trust is established), GFES's confirmed Plan vested in the Trust all unreleased claims and causes of action belonging to the Debtors' estates, including actions for preservation of property under Section 551.  See Compl. ¶ 8.  Accordingly, Defendants' argument fails.  See Zazzali, 476 B.R. at 431 (denying in part motion to dismiss avoidance action complaint, including counts seeking preservation of property under Section 551, filed by trustee of post-confirmation liquidation trust established for Chapter 11 debtors); OHC Liquidation Trust v. Am. Bankers Ins. Co. (In re Oakwood Homes Corp.), 2005 Bankr. LEXIS 429, at *3 (Bankr. D. Del. Mar. 18, 2005).

## VII.    THE TRUSTEE ADEQUATELY ALLEGES CLAIMS SEEKING SUBORDINATION AND DISALLOWANCE.

Defendants argue that the Trustee has failed to adequately allege facts sufficient to substantiate its claims for subordination and disallowance.  Their arguments, however, are without merit.

---

commit fraud").   Under the allegations here, Moreno had both a "motive" to transfer the $571,897 constituting the Moreno Transfers to himself, and the "opportunity" to effect the transfer (via his control of GFES).  Further, his conduct is imputed to GFES.  See Part I.A, supra.

The Trustee's objections to Defendants' claims (Counts 24-28)[39] are included in the Complaint pursuant to Bankruptcy Rule 3007(b), which provides that a plaintiff "may include the [claim] objection in an adversary proceeding."  Fed R. Bankr. P. 3007(b). An objector need only show that the facts underlying its claim objections, if accepted as true, create "a plausible showing of entitlement to relief in the [Trustee's] objection to the Claim."  In re Rutledge, 510 B.R. 491, 510 (Bankr. M.D.N.C. 2014); see also Frontier Ins. Co. v. Westport Ins. Corp. (In re Black, Davis & Shue Agency, Inc.), 460 B.R. 407, 416 n.8 (Bankr. M.D. Pa. 2011) (applying Bankruptcy Rule 7012 to motion to dismiss claim objections filed in complaint).  That standard is satisfied here.

## A.    Equitable Subordination (Count 24)

Defendants argue that Count 24, which seeks equitable subordination of claims filed by Moreno and his affiliates in light of their inequitable conduct, must be dismissed because the Trustee has not sufficiently alleged that (i) particular inequitable conduct existed that warrants subordination, (ii) Defendant Moreno Affiliates are insiders (which would warrant stricter scrutiny of their actions), (iii) any inequitable conduct actually harmed creditors, and (iv) any such harm had any causal connection to the inequitable conduct.  See MTD ¶¶ 155-63.  Defendants' arguments are meritless.

As Defendants acknowledge, a plaintiff asserting a claim for equitable subordination need only prove the existence of (i) inequitable conduct, (ii) resulting in injury to creditors or unfair advantage to the claimant, and (iii) an outcome that is not

---

[39] Defendant MMR has admitted that it has only one contract claim against the Estate.  See Answer and Affirmative Defenses of Moody Moreno and Rucks, LLC to Complaint and Objection to Claims Pursuant to Bankruptcy Code Sections 502 and 503 and Federal Rule of Bankruptcy Procedure 2007 [Docket No. 11], at ¶ 321.  It therefore appears that MMR does not dispute Count 29 of the Complaint (seeking to disallow MMR's duplicative claim), so the merits of that claim are not discussed here.

otherwise inconsistent with the Bankruptcy Code.  See MTD ¶ 156 (citing Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns), 554 F.3d 382, 411 (3d Cir. 2009)).

As Defendants fail to acknowledge, however, a claim for equitable subordination is an inherently fact-intensive inquiry not ordinarily suitable for resolution on a motion to dismiss.  See Autobacs Strauss, 473 B.R. at 583 ("[C]ourts recognize that determining whether a creditor's claim should be subordinated is a fact-intensive inquiry which should not necessarily be determined on a motion to dismiss."); see also Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.), 365 B.R. 24, 69 (Bankr. S.D.N.Y. 2007) ("The nature of the underlying conduct . . . will have to be fleshed out as a factual matter – a task that is, of course, inappropriate when considering motions under Rule 12(b)(6)."); Tese-Milner v. TPAC, LLC (In re Ticketplanet.com), 313 B.R. 46, 66 (Bankr. S.D.N.Y. 2004) ("[t]he extent of the damage and the appropriate remedy are not issues that can be decided at this stage of the case").  Under this standard, Defendants' argument fails for at least four reasons.

First, the Trustee has adequately pled "inequitable conduct."  Defendants are statutory insiders whose prepetition actions (which the Trustee details at length throughout the Complaint) constitute the very type of conduct that courts routinely find satisfies the first prong of the Third Circuit's equitable subordination test.[40]  "Courts have generally recognized three categories of misconduct which may constitute inequitable

---

[40]  As discussed above, Defendants are statutory insiders, see Part V.A, supra, and "[a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the court."  Winstar, 554 F.3d at 412 (citations omitted)  (internal quotation marks omitted); see In re Mid-Am. Waste Sys., Inc., 284 B.R. 53, 69 (Bankr. D. Del. 2002) ("The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider or outsider in relation to the debtor at the time of the act.").  And even if the Defendant Moreno Affiliates were not insiders, and the Trustee were required to show "evidence of more egregious conduct such as fraud, spoliation or overreaching," the Complaint still would adequately allege facts supporting Defendants' "egregious conduct."

conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." In re Mid-Am. Waste Sys., Inc., 284 B.R. 53, 70 (Bankr. D. Del. 2002). Here, the Complaint alleges just such conduct. See Compl. ¶¶ 33-68.

Second, the Trustee has adequately alleged facts to show that Defendants' inequitable conduct caused harm to the Debtors' creditors by, *inter alia*, diverting estate assets to Defendants that would otherwise go to satisfy creditor claims. And even if the Trustee had failed to adequately allege facts showing creditor harm, the second prong of the Third Circuit's test is disjunctive—it is also satisfied where the claimant received an "unfair advantage." See Mid-Am. Waste Sys., 284 B.R. at 71 ("Under the second prong of the traditional equitable subordination analysis, the Court must determine whether the claimant's inequitable conduct either (i) created some unfair advantage for the claimant or (ii) harmed the debtor or its creditors. This standard is stated in the disjunctive so only either unfair advantage *or* harm must be established. . . .) (emphasis in original); see also Autobacs Strauss, 473 B.R. at 583 (requiring that a plaintiff show "the misconduct caused injury to the creditors or conferred an unfair advantage on the defendant"). At a minimum, Defendants conferred an unfair advantage on themselves through their inequitable conduct by, among other things, absorbing millions of dollars from the Debtors as the Debtors veered toward collapse. See Compl. ¶¶ 63-68.

Third, Defendants' argument that the Trustee has failed to establish a causal connection between the Defendants' inequitable conduct and (i) the claims to be

subordinated and (ii) the harm suffered by creditors, <u>see</u> MTD ¶ 159, misses the mark.[41]

The Third Circuit test for equitable subordination does not require proof of a causal connection between the Defendants' inequitable conduct and the claims that the Trustee seeks to have subordinated.  <u>See Winstar</u>, 554 F.3d at 412 ("The inequitable conduct underlying equitable subordination may be 'unrelated to the acquisition or assertion of the particular claim whose status [is] at issue.'") (citation omitted); <u>see also</u> <u>Mach. Rental, Inc. v. Herpel (In re Multiponics, Inc.)</u>, 622 F.2d 709, 713 (5th Cir. 1980) ("[T]he inequitable conduct which must be shown need not necessarily be related to the acquisition or assertion of the claim.").  Nor does the Third Circuit test require proof of a causal connection between the Defendants' inequitable conduct and the harm suffered by the creditors.  <u>Mid-Am. Waste Sys.</u>, 284 B.R. at 71 (citation omitted) ("An injury to the debtor caused by a claimant's inequitable conduct in reasonable proximity to bankruptcy or while the corporation is in financial distress decreases the likelihood of the recovery of claims by general creditors, and thus injures them.  There is no requirement that the purported misconduct or the harm it causes be a major cause of the debtor's bankruptcy.").  In any event, the Trustee has alleged that the Defendants pilfered the assets of an undercapitalized and insolvent corporation, thereby "decreas[ing] the likelihood of the recovery of claims by general creditors, and thus injur[ing] them."  <u>Id.</u>

## B.   <u>Inconsistent Claim of Casafin (Count 28)</u>

Count 28 objects to certain claims on the basis that the Debtors do not owe the amounts claimed.  Defendants argue that the Trustee has made only a conclusory

---

[41] Defendants do not argue that equitable subordination of their claims would result in an outcome that is inconsistent with the Bankruptcy Code.

allegation that Casafin's inconsistent claim is inconsistent with the Debtors' books and records. See MTD ¶ 178. But "Rule 3007, which governs objections to claims, provides little guidance as to the form the objection must take other than specifying that it be in writing and filed with the court." Southland Corp. v. Kilgore & Kilgore (In re Southland Corp.), 19 F.3d 1084, 1087 (5th Cir. 1994). Moreover, "[o]bjections to proofs of claim need not be pleaded with great precision[.]" In re Mall At One Assocs., L.P., 185 B.R. 1009, 1015 (Bankr. E.D. Pa. 1995). The Trustee has alleged that it is not liable to the Defendant Moreno Affiliates for the inconsistent claims, and resolution of that objection will be a matter of fact for a later stage.

### C.    Administrative Claim of Moreno (Count 27)

Count 27 objects to the administrative claim filed by Moreno against GFES in which he seeks approximately $1.5 million for professional fees incurred in connection with the examiner process. Under Section 503 of the Code, "after notice and a hearing, there shall be allowed administrative expenses . . . including the actual and necessary costs and expenses of preserving the estate." 11 U.S.C. § 503. For a claim to qualify: (i) the expense must have arisen from a post-petition transaction between the creditor and the debtor, and (ii) the expense must have been "actual and necessary" to preserve the estate. See In re New Century TRS Holdings, Inc., 446 B.R. 656, 661 (Bankr. D. Del. 2011). Creditors filing substantial contribution applications "who seek to have their claims paid ahead of general unsecured creditors bear the burden of establishing that their claim qualifies for priority status." Id. at 661.

Defendants request dismissal of Count 27 based upon the following sentences: "The Trustee acknowledges that Moreno incurred these fees post-petition in the process of responding to this Court's orders appointing an examiner. As such, Moreno's efforts

to assist the examiner in this Court-appointed role was necessary to the administration of the estate."  MTD ¶ 177.  Neither sentence is supported by any facts or case law, and neither sentence provides a basis for dismissal.

First, as alleged, Defendants' claim "arises from pre-petition conduct and not from post-petition conduct."  Compl. ¶ 308.  In particular, the claim relates to a prepetition indemnification clause as well as prepetition transactions for which indemnity and advancement may be due.  Id. ¶ 75, n.6  Claims for indemnification based on a prepetition agreement are prepetition claims, even if the alleged injury does not manifest itself until the post-petition period.  See, e.g., Stratton v. Mariner Health Care, Inc. (In re Mariner Post-Acute Network, Inc.), 303 B.R. 42 (Bankr. D. Del. 2003); In re Mid-Am. Waste Sys., Inc., 284 B.R. 53 (Bankr. D. Del. 2002).

Second, Defendants' assertion that "Moreno's efforts to assist the examiner in this Court-appointed role was necessary to the administration of the estate," MTD ¶ 177, is inappropriate for resolution at the pleading stage.[42]  See In re S&Y Enters., LLC, 480 B.R. 452, 462 (Bankr. E.D.N.Y. 2012) (determining whether a creditor "has made a substantial contribution in a Chapter 11 case is case-specific and fact-intensive").

## D.    Reimbursement and Declaratory Judgment (Counts 26, 30, and 31)

Counts 26, 30 and 31 object to reimbursement and seek declaratory judgments in connection with certain agreements with (and waivers executed by) Shell.  Defendants

---

[42] Its prospects for success are dim in any event.  Moreno would first need to prove that his actions "would have been undertaken absent an expectation of reimbursement from the estate."  Lebron v. Mechem Fin. Inc., 27 F.3d 937, 944 (3d Cir. 1994).  Then, Moreno would need to prove a "causal connection between the service" and a "contribution."  In re Worldwide Direct, Inc., 334 B.R. 112, 121 (Bankr. D. Del. 2005).  Most fundamentally, claims "arising under § 503(b)(1)(A) are equitable in nature and thus are valued by the amount of post-petition *benefit* the claimant provides to the estate and not necessarily according to the contract terms underlying the claim."  Camelot Music, Inc. v. MHW Adver. & Pub. Relations Inc., 264 B.R. 141, 149 (Bankr. D. Del. 2000) (emphasis added).  Here, Moreno was fighting *against* the assertion by the estate of valuable claims for recovery—hardly an outcome that would "benefit" the estate.

argue that (i) the Trustee lacks standing because he was never party to the Shell Guarantee, and (ii) the claims fail in any event.  Both arguments are without merit.

First, the Trustee has standing.  A debtor has a right to object to a guarantor's reimbursement claim against the estate, even if the debtor was never a party to the guarantee, so long as the estate is the beneficiary of that waiver of rights.  See, e.g., Parker v. Kolath (In re Fremont Hospitality Grp., LLC), Nos. 13-31005, 13-3127, 2014 WL 4796668, at *9 (Bankr. N.D. Ohio Sept. 26, 2014) (disallowing claims after rejecting argument "that the Guaranties were agreements between [the creditor] and the Bank and, as such, do not limit [the creditor's] right to assert claims against Debtor"); Linnemann v. Post (In re Mission Bay Ski & Bike, Inc.), 398 B.R. 250, 255 (Bankr. N.D. Ill. 2008) (concluding that debtor could enforce guarantor's waiver of its rights of subrogation, indemnity, contribution, exoneration, and reimbursement even though not a party to the guarantee, because "[w]hen two parties agree to waive rights against a non-party, courts generally find the non-party to be a third-party beneficiary entitled to enforce the waiver").  Here, the estates benefit from Defendants' waiver, to the extent disallowance of the claims increases the size of distributions for general unsecured creditors.

Further, Section 502(a) allows any "party in interest" to object to a claim.  See 11 U.S.C. § 502(a).  Indeed, "even [where] the existence of a claim is controlled by state law, the allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of its equitable powers."  Canal Corp. v. Finnman (In re Johnson), 960 F.2d 396, 404 (4th Cir. 1992) (concluding that the "bankruptcy court was clearly permitted to deny" claims "under its federal equitable power" and rejecting arguments that state law and/or contractual agreements can govern disposition of estate

claims and assets); see In re Shelter Enters., Inc., 98 B.R. 224, 229 (Bankr. W.D. Pa. 1989), amended by 99 B.R. 668 (Bankr. W.D. Pa. 1989) ("[T]he Bankruptcy Court has the power to inquire as to the 'validity' of the claim and to determine that allowance of the claim would be just and fair in relation to other creditors.").

Further still, courts recognize standing for a liquidation trust to object to claims where a confirmed plan so provides. See, e.g., In re Level III Trading Partners, L.P., No. 13-12120, 2015 WL 475268, at *2 (Bankr. E.D. La. Feb. 3, 2015). Here, section 9.01(b) of the Debtors' Plan provides the Liquidation Trustee with the "exclusive responsibility for reviewing and objecting to the Allowance of any Claim or Interest filed in the Chapter 11 Cases[.]" Plan § 9.01(b) (emphasis added). And the Liquidation Trust Agreement empowers the Trustee to "[f]ile objections to, compromise, arbitrate, abandon, or otherwise resolve or settle, issues involving Claims and Interests pursuant to Article IX of the Plan." Liquidation Trust Agreement, § 2.2(h), Exhibit B to Plan. Finally, in confirming the Plan, the Court recognized that the Litigation Trustee will serve "as the sole representative of the Estates" and "from and after the Effective Date of the Plan, only the Liquidation Trustee shall be entitled to object to Claims." Findings of Fact, Concl. of Law and Order Confirming Second Amended Joint Plan of Liq. of Green Field Energy Services [Docket No. 885], at ¶ K.8.b. It is nonsensical for the Defendants to request a distribution from the Estates on account of the Reimbursement Claims while simultaneously arguing that the Trustee—"the sole representative of the Estates"—lacks standing to contest the allowance or amount of those claims.

Finally, because the Trustee is "the sole representative of the Estates" and the only party entitled "to object to Claims," he likewise has standing to seek declaratory

judgment concerning the enforceability of Moreno's claims.  See, e.g., In re Chateaugay Corp., 116 B.R. 887, 900 (Bankr. S.D.N.Y. 1990) ("In order to have standing, the Debtors must establish that they are the proper plaintiff to raise the issues sought to be litigated in their declaratory judgment action.") (citation and quotation marks omitted).

Second, with respect to Defendants' substantive argument, the Trustee has satisfied his burden at this stage.  The  Complaint alleges that under the Shell Guarantee, Moreno waived his rights to obtain, among others, reimbursement, contribution, and indemnification, or to seek to exercise any right or remedy against the Debtors with respect to the Shell Guarantee.  See Compl. ¶ 78 (quoting relevant provisions of the Shell Guarantee).  Courts have held that even where such contractual waivers are contained in guarantee agreements that do not involve a debtor or its estates, where a party clearly and unambiguously "waives its rights of subrogation, reimbursement, indemnification, and contribution . . . [that] waiver is enforceable[.]"  Fremont Hospitality, 2014 WL 4796668, at *9-10 (granting trustee's motion for summary judgment seeking disallowance of subrogation claim).  Because Defendants are alleged to have explicitly waived their rights to obtain reimbursement, contribution, and indemnification, Defendants' Reimbursement Claims, including that portion seeking reimbursement of legal fees, should be disallowed.  At a minimum, the Trustee has stated a plausible claim.

Defendants' Reimbursement Claims should also be disallowed pursuant to Section 502(e).  "To achieve disallowance of a claim under Bankruptcy Code § 502(e)(1)(B), the Plan Trustee must prove three elements: (i) the claim must be contingent, (ii) the claim must be for reimbursement or contribution, and (iii) the debtor and the claimant must be co-liable on the claim."  In re Touch Am. Holdings, Inc., 409

B.R. 712, 715-16 (Bankr. D. Del. 2009). The Trustee has adequately pled each element.

First, Moreno's claim is contingent, because he has made no payment to Shell, pursuant to the Shell Guarantee or otherwise. See Compl. ¶ 303; see also In re Friendship Dev. Ctr., Inc., 164 B.R. 625, 627 (Bankr. D. Minn. 1992) (citation omitted) ("Since [the guarantor] has not paid [the primary creditor], thereby establishing his right to payment from the Debtor, as of the date of the ruling on this objection, [the guarantor]'s claim is contingent and must be disallowed under § 502(e)(1)(B)."). Second, the claim filed was for indemnification and/or reimbursement and was based on the Shell Guarantee. See Compl. ¶¶ 76-78; see also Touch Am. Holdings, 409 B.R. at 716 ("Courts have consistently held that the concept of reimbursement includes indemnity.") (citations and internal quotation marks omitted). Third, Defendants filed their Reimbursement Claims on January 31, 2014, prior to consummation of the Debtors' Plan and settlements set forth therein, and therefore at a time when Defendants and Debtors were co-liable on the underlying claim. See Compl. ¶ 75; see also In re Amatex Corp., 110 B.R. 168, 171 (Bankr. E.D. Pa. 1990) ("Given the obvious intention of the Code draftspersons to cover the entire field of treatment of claims of indemnitors and contributors in 11 U.S.C. §§ 502 and 509, it appears to us illogical to give § 502(e)(1)(B) a narrow reading, based on the tense of the verb used in § 502(e)[.]"). Moreover, "[b]y its very nature a claim for contribution presupposes a sharing of liability and thus a co[-]debtor relationship." In re Baldwin-United Corp., 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985).

Additionally, because the portion of the Reimbursement Claim requesting reimbursement of attorneys' fees is part of the larger Reimbursement Claim, the "co-liability" prong is satisfied, and that portion of the Reimbursement Claim should also be

disallowed.  See Touch Am. Holdings, 409 B.R. at 718-19 ("The interdependence between [the claimant's] defense costs and the underlying action for indemnification costs places all of [the claimant's] claims under the umbrella of § 502(e)(1)(B).").

## VIII.    IN THE ALTERNATIVE, LEAVE TO RE-PLEAD SHOULD BE GRANTED.

Should the Court conclude that any of the claims are not adequately pled, the Trustee respectfully requests leave to re-plead.  Rule 15(a) of the Federal Rules of Civil Procedure, applicable to this adversary proceeding pursuant to Rule 7015 of the Federal Rules of Bankruptcy Procedure, provides that "when justice so requires," leave to amend should be "freely granted." See Fed. R. Civ. P. 15(a)(2).  As the Third Circuit has explained, courts should use "strong liberality" in considering whether to grant leave to amend.  Bechtel v. Robinson, 886 F.2d 644, 652 (3d Cir. 1989).  Leave to amend should not be denied absent undue delay, bad faith, undue prejudice to the non-movant, or futility, see Foman v. Davis, 371 U.S. 178, 182 (1962), none of which are present here.

[Signature page follows.]

Dated:  July 10, 2015

**WOMBLE CARLYLE SANDRIDGE**
**& RICE, LLP**

/s/ Thomas M. Horan
Steven K. Kortanek (Del. Bar No. 3106)
Thomas M. Horan (Del. Bar No. 4641)
Morgan L. Patterson (Del. Bar No. 5388)
222 Delaware Avenue, Suite 1501
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: skortanek@wcsr.com
E-mail: thoran@wcsr.com
E-mail: mpatterson@wcsr.com

**BROWN RUDNICK LLP**

Robert J. Stark (admitted *pro hac vice*)
Marek P. Krzyzowski (admitted *pro hac vice*)
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

Joel S. Miliband (admitted *pro hac vice*)
2211 Michelson Drive, 7th Floor
Irvine, California 92612
Telephone:  (949) 752-7100
Facsimile:  (949) 252-1514

*Counsel for Alan Halperin, as Trustee of the GFES*
*Liquidation Trust*