## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GREEN FIELD ENERGY | ) | |
| SERVICES, INC., *et al.*, | ) | Case No. 13-12783 (KG) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| ALAN HALPERIN, AS TRUSTEE OF THE | ) | |
| GFES LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 15-50262 (KG) |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL B. MORENO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | **Re: Adv. Dkt. No. 13** |

## <u>MEMORANDUM OPINION</u>

The Court is ruling on the motion of Michael B. Moreno, and certain affiliated entities (collectively, the "Moving Defendants"),[1] seeking dismissal of an adversary complaint (the "Complaint") filed by Alan Halperin, as trustee of the GFES Liquidation Trust (the "Trustee"), pursuant to Federal Rule of Civil Procedure 12(b)(6)[2] ("Rule 12(b)(6)"). For the reasons discussed below, the Court will deny the motion.

---

[1] In addition to Mr. Moreno, the Moving Defendants include: MOR DOH Holdings, LLC, MOR MGH Holdings, LLC, Shale Support Services, LLC, FRAC Rentals, LLC, Turbine Generation Services, LLC, Aerodynamic, LLC, Casafin II, LLC, Moreno Properties, LLC, and Elle Investments, LLC. The Moving Defendants do not include the following defendants: Moody, Moreno and Rucks, LLC, Dynamic Group Holdings, LLC, and LQT Industries, LLC a/k/a Dynamic Energy Services International, LLC.

[2] Made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012.

## THE RULE 12(b)(6) STANDARD

Before the Court delves into the facts alleged in the Complaint, it is appropriate to consider the standards guiding its analysis. Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Rule 12 (b)(6) is inextricably linked to Federal Rule of Civil Procedure 8(a)(2) ("Rule 8(a)(2)"), which provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Nearly a decade ago, in its seminal *Twombly* decision, the Supreme Court ushered in the modern era of notice pleading under Rule 8(a)(2). The Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The *Twombly* standard is one of "plausibility" and not "probability"; "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* at 556. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (quotation omitted).

In its *Phillips* decision, the United States Court of Appeals for the Third Circuit addressed the *Twombly* decision, observing that "the notice pleading standard of Rule 8(a)(2) remains intact, and courts may generally state and apply the Rule 12(b)(6) standard, attentive to context and [a] showing that 'the pleader is entitled to relief, in

order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555). Thus, the Third Circuit found that "[i]t remains an acceptable statement of the standard, for example, that courts 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Id*. (citation omitted).

Subsequent to the *Phillips* decision, the Supreme Court again addressed the Rule 8(a)(2) notice pleading standard in its *Iqbal* decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). The *Iqbal* decision makes it clear that the *Twombly* plausibility standard applies to all civil suits filed in federal courts[3] and identifies two "working principles" underlying the *Twombly* decision. *Id.* at 678. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citation omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679 (citation omitted).

---

[3] The *Twombly* decision arose out of an antitrust case and courts were initially unclear whether the seemingly heightened "plausibility" standard applied outside of that specific context. *See Phillips*, 515 F.3d at 234.

In its *Fowler* decision, the Third Circuit usefully synthesized the foregoing authorities as follows:

> [A]fter *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. As the Supreme Court instructed in *Iqbal*, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

*Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted). With these principles in mind, the Court will proceed with its analysis of the Moving Defendants' motion to dismiss.

## BACKGROUND

With the exception of a few minor procedural observations, the following facts are taken from the Complaint and are accepted as true for purposes of this memorandum opinion. Green Field Energy Services ("Green Field" or, together with certain affiliate debtors, the "Debtors") was, until September 2011, formerly known as Hub City Industries, LLC ("Hub City"). Compl. ¶ 24. Hub City traced its roots back to 1969 and was for many years involved in a "traditional well services business." *Id.* In December

2010, Hub City entered the burgeoning hydraulic fracturing ("fracking") industry. *Id.* In May 2011, defendants MOR MGH Holdings, LLC ("MOR MGH") and Moody, Moreno and Rucks, LLC ("MMR") paid $27.9 million and $4.8 million, respectively, to buy out the members of Hub City. *Id.* at ¶ 25. As of the Petition Date (defined below), MOR MGH and MMR held 81.634% and 10.2%, respectively, of Green Field's common stock. *Id.* at ¶¶ 10, 12. Mr. Moreno indirectly holds a 100% ownership interest in MOR MGH and a one-third[4] ownership interest in MMR. *Id.*

After the Hub City/Green Field acquisition, Mr. Moreno, in his capacity as incorporator of Green Field, appointed himself and three other men to the Green Field board of directors. *Id.* at ¶ 26. One appointee, Rick Fontova, had a long-standing business relationship with Mr. Moreno and also served as Green Field's president, earning an annual salary of $375,000. *Id.* It does not appear that the other two appointees, Charlie Kilgore and Mark Knight, had any such history with Mr. Moreno. *Id.* These four men comprised Green Field's board of directors at all times relevant to the Complaint. *Id.* Due to his 100% ownership interest in MOR MGH, which in turn owned over 80% of Green Field's common stock, Mr. Moreno had the ability to unilaterally elect Green Field's directors to one-year terms or remove them, with or without cause. *Id.* at ¶ 27.

Starting in early 2011, Green Field's fracking business embarked on a rapid expansion, fueled by significant increases in capital expenditures and borrowing. *Id.* at ¶

---

[4] Elle Investments, LLC ("Elle") holds a one-third ownership interest in MMR. Elle is owned by Mr. Moreno and his wife, Tiffany Moreno.

28. By late 2012 or early 2013, Green Field had incurred $340 million in new debt, $250 million of which bore a 13% interest rate, which represented a 640% increase in funded debt obligations from September 2011. *Id.* Further, the fortunes of Green Field's fracking business were largely tied to a single customer: SWEPI LP ("Shell"). *Id.* at ¶ 29. By the end of 2012, Shell accounted for 79% of company-wide revenues. *Id.* Over the course of Green Field's post-acquisition fracking operations, Shell accounted for 92% of its fracking revenues. *Id.* Green Field's fracking business operated at a substantial loss from start to finish. *Id.* at ¶ 30. From April 2011 through June 30, 2013, Green Field incurred operating losses on an accrual basis of approximately $100 million and on a cash basis of approximately $53 million. *Id.*

Much of the relief sought in the Complaint revolves around "PowerGen"—a somewhat loosely defined term used by the Trustee to describe a Green Field-owned technology and/or business opportunity which was allegedly usurped by Mr. Moreno and Moreno-controlled entities. *See id.* at ¶¶ 33-34. PowerGen essentially refers to portable turbine engines used to generate power at well sites. *Id.* at ¶ 34. What distinguished the PowerGen turbines is that they could run on "field gas" extracted onsite, thus saving the costs associated with transporting diesel fuel to well sites and reducing emissions. *Id.* Further, users could sell excess power generated by PowerGen turbines to local power grids, resulting in an additional revenue stream. *Id.* The PowerGen turbines were sold or rented by Turbine Powered Technology, LLC ("TPT"). *Id.* Green Field owned 50% of TPT while Ted McIntyre, who developed the PowerGen technology, indirectly owned the other 50%. *Id.* at ¶¶ 23, 34.

Green Field expended substantial funds in connection with the development of the PowerGen technology. *Id.* at ¶ 35. Green Field employees worked on PowerGen's development and Green Field acquired significant inventory and other assets in support of the PowerGen operation. *Id.* In the fall of 2012, Green Field began to manufacture PowerGen turbines and seek to secure commitments from customers to conduct pilot programs. *Id.* at ¶ 36. On Green Field bondholder calls, Mr. Moreno repeatedly described the PowerGen operation as one that would benefit Green Field. *Id.* at ¶ 37. In late 2012 and early 2013, Green Field was in communications with General Electric Corporation ("GE") regarding a $100 million investment in the PowerGen operation, for which GE would receive a 50% stake. *Id.* at ¶ 38. During these communications, GE personnel contemplated structuring the PowerGen investment through the use of a Green Field subsidiary. *Id.*

No such investment ever took place. *Id.* at ¶ 39. In March 2013, Mr. Moreno caused entities under his control to form Turbine Generation Services, LLC ("TGS"). *Id.* at ¶ 40. TGS is wholly owned by MOR DOH Holdings, LLC ("MOR DOH"). *Id.* at ¶ 17. In March 2013, MOR DOH was wholly owned by two trusts which were in turn controlled by Mr. Moreno or his family members. *Id.* at ¶ 11.[5] So, Mr. Moreno indirectly held a controlling ownership interest in TGS. *Id.* at ¶ 40. In May 2013, Green Field's shareholders (essentially MOR MGH and MMR, both Moreno-controlled entities) and the four Green Field board

---

[5] As referenced below, Powermeister, LLC, an entity unrelated to Mr. Moreno, purchased a 9.6% equity interest in MOR DOH for $20 million in June 2013. *Id.* at ¶ 11.

members executed a written waiver formally waiving the opportunity for Green Field to pursue the PowerGen business and agreeing that Moreno, TGS and TPT could pursue the business outside of Green Field (the "PowerGen Waiver"). *Id.* at ¶ 41. In connection with the PowerGen Waiver, Green Field's board of directors did not review any materials, presentations or other documents, nor did they hire financial advisors or appoint a special committee to investigate or analyze the waiver. *Id.* at ¶ 42.

The Debtors received little or nothing by way of monetary compensation in connection with the PowerGen Waiver. *Id.* at ¶ 44. A "small payment" was made to Green Field in return for services rendered in connection with PowerGen, but no payment specifically for the PowerGen Waiver. *Id.* The PowerGen business could have been worth as much as $200 million, an extrapolation based on: (1) GE's contemplated, pre-PowerGen Waiver, $100 million investment; (2) non-party Powermeister, LLC's purchase, post-PowerGen Waiver, of a 9.6% equity stake in MOR DOH for $20 million; (3) a January 2013 presentation which projected that the PowerGen business's EBIDTA would be $7 to $11.8 million in 2013 and grow to $102.9 to $142 million as early as 2015; and (4) pre-petition financing materials in which Green Field frequently valued the PowerGen business at $180 million. *Id.* at ¶¶ 45-46.

After the PowerGen Waiver, Green Field's financial condition continued to deteriorate. *Id.* at ¶ 47. In June, July and August of 2013, Green Field failed to make an aggregate of $6 million in payments due under a credit facility entered into with Shell in October 2012 and under which $78.2 million remained outstanding. *Id.* This failure triggered a default under the documents governing the Shell credit facility and a cross

8

default under the indenture governing Green Field's secured notes. *Id.* Green Field's quarterly report for the six-month period ending June 30, 2013, estimated that as of June 30, 2013, it had a net working capital deficiency of approximately $333.4 million and owed $20.9 million to its vendors and suppliers that had been outstanding for more than 120 days. *Id.*

Additionally, during this time of financial distress the Debtors were not receiving contracted-for financial support from its two largest shareholders, MOR MGH and MMR. *Id.* at ¶¶ 48-62. Under the terms of a share purchase agreement dated October 24, 2012 (the "2012 SPA"), MOR MGH and MMR were required to purchase, *pro rata* in accordance with their respective ownership interests, up to $25 million in Green Field preferred stock. *Id.* at ¶¶ 48-51. While MOR MGH and MMR initially performed under the 2012 SPA, they ultimately failed to purchase approximately $9.6 million and $1.2 million, respectively, of Green Field preferred stock during the first three quarters of 2013 as required by the agreement. *Id.* at ¶¶ 52, 54-55. Further, under the terms of a share purchase agreement dated June 28, 2013 (the "2013 SPA," together with the 2012 SPA, the "SPAs"), MOR MGH was obligated to purchase another $10 million in Green Field preferred stock as of the execution date of the agreement. *Id.* at ¶¶ 56-57. MOR MGH never purchased any preferred stock pursuant to the 2013 SPA. *Id.* at ¶ 58. Mr. Moreno signed both of the SPAs on behalf of Green Field, MOR MGH and MMR (*i.e.* all parties involved). *Id.* at ¶ 59.

Finally, during the twelve months preceding the Petition Date, Green Field executed approximately $14.6 million of transactions in favor of Moreno-affiliated entities. *Id.* at ¶¶64-65. Mr. Moreno also received approximately $571,897 in salary,

bonuses and expense reimbursement during this time period. *Id.* at ¶ 66. Other transactions of note during the two years preceding the Petition Date include approximately $24.9 million worth of payments to TPT and approximately $5 million worth of payments to Alliance Consulting Group, LLC ("Alliance"). *Id.* at ¶¶ 67-68. The Court will discuss the specifics of each transaction below in connection with its analysis of the related preference and fraudulent transfer counts in the Complaint.

In August 2013, Shell informed Green Field that it would terminate its use of Green Field's fracking services. *Id.* at ¶ 70. On October 8, 2013, Shell delivered a notice of loan default to Green Field which, as discussed above, triggered a cross default under the indenture governing Green Field's senior secured notes. *Id.* at ¶ 71. On October 27, 2013 (the "Petition Date"), Green Field and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq. Id.* at ¶ 72. As of the Petition Date, the Debtors had approximately $434.5 million in outstanding debt obligations, which includes $80 under a revolving credit facility with Shell (the "Shell Revolver"), $255.9 million in senior secured notes and $98.6 million in trade debt. *Id.* at ¶ 74. On April 23, 2014, the Court entered an order (the "Confirmation Order") confirming the Debtors' chapter 11 plan (the "Plan"). *Id.* at ¶ 73. The effective date of the Plan was May 12, 2014. *Id.*

Subsequent to the Petition Date, Mr. Moreno and certain Moreno-affiliated entities filed proofs of claim against the Debtors' bankruptcy estate. *Id.* at ¶ 75. The Court will discuss the specifics of each claim, to the extent necessary, in connection with the Court's analysis of the claim objection counts in the Complaint.

Pursuant to the terms of the Plan, the Trustee was appointed to prosecute and resolve claims on behalf of a post-effective liquidating trust. On April 6, 2015, the Trustee filed his 55-page, 329-paragraph, 31-count Complaint asserting claims against Mr. Moreno and certain Moreno-affiliated entities. The Complaint includes counts for fraudulent and preferential transfer, breach of fiduciary duty and breach of contract, as well as a series of objections to claim. On June 8, 2015, the Moving Defendants filed their motion (the "Motion") seeking dismissal of all counts of the Complaint implicating the Moving Defendants. On July 10, 2015, the Trustee filed his opposition to the Motion. On August 20, 2015, the Court entertained argument on the Motion and thereafter took the matter under advisement.

## ANALYSIS

The Court's lengthy exposition of the facts, while somewhat cumbersome, serves to underscore the robustness of the Complaint's factual allegations. A Rule 12(b)(6) motion is, after all, meant to test the sufficiency of a complaint's factual allegations. *See Twombly*, 550 U.S. at 555-56. In the Motion and supporting briefs, the Moving Defendants repeatedly ask the Court to consider "additional background information" not contained in the Complaint and draw inferences adverse to the Trustee's position, neither of which is appropriate at this stage in the proceeding. *See Iqbal*, 556 U.S. at 678-79; *Phillips*, 515 F.3d at 233. The Court is duty-bound to accept the Trustee's well-pleaded facts as true and, drawing on the Court's "judicial experience and common sense," conduct a context-specific analysis to determine if the pleaded facts permit the Court to "infer more than the mere possibility of misconduct"—*i.e.* plausibility. *Fowler*, 578 F.3d at 210-11. The

Court will proceed with such an analysis below on a claim-by-claim basis. While the numerosity of the Complaint's counts necessarily draws out the analysis, the breadth of the Trustee's factual allegations ultimately renders it a relatively easy task to dispense with the Motion.

### A.    PowerGen Fraudulent Transfer Claims (Counts 1 and 2)

#### 1.    *Count 1: Actual Fraudulent Transfer (against TGS and Mr. Moreno)*

In the Complaint's first count, the Trustee alleges that the circumstances surrounding the PowerGen Waiver constituted an actual fraudulent transfer. "Generally speaking, Federal Rule of Civil Procedure 9(b) requires those asserting fraudulent transfer claims in bankruptcy proceedings to plead them with specificity." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 544 (Bankr. D. Del. 2009) (citations omitted). The Third Circuit analyzed the Rule 9(b) standard as follows:

> We approach this question mindful of our recent admonition that in applying Rule 9(b), focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.' . . . Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct of which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). Further, "[t]he requirements of Rule 9(b) are relaxed and interpreted liberally where a trustee, or trust formed for the benefit of creditors, as here, is asserting the fraudulent transfer claims . . . ." *Fedders*, 405 B.R. at 544 (citations omitted). "This is because of the trustee's inevitable lack of knowledge concerning acts of fraud previously committed against the debtor, a third party." *Id.* (quotation omitted).

In order to avoid a transfer as actually fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, the plaintiff must show that the transfer was made within two years preceding the petition date and "with actual intent to hinder, delay, or defraud" a past or future creditor. "Direct evidence of fraudulent intent, however, is often unavailable and courts usually rely on circumstantial evidence, including the circumstances of the transaction, to infer fraudulent intent." *Liquidation Trust of Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co. of Del.*), 327 B.R. 537, 550-51 (D. Del. 2005) (citations omitted). "When evaluating the circumstances of a transaction, courts have relied on 'badges of fraud' that include: (1) the relationship between the debtor and the transferee; (2) consideration for conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or dominion by the debtor; and (6) secrecy or concealment of the transaction." *Id.* (citations omitted).

"The presence or absence of any single badge of fraud is not conclusive." *Fedders*, 405 B.R. at 545 (citation omitted). "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent." *Id.* "Although the presence of a single

factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *Id.* (quotation omitted).

Mr. Moreno and TGS argue that count one should be dismissed pursuant to Rule 12(b)(6) because the Trustee failed to adequately define "PowerGen" such that the Moving Defendants have not been put on fair notice as to what assets were allegedly transferred and what interest the Debtors held in those assets. Mr. Moreno and TGS further argue that the Trustee failed to adequately plead the existence of a sufficient number of the badges of fraud. The Court disagrees.

First, while the Trustee uses the term "PowerGen" somewhat loosely in the Complaint, the Court is convinced that PowerGen is sufficiently defined to put the Moving Defendants on notice of the allegedly proscribed conduct. The Trustee describes the PowerGen technology as portable turbine engines used to generate power at well sites and which were developed by Mr. McIntyre. The Trustee further alleges that TPT—an entity 50% owned by Green Field—sold or rented equipment employing this technology and that Green Field expended substantial resources developing the technology. The Trustee provides values of the PowerGen business in the $200 million range. The Trustee even alleges that Mr. Moreno essentially referred to PowerGen as a Green Field asset in bondholder calls. Finally, the Trustee alleges that the Debtors transferred PowerGen to Mr. Moreno and Moreno-affiliated entities through the PowerGen Waiver.

It is not as though the Debtors were associated with any similar such technology. Perhaps the Trustee will be unable to prove that the PowerGen business was actually worth $200 million to the Debtors. But the Trustee is not required to make such a showing at this stage in the proceeding. Based on the facts provided in the Complaint, the Court is satisfied that the Trustee has pleaded that the Debtors transferred *something* of substantial value by way of the PowerGen Waiver with the requisite specificity. In short, the Court is satisfied that the Complaint properly puts the Moving Defendants on notice as to the parameters of the disputed PowerGen transaction.

With respect to the badges of fraud, the Court finds that the Trustee has adequately pleaded the existence a sufficient number to survive a Rule 12(b)(6) motion. While Mr. Moreno and TGS are correct that the Trustee pleaded the badges of fraud in a conclusory manner under the Complaint's "First Cause of Action" heading, the Court finds that the facts pleaded earlier in the Complaint provide the necessary specificity. First, the Court finds that the Trustee has adequately pleaded a relationship between the Debtors and transferees: according to the Complaint, at the time of the alleged transfer Mr. Moreno indirectly held controlling interests in both the Debtors and TGS. Second the Trustee has adequately pleaded a lack of consideration in return for the PowerGen Waiver: at best, under the facts alleged in the Complaint, Green Field received only a small payment for services rendered in connection with the PowerGen business in return for an asset the Trustee values at approximately $200 million.

With respect to insolvency or indebtedness of the Debtors, the Moving Defendants are correct that the Trustee did not provide a detailed valuation analysis demonstrating

an exact pre-petition time frame in which the Debtors became insolvent. But such an analysis is not necessary at this stage in the proceeding. *Zazzali v. Mott* (*In re DBSI, Inc.*), 445 B.R. 344, 349 (Bankr. D. Del. 2011) ("insolvency is generally a factual determination not appropriate for resolution in a motion to dismiss"). The Trustee provided extensive information about the Debtors' financial condition at or around the time of the PowerGen Waiver. By early 2013, Green Field had incurred $340 million in new debt, a 640% increase in funded debt obligations from September 2011. By mid-2013, Green Field had incurred operating losses (from April 2011) of approximately $50-100 million and had a net working capital deficiency of approximately $333.4 million. Based on these facts, the Court finds that the Trustee has adequately pleaded the insolvency badge of fraud.

Finally, with respect to the amount of the Debtors' estate transferred, the Trustee alleges that the PowerGen enterprise was worth as much as $200 million. As of the Petition Date, the Debtors' had an approximate $434.5 million capital structure. Based on these facts, the Court finds that the Trustee has adequately pleaded the existence a fourth badge of fraud. Four badges of fraud is certainly enough for an actual fraudulent transfer claim to survive a Rule 12(b)(6) motion. Accordingly, the Court will deny the Motion with respect to the Complaint's first count.

2.    *Count 2: Constructive Fraudulent Transfer (against TGS and Mr. Moreno)*

In the Complaint's second count, the Trustee alleges that the circumstances surrounding the PowerGen Waiver constitute a constructive fraudulent transfer. In order to avoid a transfer as constructively fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the plaintiff must show, as is relevant here, that the transfer was: (1)

16

made within two years of the petition date; (2) that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation;" and (3) that the debtor "was insolvent on the date that such transfer was made . . . , or became insolvent as a result of such transfer." 11 U.S.C. § 548(a)(1)(B)(i), (ii)(I). TGS and Mr. Moreno argue that count two should be dismissed pursuant to Rule 12(b)(6) due to the Trustee's failure to adequately plead a lack of reasonably equivalent value and insolvency. Again, the Court disagrees.

The Third Circuit requires the application of a "totality of the circumstances" test in determining whether reasonably equivalent value was exchanged for a transfer. The test includes consideration of factors such as market value, good faith, and whether the transaction was at arm's length. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 153 (3d Cir. 1996). Given the wide number of variables to consider, and the less stringent pleading requirements of Rule 8(a)(2) to constructive fraud claims, "[t]he issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss." *EPLG I, LLC v. Citibank, N.A.* (*In re Qimonda Richmond, LLC*), 467 B.R. 318, 327 (Bankr. D. Del. 2012); *see also Charys Liquidating Trust v. McMahan Sec. Co., L.P.* (*In re Charys Holding Co.*), 443 B.R. 628, 638 (Bankr. D. Del. 2010) ("reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process."). With these principles in mind, the Court is satisfied that it may plausibly infer lack of reasonably equivalent value based on the Trustees allegation that Green Field transferred an

approximately $200 million asset to or for the benefit of Moreno and TGS in return for little or no compensation.

Insolvency is likewise "generally a factual determination not appropriate for resolution in a motion to dismiss." *Zazzali,* 445 B.R. 344, 349 (Bankr. D. Del. 2011). *See also Forman v. HBK Master Fund L.P.* (*In re Glencoe Acquisition, Inc.*), No. 14-50464, 2015 WL 3777972, at *4 (Bankr. D. Del. June 16, 2015). In any event, based on the facts discussed above in connection with the insolvency/indebtedness badge of fraud, the Court finds that it may plausibly infer Green Field's insolvency as of May 2013. Thus, the Court will deny the Motion with respect to the Complaint's second count.

### B.    PowerGen Fiduciary Duty Claims (Counts 3, 4 and 6)

#### 1.    Count 3: Breach of Fiduciary Duty (against Mr. Moreno)

In the Complaint's third count, the Trustee claims that by engineering the transfer of the PowerGen business to TGS, Mr. Moreno breached his duties of care and loyalty. The *Fedders* Court provided the following synopsis of the duties of care and loyalty under Delaware law:

> A plaintiff cannot prove a breach of the duty of care without a showing of gross negligence. *See, e.g., Cargill, Inc. v. JWH Special Circumstance LLC,* 959 A.2d 1096, 1113 (Del. Ch. 2008) (noting "a corporate director is only considered to have breached his duty of care in instances of gross negligence"). The exact behavior that will constitute gross negligence varies based on the situation, but generally requires directors and officers to fail to inform themselves fully and in a deliberate manner. *See Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 368 (Del. 1993) (collecting cases explaining the requirements established by the duty of care in a variety of settings). . . .

> By contrast, the duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d at 361. "To state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs." *Joyce v. Cuccia*, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997).

*Fedders*, 405 B.R. at 539-40. Mr. Moreno argues that count three should be dismissed pursuant to Rule 12(b)(6) based on the Trustee's failure to adequately define "PowerGen" and state the facts that should have been disclosed to Green Field's board of directors but were not prior to the PowerGen Waiver.

The Court finds that it may plausibly infer Mr. Moreno's liability for breaches of the duties of care and loyalty based on the facts pleaded in the Complaint. First, as set forth above, the Court finds that the Trustee adequately defined "PowerGen" so as to put the Moving Defendants on notice of the disputed transaction. Second, the Trustee alleges that the board did not review *any* sort of financial analysis or other documentation, nor did it conduct *any* sort of meaningful deliberation prior to the PowerGen Waiver. Third, the Trustee alleges that Mr. Moreno held a controlling interest in both the transferor, Green Field, and the transferee, TGS, at the time of the disputed transaction. Finally, the Trustee alleges that Green Field received little or no value in return for an asset worth approximately $200 million. Based on these well-pleaded facts, the Court will deny the Motion with respect to the Complaint's third count.

2.     *Count 4: Breach of the Fiduciary Duty of Loyalty—Usurpation of Corporate Opportunity (against Mr. Moreno)*

In the Complaint's fourth count, the Trustee alleges that Mr. Moreno usurped the PowerGen corporate opportunity in breach of his fiduciary duty of loyalty to Green Field. The Delaware Supreme Court has described the corporate opportunity doctrine as follows:

> The corporate opportunity doctrine, as delineated by *Guth* and its progeny, holds that a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.

*Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154-55 (Del. 1996) (citation omitted). Mr. Moreno argues that count four should be dismissed pursuant to Rule 12(b)(6) because PowerGen is not adequately defined in the Complaint and, even if it is, the Trustee has not adequately pleaded that Green Field was financially able to exploit the opportunity or that the opportunity was in Green Field's line of business.

The Court finds that it may plausibly infer that Mr. Moreno usurped a Green Field corporate opportunity. First, as set forth above, the Court finds that the Trustee adequately defined "PowerGen" so as to put the Moving Defendants on notice of the disputed transaction. Second, given the pre-PowerGen Waiver possibility of a $100 million investment from GE, the Court may plausibly infer that Green Field had the financial wherewithal to exploit the PowerGen opportunity. Third, the Court finds that

20

Mr. Moreno's line of business argument relies on an unduly restrictive view of the fracking industry. As described in the Complaint, the PowerGen turbines are designed to be used in the fracking process—thus making it a plausible inference that the turbines fell within the Debtors' fracking line of business. For these reasons, the Court will deny the Motion with respect to the Complaint's fourth count.

3.    *Count 6: Aiding and Abetting Breach of Fiduciary Duty (against TGS)*

In the Complaint's sixth count, the Trustee alleges that TGS aided and abetted Mr. Moreno's alleged breaches of fiduciary duty described in counts three and four. "The elements of aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 584 (Del. Ch. 1998) (citation omitted). TGS argues that count six should be dismissed pursuant to Rule 12(b)(6) because the Trustee has failed to adequately plead a breach of fiduciary duty in the first instance as well as TGS's knowing participation in such a breach.

The Court finds that it may plausibly infer TGS's liability for aiding and abetting the breaches of fiduciary duty set forth in the Complaint's third and fourth counts. First, for the reasons discussed above, the Court finds that the Trustee has adequately pleaded breaches of fiduciary duty against Mr. Moreno in counts three and four. Second, according to the Complaint, Mr. Moreno indirectly held a controlling interest in TGS at the time of the disputed PowerGen transfer. The Trustee essentially alleges that TGS was a 100% Moreno-owned, special-purpose, acquisition vehicle for the PowerGen business.

21

The Court may plausibly infer that TGS knew everything that Mr. Moreno knew with respect to the PowerGen transfer. It follows, then, that the Court may plausibly infer TGS's knowing participation in Mr. Moreno's breaches of fiduciary duty. The Court will deny the Motion with respect to the Complaint's sixth count.

C.      **Count 5: PowerGen Unjust Enrichment Claim (against TGS)**

In the Complaint's fifth count, the Trustee alleges that the PowerGen Waiver resulted in TGS's unjust enrichment. "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). TGS essentially takes issue with the existence of each unjust enrichment element in arguing that count five should be dismissed pursuant to Rule 12(b)(6). Based on the allegations in the Complaint regarding the circumstances surrounding the PowerGen Waiver, discussed at some length above, the Court finds that it may plausibly infer the existence of the first four unjust enrichment factors. The existence of the fifth unjust enrichment factor presents a closer question.

Count five is essentially duplicative of the Complaint's PowerGen fraudulent transfer counts. This raises a question as to whether the Trustee has an adequate remedy at law. It is plausible, though, that the Trustee could be left without an adequate remedy at law against TGS if, for example, his failure to prove insolvency at a later stage in the proceeding is fatal to both of his PowerGen fraudulent transfer counts. The Trustee is not required to prove insolvency to succeed on his unjust enrichment claim and so the claim

would remain viable. The Trustee may plead alternative claims for relief at this stage in the proceeding so long as each is supported by sufficient factual material to move the needle from possible to plausible. Therefore, the Court will deny the motion with respect to the Complaint's fifth count.

### D.   Count 7: PowerGen Corporate Waste Claim (against Mr. Moreno)

In the Complaint's seventh count, the Trustee argues that the PowerGen Waiver constituted corporate waste. The internal affairs doctrine dictates that Delaware law governs the Trustee's corporate waste claim. *Fedders*, 405 B.R. at 549. As summarized by the *Fedders* court:

> Under Delaware law, a corporate waste claim "must rest on the pleading of facts that show that the economics of the transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction beneficial to the corporation" in order to survive a motion to dismiss. *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 893 (Del. Ch. 1999). Stated slightly differently, "if, under the facts pled in the complaint, 'any reasonable person might conclude that the deal made sense, then the judicial inquiry ends.'" *Id.*

*Id.* Mr. Moreno argues that count seven must be dismissed pursuant to Rule 12(b)(6) because there was a legitimate business reason for the PowerGen Waiver: Green Field lacked the financial ability to continue the PowerGen business. But this conclusion does not follow from the facts pleaded in the Complaint.

The Trustee alleges that the PowerGen business was worth approximately $200 million, that Green Field had a potential source of funding in GE to the tune of $100 million and that Green Field received little to no compensation in connection with the

PowerGen Waiver. A plausible framing of the narrative set forth in the Complaint is that Mr. Moreno engineered the PowerGen Waiver not for any legitimate business reason that would benefit Green Field but for personal gain. As framed by the Trustee, no reasonable person would conclude that the PowerGen Waiver made business sense. As a result, the Court will deny the Motion with respect to the Complaint's seventh count.

### E.   SPA Claims (Counts 8 through 11)

1.   *Count 8: Breach of Contract (against MOR MGH and MMR); Count 9: Breach of Contract (against MOR MGH)*

The Complaint's eighth and ninth counts relate to the obligations of MOR MGH and MMR under the SPAs. The Trustee alleges that by failing to purchase approximately $20 million in Green Field preferred shares as required by the SPAs, MOR MGH and MMR breached those agreements. MOR MGH[6] argues that it did not breach the SPAs because Green Field did not satisfy all the contractual conditions precedent to its performance thereunder. Specifically, each SPA provided, as a condition precedent, that "[t]here shall have occurred no Material Adverse Change." A Material Adverse Change is defined in each SPA as "a material adverse change in the business, operations, assets, liabilities, properties, financial condition or results of operations of [Green Field] and its subsidiaries, taken as a whole." MOR MGH argues that the Debtors' pre-petition financial deterioration constitutes a Material Adverse Change.

First, Federal Rule of Civil Procedure 9(c) provides that "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or

---

[6] MMR is not among the Moving Defendants.

been performed." Thus, the Trustee's allegation in the Complaint that all conditions precedent to MOR MGH's performance under the SPA were satisfied is sufficient to survive a Rule 12(b)(6) motion to dismiss. *See Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 112 (3d Cir. 2014); *In re Residential Capital, LLC*, 524 B.R. 563, 584-85 (Bankr. S.D.N.Y. 2015). Further, the occurrence of a Material Adverse Change is an intensely factual inquiry which the Court is unable and not required to address at this early stage in the proceeding. Finally, the Court finds that it may plausibly infer that no such change occurred in light of the Trustee's allegations that the Debtors' financial troubles predated the SPAs. This is especially true for the 2013 SPA, under which payment was due on the date of execution, leaving an extraordinarily narrow window for a Materially Adverse Change to have occurred. Consequently, the Court will deny the Motion with respect to the Complaint's eighth and ninth counts.

### 2.    *Count 10: Breach of Fiduciary Duty of Loyalty (against Mr. Moreno)*

In the Complaint's tenth count, the Trustee alleges that Mr. Moreno breached his duty of loyalty to Green Field by causing MOR MGH and MMR to breach their contractual duties under the SPAs. Mr. Moreno argues that the count fails as a matter of law and must be dismissed pursuant to Rule 12(b)(6) because "under Delaware law, subject to only narrow exceptions, . . . a plaintiff may not 'bootstrap' a breach of fiduciary duty claim into a breach of contract claim merely by restating the breach of contract claim as a breach of fiduciary duty." *Grunstein v. Silva*, No. 3932-VCN, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009) (citations omitted).

"In determining whether a breach of fiduciary duty claim is duplicative of a corresponding breach of contract claim, the principal inquiry by Delaware courts is whether the fiduciary duty in the complaint arises from general fiduciary principles or from specific contractual obligations agreed upon by the parties." *Id.* Put simply, "[t]he issue is whether the duty sought to be enforced arises out of the parties' contractual, as opposed to their fiduciary, relationship." *Gale v. Bershad*, No. 15714, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998). *See also Schuss v. Penfield Partners, L.P.*, No. 3132-VCP, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008) (allowing breach of contract and fiduciary duty claims arising out of a common nucleus of facts to proceed in tandem where the fiduciary duty claims "depend on additional facts . . . , are broader in scope, and involve different considerations in terms of a potential remedy"); *Grunstein*, 2009 WL 4698541, at *7 ("the [*Schuss*] court allowed the fiduciary duty claim to go forward because the plaintiff had plead distinct harms caused by the defendants that fell outside the scope of their contractual relationship but within their fiduciary relationship").

While Mr. Moreno signed the SPAs on behalf of all parties involved, he is not a party to the SPAs in his individual capacity. Thus, the Trustee could not recover directly from Mr. Moreno on an SPA breach of contract claim. As pleaded by the Trustee, Mr. Moreno's potential liability arises by virtue of his position as a director, officer and majority shareholder of Green Field. This count raises considerations beyond pure breach of contract, including self-dealing, fairness and good faith. *See Fedders*, 405 B.R. at 540 (discussing the duties of loyalty and good faith under Delaware law). Perhaps the Trustee cannot prove a breach of fiduciary duty if he is unable to prove a breach of contract in

count eight or nine. But since the Trustee pleaded count ten against a different defendant on different grounds, the Court cannot say with certainty that the count is totally duplicative from a recovery perspective at this stage in the proceeding. Accordingly, the Court will deny the Motion with respect to the Complaint's tenth count.

3.    *Count 11: Tortious Interference with Contract (against Mr. Moreno)*

In the Complaint's eleventh count, the Trustee alleges that Mr. Moreno tortuously interfered with the SPAs by causing MOR MGH and MMR to breach their duties thereunder. "In order to establish a claim for tortious interference with contractual relations, a plaintiff must show that there was: (1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Grunstein*, 2009 WL 4698541, at *16. *See also Long Island Compost Corp. v. Marolf*, No. 009971/11, 2014 WL 641434, at *6 (N.Y. Sup. Ct. Feb. 18, 2014) (same).

Mr. Moreno does not address the tortious interference elements in the Motion, but instead argues that count eleven should be dismissed pursuant to Rule 12(b)(6) based on the axiom that a party to a contract cannot tortuously interfere with his own contract. *See, e.g.*, *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, No. 7668-VCN, 2015 WL 394011, at *9 (Del. Ch. Jan. 29, 2015); *Marlof*, 2014 WL 641434, at *6. Courts have extended this principle to affiliates of a contracting party since they are not "strangers" to the contract or underlying business relationship and share in the contractual interest. *See, e.g.*, *Renco*, 2015 WL 394011, at *9; *Cornell Glasgow, LLC v. La Grange Properties, LLC*, No. N11C-05-016 JRS CCLD, 2012 WL 2106945, at *9 (Del. Super. June 6, 2012); *Tenneco Auto., Inc. v. El Paso*

*Corp.*, No. 18810-NC, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007). Mr. Moreno argues that since he is not a stranger to the SPAs, he could not have tortuously interfered with them as a matter of law.

The cases cited by Mr. Moreno also provide that a claim for interference against an affiliate of a party charged with breaching a contract may survive a motion to dismiss if the plaintiff adequately pleads "that the non-party was not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises, or was motivated by some malicious or other bad faith purpose to injure the plaintiff." *Renco*, 2015 WL 394011, at *9. *See also Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994). Read in context with the fraudulent transfer and breach of fiduciary duty counts addressed above, the Court finds that it may plausibly infer that Mr. Moreno was motivated by a malicious or bad faith purpose in causing MOR MGH and MMR to breach the SPAs. The Court further finds that it may plausibly infer the existence of the five tortious interference elements, a point Mr. Moreno does not seem to contest at this stage in the proceeding. Thus, the Court will deny the Motion with respect to the Complaint's eleventh count.

### F.    Moreno Salary Claims (Counts 12 and 13)

#### 1.    *Count 12: Preferential Transfers (against Mr. Moreno)*

In the Complaint's twelfth count, the Trustee alleges that the payments totaling $571,897 that Mr. Moreno received in salary, bonuses and expense reimbursement during the year preceding the Petition Date constituted preferential transfers. In order for the Trustee to avoid an allegedly preferential transfer pursuant to Section 547(b) of the Bankruptcy Code, he must satisfy the elements set forth in the statue itself:

> Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
>> (A) on or within 90 days before the date of the filing of the petition; or
>>
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
>> (A) the case were a case under chapter 7 of this title;
>>
>> (B) the transfer had not been made; and
>>
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). Mr. Moreno does not dispute that he is an insider and thus Section 547(b)(4)'s one-year, look-back period applies. Mr. Moreno does dispute whether the Trustee met the applicable pleading standard by simply "lumping" all payments into a single estimate, *see Valley Media, Inc. v. Borders, Inc.* (*In re Valley Media, Inc.*), 288 B.R. 189, 192 (Bankr. D. Del. 2003), and failing to adequately plead insolvency, *see* 11 U.S.C. § 547(f) (presumption of insolvency applies only during 90 days immediately preceding petition date). According to Mr. Moreno, the Court should dismiss count twelve pursuant to Rule 12(b)(6).

In *Valley Media*, the court determined that "the following information must be included in a complaint to avoid preferential transfers in order to survive a motion to

dismiss: (a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." 288 B.R. at 192. The complaint in *Valley Media* failed to meet this standard because it "only contain[ed] a rough estimate of the total amount of the preferential transfers. No other information [was] provided in the complaint." *Id.* To the extent *Valley Media* provides the applicable pleading standard, the Court finds that it is satisfied. In the Complaint, the Trustee provided information regarding the amount and nature of the debt/transfers, the timing of the transfers, and the identities of the transferor and transferee. Given the transfers' nature as wages, bonuses and expense reimbursement, the Court does not take issue with the failure of the Trustee to itemize each transfer.

To the extent the facts pleaded in the Complaint do not meet the *Valley Media* standard, the Court rejects the standard as unduly restrictive. *See, e.g., Official Comm. of Unsecured Creditors of The IT Grp. v. Brandywine Apts.* (*In re The IT Grp., Inc.*), 313 B.R. 370, 373 (Bankr. D. Del. 2004) ("While plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them to do so in their initial pleading in all cases, particularly with the specificity demanded by *Valley Media,* is in this court's view inappropriate and unnecessarily harsh"). The Court finds it may plausibly infer the existence of the Section 547(b) non-insolvency factors based on the facts pleaded in the Complaint under the flexible standard set forth in *Iqbal* and *Twombly.*

With respect to the Debtors' solvency during the year preceding the Petition Date—at the outset it is important to note that this is a factual determination which the

court is not obligated to make at this stage in the proceeding. *Cf. Zazzali*, 445 B.R. at 349 (citing *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 35 (2d Cir. 1996)). An entity is insolvent when "the sum of such entity's debts is greater than all of such entity's property." 11 U.S.C. § 101(32)(A) (defining the term "insolvent"). In light of this definition, Mr. Moreno argues that the Trustee must provide a fair valuation of the Debtors' assets, either on a going concern or liquidation basis, and demonstrate that the Debtors' debts were greater than the value of its assets during the entire year preceding the Petition Date.

While such a showing may be necessary for the Trustee to ultimately prove his preferential transfer claims, the Court does not find it to be necessary at this stage in the proceeding. The Trustee must do more than baldly assert insolvency, but certainly something short of a detailed financial analysis will suffice. Based on the dire financial figures provided in the Complaint, discussed above in connection with the Trustee's PowerGen fraudulent transfer claims, the Court finds that it may plausibly infer that the Debtors were insolvent during the year immediately preceding the Petition Date. For these reasons, the Court will deny the Motion with respect to the Complaint's twelfth count.

        2.      *Count 13: Fraudulent Transfer (against Mr. Moreno)*

In the Complaint's thirteenth count, the Trustee alleges that the $571,897 in payments Mr. Moreno received in salary, bonuses and expense reimbursement during the year preceding the Petition Date constituted both actual and constructive fraudulent

transfers. Mr. Moreno argues that the Trustee failed to adequately plead the required elements, characterizing count thirteen as a "throw-away" claim. The Court disagrees.

The Court has already determined that the Trustee adequately pleaded claims for breaches of fiduciary duty and corporate waste against Mr. Moreno, all of which occurred in the year preceding the Petition Date. Thus, the Court may plausibly infer that the Debtors did not receive reasonably equivalent value in return for the compensation paid to Mr. Moreno in the year preceding the Petition Date. *See, e.g., Picard v. Madoff (In re Bernard L. Madoff Inv. Secs. LLC)*, 458 B.R. 87, 112 (Bankr. S.D.N.Y. 2011) ("the Trustee has sufficiently alleged [the defendants] breached fiduciary duties to [the debtor], and thus did not provide services that might otherwise have constituted adequate consideration in exchange for their receipt of salaries and bonuses"). *See also id.* at 113 ("In any event, the Court need not make a finding as to whether the Defendants' services constituted adequate value, as these issues often involve factual inquiries inappropriate for a motion to dismiss").

The Trustee also adequately pleaded Mr. Moreno's relationship with the Debtors and the amount transferred. And, for the reasons discussed above, the Court may plausibly infer the Debtors' insolvency during the year preceding the Petition Date. Thus, the Court may plausibly infer the existence of a number of badges of fraud sufficient to state a claim for actual fraudulent transfer. The Court may also plausibly infer the existence of the elements of a constructive fraudulent transfer. Therefore, the Court will deny the Motion with respect to the Complaint's thirteenth count.

### G.   Moreno Affiliate Preference Claims (Counts 15 through 21)

In counts fifteen through twenty-one of the Complaint, the Trustee alleges that a series of transfers to Mr. Moreno and Moreno-affiliated entities in the year preceding the Petition Date are avoidable as preferences pursuant to Section 547(b). The Moving Defendants argue that each count should be dismissed pursuant to Rule 12(b)(6). Four of their arguments for dismissal apply to all seven counts: (1) the Trustee failed to adequately plead the Debtors' insolvency for the year preceding the Petition Date; (2) the Trustee failed to adequately plead that each Moreno-affiliated transferee was an insider for purposes of Section 547(b)(4)'s one-year, look-back period; (3) the Trustee failed to adequately plead Section 547(b)(5), *i.e.* that each transferee received more than it would have in a chapter 7 liquidation; and (4) Mr. Moreno is not a proper co-defendant as he did not benefit from the allegedly preferential transfers in any quantifiable way.

First, for the reasons stated above, the Court may plausibly infer that the Debtors were insolvent for the year preceding the Petition Date. Second, with respect to whether the Moreno-affiliated transferees qualify as insiders for purposes of Section 547(b)(4), the Bankruptcy Code's definition of "insider" includes "affiliates" of a debtor. 11 U.S.C. § 101(31)(E). The Bankruptcy Code in turn defines the term "affiliate" to mean, as is relevant here, a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ." 11 U.S.C. § 101(2)(B). The Trustee alleges that at the time of the alleged preferential transfers, Mr.

Moreno directly or indirectly owned or controlled at least 20% of the Debtors voting shares and at least 20% of each Moreno-affiliated transferee. Thus, all defendants implicated by counts fifteen through twenty-one qualify as insiders and Section 547(b)(4)'s one-year, look-back applies.

Third, Section 547(b)(5) requires the Trustee to show that each transferee received more than it would have if the disputed transfer had not occurred and the case were one under chapter 7 of the Bankruptcy Code. The Trustee essentially states verbatim the words of Section 547(b)(5) under each preference count, without providing any sort of liquidation analysis in the Complaint. But under the circumstances of this particular case, the Court finds that nothing more is necessary. On April 23, 2014, the Court confirmed a plan of liquidation in the Debtors' bankruptcy cases. In connection with the confirmation process, the Debtors produced a liquidation analysis (the "Liquidation Analysis") which was attached as Exhibit C to their disclosure statement. Disclosure Statement Ex. C, at 6 [Main Case D.I. 718-3]. In the Liquidation Analysis, Debtors concluded that general unsecured creditors of the Debtors' estate would receive a 0% to 10% recovery in a chapter 7 liquidation. *Id.* The Court relied on these figures in the Confirmation Order, finding that the Liquidation Analysis was persuasive, credible and uncontroverted. Confirmation Order 14 [Main Case D.I. 885]. The Court may take judicial notice of the Liquidation Analysis. *See* Fed. R. Evid. 201(b)(1)-(2).

The *Iqbal* court used the terms "context-specific" and "common sense" to describe the plausibility inquiry. *Iqbal*, 556 U.S. at 679. It would make little sense for the Court to ignore everything that has transpired in the Debtors' bankruptcy cases to this point. The

34

Liquidation Analysis is a reliable document which was well-publicized in connection with the confirmation process. The Court is satisfied that Mr. Moreno and the Moreno-affiliated entities implicated by counts fifteen through twenty-one were not unfairly surprised as to the existence of the Section 547(b)(5) element. The Court therefore finds that the Trustee is entitled to the inference that each transferee received more than it would have if the disputed transfer had not occurred and the case were one under chapter 7.

Finally, with respect to whether Mr. Moreno is a proper co-defendant, he argues that he may not be held liable as a "transfer beneficiary" under Section 550(b)(1) of the Bankruptcy Code because the Trustee has not alleged any actual, quantifiable or accessible benefit that Mr. Moreno received on account of the transfers challenged in counts fifteen through twenty-one. *See* 11 U.S.C. § 550(b)(1) (the trustee may recover transfers avoided pursuant to Section 547 from "the initial transferee of such transfer or the entity for whose benefit such transfer was made"). While Mr. Moreno argues in favor of a somewhat more restrictive reading of Section 550(b)(1), "[t]he provision applies on its face to any 'entity' for whose benefit a transfer is made, and contains no express limitation upon the type of 'benefit' required." *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Grp., Inc.* (*In re Buckhead Am. Corp.*), 178 B.R. 956, 962 (D. Del. 1994) (quoting *Branch v. FDIC*, 825 F. Supp. 384, 401 (D. Mass. 1993)). Read in context with the Trustee's fraudulent transfer and breach of fiduciary duty claims, the Court finds that it may plausibly infer that Mr. Moreno qualifies as a transfer beneficiary under Section 550(b)(1) based on his alleged ownership in each affiliate transferee. As a

result, the Court will decline to dismiss counts fifteen through twenty-one as to Mr. Moreno.

The Moving Defendants also raise a number of issues with respect to each individual preference count. The Court will address each in turn.

1. *Count 15: Preferential Transfer (against Frac Rentals and Mr. Moreno)*

In the Complaint's fifteenth count, the Trustee alleges defendant Frac Rentals, LLC ("Frac Rentals") received payments from Green Field totaling $743,966 in the year preceding the Petition Date. Compl. ¶ 65. These payments were allegedly for safety equipment rentals and made pursuant to a "Master Service Agreement" dated July 10, 2012. *Id.* The Trustee itemized the payments in Appendix A to the Complaint. The Trustee further alleges that Frac Rentals is owned by a Moreno-controlled entity. *Id.* at ¶ 16. From these facts the Court may plausibly infer the defendants' liability under Section 547. Consequently, the Court will deny the Motion with respect to the Complaint's fifteenth count.

2. *Count 16: Preferential Transfer (against S3 and Mr. Moreno)*

In the Complaint's sixteenth count, the Trustee alleges that defendant Shale Support Services, LLC ("S3") received payments from Green Field totaling $3,444,411 in the year preceding the Petition Date. *Id.* at ¶ 65. The payments were allegedly for "refined fracturing sand." *Id.* The Trustee itemized the payments in Appendix A to the Complaint. The Trustee further alleges that Mr. Moreno indirectly holds a 70% ownership interest in S3. *Id.* at ¶ 14. From these facts the Court finds that it may plausibly infer the defendants' liability under Section 547. The Moving Defendants' arguments with respect to whether

the S3 transfers were on account of an antecedent debt rely on a mischaracterization of Appendix A and improper unfavorable inferences. *See Phillips* 515 F.3d at 233 (the Court must "construe the complaint in the light most favorable to the plaintiff"). Accordingly, the Court will deny the Motion with respect to the Complaint's sixteenth count.

> 3.    *Count 17: Preferential Transfer (against TGS and Mr. Moreno)*

In the Complaint's seventeenth count, the Trustee alleges that TGS received a payment from Green Field totaling $2,210,883.76 in the year preceding the Petition Date. Compl. ¶ 65. The payment was allegedly made pursuant to an "Agreement for the Manufacture and Sale of Turbine Powered Generators" dated June 21, 2013, and is characterized by the Trustee as a "reimbursement" in connection with the purchase of certain PowerGen-related equipment. *Id.* From these facts the Court finds that it may plausibly infer the defendants' liability under Section 547. As with count sixteen, the Moving Defendants' arguments with respect to whether the TGS transfer was on account of an antecedent debt rely on improper unfavorable inferences. Thus, the Court will deny the Motion with respect to the Complaint's seventeenth count.

> 4.    *Count 18: Preferential Transfer (against MOR DOH and Mr. Moreno)*

In the Complaint's eighteenth count, the Trustee alleges that MOR DOH received a payment from Green Field totaling $4,614,310 in the year preceding the Petition Date. *Id.* The payment was allegedly made in connection with an undocumented sale/lease back transaction in which Green Field agreed to sell certain fracking equipment to Frac Rentals. *Id.* The Trustee alleges that MOR DOH was the sole owner of Frac Rentals at all times relevant to the count. *Id*. at ¶ 16. From these facts the Court finds that it may

plausibly infer the defendants' liability under Section 547. As with previous counts, the Moving Defendants' arguments with respect to whether the TGS transfer was on account of an antecedent debt rely on improper unfavorable inferences. Accordingly, the Court will deny the Motion with respect to the Complaint's eighteenth count.

5.    *Count 19: Preferential Transfer (against Aerodynamic and Mr. Moreno)*

In the Complaint's nineteenth count, the Trustee alleges that defendant Aerodynamic, LLC ("Aerodynamic") received payments from Green Field totaling $605,000 in the year preceding the Petition Date. *Id.* at ¶ 65. The payments were allegedly made pursuant to a "dry" lease agreement dated June 1, 2011, for the use of an aircraft. *Id.* The Trustee itemized the payments in Appendix A to the Complaint. The Trustee further alleges that Mr. Moreno is the sole owner of Aerodynamic. *Id.* at ¶ 19. From these facts the Court finds that it may plausibly infer the defendants' liability under Section 547. The Moving Defendants' assertion that the Court should dismiss the count based on the ordinary course defense is not at all clear on the face of the count and thus requires a factual determination which the Court is unable and unwilling to make at this stage in the proceeding. *Buckley v. Merrill Lynch & Co.* (*In re DVI, Inc.*), No. 03-12656 (MFW), 2008 WL 4239120, at *7 (Bankr. D. Del. Sept. 16, 2008). Therefore, the Court will deny the Motion with respect to the Complaint's nineteenth count.

6.    *Count 20: Preferential Transfer (against Casafin and Moreno)*

In the Complaint's twentieth count, the Trustee alleges that defendant Casafin II LLC ("Casafin") received payments from Green Field totaling $1,391,158 in the year preceding the Petition Date. Compl. ¶ 65. The payments were allegedly made pursuant

to a non-exclusive lease agreement dated June 1, 2011, for the use of an aircraft. *Id.* The Trustee itemized the payments in Appendix A to the Complaint. The Trustee further alleges that Mr. Moreno held a 100% ownership interest in Casafin as of the Petition Date. *Id.* at ¶ 18. From these facts the Court finds that it may plausibly infer the defendants' liability under Section 547. As with count 19, the Moving Defendants' assertion that the Court should dismiss the count based on the ordinary course defense is not at all clear on the face of the count and so must be disregarded at this stage in the proceeding. As a result, the Court will deny the Motion with respect to the Complaint's twentieth count.

       7.    *Count 21: Preferential Transfer (against Moreno Properties and Mr. Moreno)*

In the Complaint's twenty-first count, the Trustee alleges that defendant Moreno Properties, LLC ("Moreno Properties") received payments from Green Field totaling $239,588 in the year preceding the Petition Date. *Id.* at ¶ 65. These payments were allegedly for maintenance services related to the aircraft described in count nineteen. *Id.* The Trustee itemized the payments in Appendix A to the Complaint. The Trustee further alleges that Mr. Moreno serves as the sole principal of Moreno Properties. *Id.* at ¶ 20. From these facts the Court may plausibly infer the defendants' liability under Section 547. Consequently, the Court will deny the Motion with respect to the Complaint's twenty-first count.

       8.    *State Law Claims (Counts Fifteen through Twenty-One)*

The Trustee also includes a reference to DEL. CODE tit. 6 § 1301 *et seq.*, the Delaware Uniform Fraudulent Transfer Act ("UFTA"), in counts fifteen through twenty-one of the

Complaint, without reference to a specific UFTA provision. The Moving Defendants argue that counts fifteen through twenty-one should be dismissed to the extent they assert state law avoidance actions as the Complaint's generic reference to DEL. CODE tit. 6 § 1301 *et seq.* is insufficient to put them on notice as to the claims asserted.

While the Trustee could have pleaded his state-law preference actions with more specificity, the UFTA is not lengthy, comprised of only eleven sections, and is well known to insolvency professionals. The Court is satisfied that a reasonable reader, using common sense and attentive to context, would understand that the Trustee is asserting a state-law preference claim pursuant to DEL. CODE tit. 6 § 1305(b). Forcing the Trustee to re-plead his state law preference claims would serve little purpose. Further, the requirements of Section 1305(b) largely overlap with those of Section 547(b). Since the Court has determined that the Trustee has stated a plausible claim under Section 547(b) in counts fifteen through twenty-one, it follows that that the Court may plausibly infer the existence of the elements underlying a Section 1305(b) claim. Accordingly, the Court will deny the Motion with respect to the state law claims contained in counts fifteen through twenty-one of the Complaint.

### H.    Count 22: Constructive Fraudulent Transfer (against Elle and Moreno)

In the Complaint's twenty-second count, the Trustee alleges that non-party Alliance received $4,995,988 in payments during the two years preceding the Petition Date which are avoidable as fraudulent transfers. Compl. ¶ 68. The payments were allegedly made pursuant to an agreement under which Dynamic was to mine, process, transport and refine sand to be used by Green Field in its fracking operations. *Id.*

According to the Trustee, Alliance was never able to produce a meaningful amount of fracking sand and was made the subject of an involuntary bankruptcy proceeding on October 3, 2013. *Id.* The Trustee further alleges that Elle Investments, LLC ("Elle") held a 50% equity interest and a 40% senior debt interest in Dynamic at all times relevant to the Complaint. *Id.* at ¶ 22. According to the Complaint, Elle is in turn owned by Mr. Moreno and his spouse, Tiffany Moreno. *Id.* at ¶ 12. The Trustee seeks to avoid and recover the Dynamic transfers from Mr. Moreno and Elle as transfer beneficiaries.

Mr. Moreno and Elle argue that the Trustee failed to adequately plead the Debtors' insolvency or lack of reasonably equivalent value as required to state a claim for constructive fraudulent transfer. Mr. Moreno and Elle further argue that they are not proper defendants as the Trustee has not adequately pleaded their status as transfer beneficiaries. As discussed above, the Court may plausibly infer the Debtors' insolvency during the two years preceding the Petition Date from the facts pleaded in the Complaint. Further, since the Trustee has alleged a nearly $5 million payment for which Green Field received nothing in return, the Court may plausibly infer lack of reasonably equivalent value. In any event, both determinations are fact intensive and thus not appropriate for resolution at this stage in the proceeding. *See Glencoe*, 2015 WL 3777972, at *3-4 (citing cases). Finally, based on Elle's ownership interest in Dynamic and Mr. Moreno's ownership interest in Elle, the Court may plausibly infer that Elle and Mr. Moreno were transfer beneficiaries for the reasons discussed above in connection with the Moreno

affiliate preference claims. Thus, the Court will deny the Motion with respect to the Complaint's twenty-second count.[7]

### I.    Count 23: To Preserve Property (against all defendants)

In the Complaint's twenty-third count, the Trustee seeks to preserve, pursuant to Section 551 of the Bankruptcy Code, property in connection with the allegedly avoidable transfers described in various of the Complaint's first twenty-two counts. Because the Court has determined that the avoidance counts state a plausible claim, this count must survive as well. Therefore, the Court will deny the Motion with respect to the Complaint's twenty-third count.

### J.    Count 24: Subordination of Defendant Claims (against Mr. Moreno and Affiliates)

In the Complaint's twenty-fourth count, the Trustee seeks to subordinate, pursuant to Section 510(c) of the Bankruptcy Code, [8] claims filed by Mr. Moreno and certain Moreno-affiliated entities who were the alleged transferees and transfer beneficiaries of the avoidable transfers described in various of the Complaint's first twenty-two counts. In order to establish a claim for equitable subordination, a plaintiff must show that: (1) the claimant engaged in some type of inequitable conduct; (2) the

---

[7] Mr. Moreno and Elle also take issue with count twenty-two's generic reference to the UFTA. As discussed in connection with the Moreno affiliate preference claims, a reasonable reader of count twenty-two would understand that the Trustee is preserving his rights with respect to the UFTA's constructive fraudulent transfer provision, DEL. CODE. tit. 6 § 1304(a)(2). Requiring the Trustee to re-plead his state-law claims in count twenty-two would serve no purpose at this juncture.

[8] Section 510(c) provides that the Court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . ."

misconduct resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Schubert v. Lucent Techs. Inc.* (*In re Winstar Commc'ns Inc.*), 554 F.3d 382, 411 (3d Cir. 2009).

As discussed above, the Trustee has adequately pleaded that Mr. Moreno and the Moreno-affiliated defendants implicated by this count are insiders. "[T]he standard for finding inequitable conduct is much lower" for insiders versus non-insiders. *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002). (citations omitted). *See also Winstar*, 554 F.3d at 412 ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts") (quotation omitted). "Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Id.* (citations omitted). Further, "[t]he inequitable conduct underlying equitable subordination may be unrelated to the acquisition or assertion of the particular claim whose status [is] at issue." *Winstar*, 554 F.3d at 412 (quotation omitted).

The Moving Defendants raise a host of issues with the Trustee's equitable subordination claim, none of which the Court need describe in any detail. Based on the facts alleged in connection with the Complaint's first twenty-two counts, the Court may plausibly infer that the Moving Defendants engaged in inequitable conduct which resulted in diversion of assets away from the Debtor's estate, thus harming creditors or conferring an unfair advantage on the Moving Defendants. In any event, determining

43

whether a creditor's claim should be subordinated, as with so many of the issues raised by the Moving Defendants, "is a fact-intensive inquiry which should not necessarily be determined on a motion to dismiss." *Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 583 (Bankr. D. Del. 2012). For these reasons, the Court will deny the Motion with respect to the Complaint's twenty-fourth count.

### K.   Count 25: Objection to Defendant Claims (against Mr. Moreno and Affiliates)

In the Complaint's twenty-fifth count, the Trustee objects, pursuant to Section 502(d) and (j) of the Bankruptcy Code, to certain proofs of claim filed by the alleged transferees and transfer beneficiaries of the avoidable transfers described in various of the Complaint's first twenty-two counts. Because the Court has determined that the avoidance claims referenced by this count state a plausible claim, this count must survive as well. Therefore, the Court will deny the Motion with respect to the Complaint's twenty-fifth count.

### L.   Moreno Reimbursement Claims (Counts 26, 30 and 31)

In the Complaint's twenty-sixth count, the Trustee objects to a proof of claim filed by Mr. Moreno seeking reimbursement for amounts due under an agreement whereby Mr. Moreno personally guaranteed the Shell Revolver. Counts thirty and thirty-one seek declaratory judgments related to the guarantee agreement and reimbursement claim.

On October 22, 2012, Mr. Moreno and his wife, Tiffany Moreno, executed a written guarantee of Green Field's payment of the Shell Revolver (the "Shell Guarantee"). Compl. ¶ 76. Under the terms of the Shell Guarantee, Mr. Moreno assigned to Shell all of his

rights against the Debtors' estate, including rights to "subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right or remedy." *Id*. at ¶ 77. Under the terms of the Plan, Shell agreed to accept $5 million in full satisfaction, settlement and release of its "secured" claim. *Id*. at ¶ 78. Shell further agreed to accept releases in full satisfaction, settlement and release of certain other claims against the Debtors' estate. *Id*. Subsequent to the Petition Date, Mr. Moreno filed an approximate $82 million proof of claim (the "Reimbursement Claim") against Green Field and affiliate debtor Hub City seeking reimbursement related to his personal guarantee of the Shell Revolver. *Id*. at ¶ 75.

The Trustee objects to the Reimbursement Claim on two grounds. First, the Trustee asserts that Mr. Moreno assigned any right to reimbursement based on the Shell Guarantee to Shell, which then released any such right under the terms of the Plan. The Trustee's argument is essentially that Mr. Moreno waived his right to reimbursement. Second, the Trustee argues that the Reimbursement Claim should be disallowed pursuant to Section 502(e)(1)(B) of the Bankruptcy Code. "For a claim to be disallowed under section 502(e)(1)(B) of the Bankruptcy Code the claimant must assert a (i) contingent claim (ii) for reimbursement of a debt (iii) for which the debtors and the claimant are co-liable." *In re RNI Wind Down Corp.*, 369 B.R. 174, 181 (Bankr. D. Del. 2007). The Trustee further seeks, in substance, declarations that the Debtors may not be held liable for a reimbursement claim arising out of the Shell Guarantee.

Mr. Moreno challenges both the standing of the Trustee to raise such arguments and the merits of each argument. The Court finds that the Trustee has standing, at the

very least as a party in interest, *see* 11 U.S.C. § 1109(b), to raise the arguments set forth in counts twenty-six, thirty and thirty-one. The Court further finds that the Trustee has pleaded sufficient facts in the Complaint to demonstrate the plausibility of counts twenty-six, thirty and thirty-one. As a result, the Court will deny the Motion with respect to the Complaint's twenty-sixth, thirtieth and thirty-first counts.

### M.     Count 27: Objection to Administrative Claim (against Moreno)

In the Complaint's twenty-seventh count, the Trustee objects to a proof of claim filed by Mr. Moreno asserting an administrative expense claim in the amount of approximately $1.5 million for legal fees incurred post-petition "in the process of responding to this Court's orders appointing an examiner." Mr. Moreno argues that the legal fees were actual and necessary costs of preserving the Debtors' estate and are thus entitled to administrative priority. *See* 11 U.S.C. § 503(b)(1)(A). The Court finds that the Trustee has plausibly stated a claim that Mr. Moreno's administrative claim should be disallowed based on the Complaint's description of Mr. Moreno's adversarial posture *vis-à-vis* the Debtors' estate. Compl. ¶ 307. Consequently, the Court will deny the Motion with respect to the Complaint's twenty-seventh count.

### N.     Count 28: Objection to Claim (against Casafin)

In the Complaint's twenty-eighth count, the Trustee objects to, as is relevant here, a proof of claim filed by defendant Casafin in the amount of $436,951.97 which is allegedly inconsistent with the Debtors' books and records. *Id*. at ¶ 75. Casafin argues that the Trustee's conclusory allegation is insufficient to rebut the *prima facie* validity of its claim. *See* FED. R. BANKR. P. 3001(f) ("A proof of claim executed and filed in accordance

with these rules shall constitute prima facie evidence of the validity and amount of the claim"). The Court is satisfied that nothing more is necessary from the Trustee at this stage in the proceeding. The Trustee's allegation fairly puts Casafin on notice and is easily susceptible to proof, *i.e.* production of the applicable records. The Court is not concerned that count twenty-eight represents the sort of claim that Rule 12(b)(6) is meant to weed out. Accordingly, the Court will deny the Motion with respect to the Complaint's twenty-eighth count.

## CONCLUSION

The Court will deny the Motion. The Court's Memorandum Opinion will serve little more than to inform the parties as to the Court's reasons for denying the Motion. But the *Iqbal* and *Twombly* courts clearly contemplated such an analysis, where context is king and the Court may rely on its own common sense and experience. Each Rule 12(b)(6) analysis is, in a sense, bound to its own well-pleaded facts. To suggest that courts should prescribe rules under which certain claims must be pleaded in a particular manner in all cases misses the point entirely. The Court will enter a separate order.

Dated: August 31, 2015

KEVIN GROSS, U.S.B.J.