## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GREEN FIELD ENERGY SERVICES, INC., | ) | Case No. 13-12783 (KG) |
| *et al.*, | ) | (Jointly Administered) |
| | ) | |
| _____Debtors._____ | ) | |
| ALAN HALPERIN, AS TRUSTEE OF THE | ) | |
| GFES LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 15-50262 (KG) |
| | ) | |
| MICHEL B. MORENO; MOR MGH | ) | |
| HOLDINGS, LLC; MOR DOH HODLINGS, | ) | |
| LLC; SHALE SUPPORT SERVICES, LLC; | ) | |
| DYNAMIC GROUP HOLDIGNS, LLC; | ) | |
| DYNAMIC INDUSTRIES, INC.; FRAC | ) | |
| RENTALS, LLC; TURBINE GENERATION | ) | |
| SERVICES, LLC; AERODYNAMIC, LLC; | ) | |
| CASAFIN II, LLC; MORENO PROPERTIES, | ) | |
| LLC; ELLE INVESTMENTS, LLC; LQT | ) | |
| INDUSTRIES, LLC (k/a DYNAMIC ENERGY | ) | |
| SERVICES INTERNATIONAL LLC, | ) | |
| | ) | |
| _____Defendants._____ | ) | **Re: D.I. 370, 406** |

## OPINION

### Introduction[1]

Alan Halperin, in his capacity as Trustee (the "Trustee") of the GFES Liquidation

Trust (the "Trust") brought a motion for partial summary judgment (the "Trustee's

---

[1]    The debtors filed the bankruptcy cases on October 27, 2013 (the "Petition Date").  The Court confirmed the Second Amended Joint Plan of Liquidation on April 23, 2014.

Motion") against Michel B. Moreno ("Moreno"), MOR MGH Holdings, LLC ("MOR MGH"), Aerodynamic, LLC ("Aerodynamic"), Casafin II, LLC ("Casafin"), Frac Rentals, LLC ("Frac Rentals"), and Turbine Generation Services, LLC ("TGS") (collectively "Defendants").  From the thirty-five count amended complaint (the "Complaint")[2],  the Trustee moved for summary judgment on his breach of contract claims (Counts 11 and 12); tortious interference with contract claims (Count 14); preference action claims (Counts 19, 21, 23, and 24); objections to proofs of claim from the recipients of preferential transfers (Count 29); objections to Moreno's bankruptcy proofs of claim (Counts 30 and 31); and declaratory judgment claims (Counts 34 and 35).

In response to the Trustee's Motion, Defendants filed a cross-motion seeking partial summary judgment ("Defendants' Motion") on the preference claims (Counts 19, 21, 23, and 24), and moved to deny the Trustee's Motion on all remaining counts.

## Facts

### I.    Background

Originally formed in 1969 under the name Hub City Industries, LLC, Green Field Energy Services, Inc. ("GFES") served for many years as a traditional oil and gas well-related service company before entering into the fracking business in December 2010.[3]

---

[2] On April 6, 2015, the Trustee filed a thirty-one count complaint against Defendants, initiating this adversary proceeding. *Complaint and Objection to Claims Pursuant to Bankruptcy Code Sections 502 and 503 and Federal Rule of Bankruptcy Procedure 3007*, Case No. 15-50262 (KG), Adv. D.I. 1.  The Trustee then filed an amended thirty-five count complaint on May 19, 2016. *Second Amended Complaint and Objection to Claims Pursuant to Bankruptcy Code Sections 502 and 503 and Federal Rule of Bankruptcy Procedure 3007*, Case No. 15-50262 (KG), Adv. D.I. 209.

[3] "Fracking" refers to the process of hydraulic fracturing which is a well stimulation technique in which rock is fractured by pressurized liquid in order to increase the rate at which

Declaration of James W. Stoll, dated May 25, 2017 ("Stoll Decl.") Ex. 1, at ¶ 10, 15; Adv. D.I. 372.  In October 2011, Moreno took control of GFES through recapitalization and buy-outs, converting the entity into a Delaware corporation.  Stoll Decl. Ex. 2, at pp. 5, 31.  As of October 17, 2011, MOR MGH owned 88.9% of GFES's common stock and Moody Moreno & Rucks, LLC ("MMR")[4] owned 11.1%. Stoll Decl. Ex. 1, at ¶ 15; Ex. 2, at p.4; Ex. 3, at p.3.  Acting as managing member, Moreno ran MOR MGH which acted as a holding company wholly owned by two grantor-retained annuity trusts ("GRAT's"): MBM 2011 MGH GRAT and TCM MGH GRAT (collectively, the "MGH Trusts").[5] Stoll. Decl. Ex. 2, at p. 83; Ex. 7; Deposition of Michel B. Moreno, dated March 23, 2017 ("Moreno Depo."), 26:4-27:16.   Expecting a successful venture, Moreno placed ownership of GFES into a GRAT structure to ameliorate expected taxes on the company. Declaration of Michel B. Moreno ("Moreno Decl.")[6] ¶¶ 3-6.

Upon taking control of GFES in October 2011, Moreno assumed the positions of Chief Executive Officer and Chairman of GFES's board of directors (the "GFES Board").  Stoll Decl. Ex. 2, at p. 78, Ex. 3, at p. 64.  Moreno also established the remaining executive structure of GFES as follows: Enrique Fontova ("Fontova") became the President of GFES

---

fluids, such as petroleum, water or natural gas can be recovered from subterranean natural resources.

[4] The membership equity interests in MMR are as follows: Moreno owned 33.3%, Kevin Moody owned 33.3% interest and Billy Ruckus owned 33.3%.  Stoll. Decl., Ex. 8.

[5] Each of the MGH Trusts owned a 50% interest in MOR MGH.

[6] Prior to initiating the GFES venture, Moreno had experienced a nearly unbroken history of success buying and selling oil and gas companies, including Dynamic Offshore Resources, LLC, one of the leading oil and gas producers operating the Gulf of Mexico shelf. Moreno Decl. ¶ 2.

and a member of the GFES Board; Earl Blackwell ("Blackwell") maintained his position as Chief Financial Officer; and Charles Kilgore ("Kilgore"), Mark Knight ("Knight") and Charles T. Goodson ("Goodson") were all appointed to the GFES Board. Stoll Decl. Ex. 2, at p. 78; Ex. 3, at p. 64-65; Ex. 11; Deposition of Earl J. Blackwell, dated March 16, 2017 ("Blackwell Depo"), 15:24-16:12.

II.    GFES Capitalization

After taking control of GFES, Moreno continued the company's transition from well-related services to fracking. Stoll Decl. Ex. 2, at p. 32; Moreno Depo. 12:11-15.   In order to successfully transition into the fracking industry, GFES entered into an equipment purchase agreement with Marine Turbine Technologies, LLC ("MTT")[7] to acquire turbine fracking equipment, including a number of turbine engines. Stoll Decl. Ex. 16.   In September 2011, Moreno and McIntyre entered into a joint venture causing GFES and MTT Properties, LLC ("MTT Properties") to form Turbine Powered Technology, LLC ("TPT") whereby each entity would own 50% of the newly formed TPT. Stoll Decl. Moreno Depo. 34:10-37.2; Ex. 19.   Pursuant to the TPT Operating Agreement, GFES was the sole source of funding for TPT's operations, TPT was the sole manufacturer of GFES's turbine powered fracking pumps and TPT entered into a fully paid and royalty free exclusive license to use the Frack Stack Pack technology MTT had developed in perpetuity. Stoll Decl. Ex. 19; Ex. 20; Moreno Depo. 35:19-36:9.

---

[7] MTT is owned and controlled by Ted Lee McIntyre, II ("McIntrye") who developed a turbine-powered fracking pump that was expected to provide advantages over the diesel-powered pumping equipment typically used in the industry. Stoll Decl. Ex. 1, at ¶ 8; Moreno Depo. 12:16-19; Ex. 15, at p. 6.

A.  <u>GFES Financing</u>

To finance GFES's entry into the highly competitive fracking market, the company borrowed heavily from several different sources, beginning with a $53 million bridge loan (the "Bridge Loan") from Jeffries & Company. Stoll Decl. Ex. 24, at § 6.2.  GFES intended the Bridge Loan to finance working capital needs, fund the manufacture of the first operational fleet of turbine powered fracking pumps, bridge GFES to an eventual note issuance and to refinance its obligations under a then existing credit agreement with JP Morgan. *Id.*

To further finance its entry into the market, GFES entered into a "Contract for High Pressure Fracturing Services" (the "Shell Contract") with SWEPI, LP, successor to Shell Western Exploration and Production, Inc. (collectively with its affiliates and subsidiaries, "Shell").[8] Stoll Decl. Ex. 25.  In the Shell Contract, GFES agreed to furnish certain fracking spreads at Shell drilling sites and service such sites at a discounted rate; in return, Shell agreed to provide up to an aggregate amount of $100 million in senior secured term loans (the "Prepayment Funding"). Stoll Decl. Ex. 1, at ¶ 48; Ex. 25; Moreno Depo. 16:23-17:20. Under the Shell Contract, the Prepayment Funding was to be distributed in stages, with $42.5 million disbursed as of the contract effective date, $32.5 million disbursed upon achieving certain milestones and the remaining $25 million disbursed upon the delivery of the first fracking equipment. Stoll Decl. Ex. 25, at p. 30-31.  To ensure further protection,

---

[8] At all relevant times, Shell remained GFES's most significant customer, representing up to 79% of all its revenues. Stoll Decl. Ex. 1, at ¶¶ 45, 63; Ex. 2, at p. 10; Blackwell Depo. 13:25-14:10.

Moreno personally guaranteed the Shell Contract in his individual capacity. Blackwell Depo. 191:3-192:8; Stoll Decl. Ex. 25.

On November 15, 2011, GFES engaged in a bond issuance (the "Bond Issuance") and raised an additional $250 million through high interest secured notes from public markets. Stoll Decl. Ex. 1, at ¶ 54; Moreno Depo. 46:5-22.  The Bond Issuance was memorialized on November 15, 2011, by an indenture (the "Indenture")[9] between GFES and Wilmington Trust, National Association, as trustee and collateral agent (the "Indenture Trustee").[10] Stoll Decl. Ex. 1, at ¶ 54; Moreno Depo. 46:23-47:2; Ex. 26. Once GFES obtained the Bond Issuance, it sought to get its new technology to market and immediately invested the funds into expanding its fracking fleet. Stoll Decl. Ex. 26.

Shortly after the Bond Issuance, the oil and gas industry experienced a significant decline in natural gas prices, which in turn impacted the fracking industry. Stoll Decl. Ex. 29, at pp 3-5; Kearns. Decl. ¶ 7.  Consequently, GFES was well behind its forecasted projections for the first half of 2012, experiencing a negative EBITDA of approximately $8.5 million as compared to the forecasted positive $54 million of EBITDA in GFES's 2011 projections. Kearns Decl. ¶ 9; Stoll Decl. Ex. 31, at p. 30.  To offset its downturn in projections, GFES sought additional financing from Shell in April 2012. Stoll Decl. Moreno Depo. 45:22-46:12.

---

[9] The Indenture was amended on October 23, 2012. Stoll Decl. Ex. 27.

[10] The funds from the Bond Issuance were used primarily to repay both the Bridge Loan with Jeffries and the initial $42.5 million of Prepayment Funding due under the Shell Contract. Stoll Decl. Ex. 15, at p. 35.  The remainder amount was made available for the manufacturing of fracking equipment and general operating cash needs. *Id.*

GFES and Shell agreed to revise the structure of the Shell Contract, replacing the interest free Prepayment Funding with a $30 million revolving senior credit facility (the "Shell Senior Credit Facility"). Stoll Decl. Ex. 25, at MORE_00571013.  In May 2012, GFES fully drew the $30 million from the Shell Senior Credit Facility, but this proved still insufficient to satisfy their cash requirements. *Id.*  Shell therefore agreed to amend the Shell Senior Credit Facility and added an additional $70 million in funding (the "Shell Amended Senior Credit Facility"). *Id.*

B. The 2012 Stock Purchase Agreement

In order to obtain additional borrowing under the Shell Amended Senior Credit Facility, Moreno approached the bondholders with a consent solicitation (the "Consent Solicitation") that proposed to modify Section 4.08 of the Indenture to permit a "one-time incurrence of up to $95.0 million in senior term loans secured by a first priority security interest in all of the company's motor vehicles and equipment under a credit agreement with one of [GFES's] key customers, [Shell]...." *See* Stoll. Decl. Ex. 32, at p. 1-2.  As consideration, on October 24, 2012, MOR MGH and MMR (the GFES shareholders) agreed to provide additional equity investments into GFES under a share purchase agreement (the "2012 SPA"). Stoll Decl. Ex. 32, at pp 9-10; Ex. 33, at p. 1.  Section 2.01(a) of the 2013 SPA established that MOR MGH and MMR would purchase $10 million of GFES preferred stock at execution, and up to an additional $15 million on a quarterly basis. Stoll Decl. Ex. 1; at ¶ 59; Ex. 32, at p. 10; Ex. 35, at § 2.01(a).[11]  The 2012 SPA was

---

[11] The formula in the 2012 SPA required the quarterly increments to bridge the gap between actual cash on hand at quarter's end and $10 million (e.g., if cash on hand at quarter's

demanded by the bondholders in an effort ensure GFES's liquidity. Moreno Depo. 110:5-15.

Following the approval of the Consent Solicitation, Moreno relayed to the bondholders the continuing difficulties of GFES and the fracking industry, but assured them that success was on the horizon based upon a new business opportunity provided to GFES. The new opportunity was PowerGen.[12] In an effort to pursue the PowerGen business, Moreno sought new sources of revenue, reaching out to no less than seventeen companies pitching his PowerGen idea. Fontova Depo. 107:8-107:25. Ultimately, Moreno began conversations with General Electric Co. and its affiliate, GE Oil and Gas, Inc. ("GEOG") (collectively, "GE"), seeking a $200 million investment ($100 million to develop the PowerGen business and $100 million to fund the fracking business). Deposition of Michael Hosford ("Hosford Depo."), dated January 31, 2017, 33:1-8. Throughout their negotiations, GE made clear to Moreno that it was not interested in joining any fracking portion of GFES's business model and would only invest in the development of PowerGen. Hosford Depo. 25:15-26:6, 67:5-68:14, 84:11-93:13; Stoll Decl.

---

end equaled $9 million, the required purchase by MOR MGH and MMR would be $1 million). Stoll Decl. Ex. 1; at ¶ 59; Ex. 32, at p. 10; Ex. 35, at § 2.01(a).

[12] PowerGen (short for power generation) involves the use of turbine engines to produce portable power for oil and gas applications, as well as potentially generating electrical power that would be supplied to local power grids. Stoll Decl. Ex. 4; Moreno Depo. 7:23-8:3, 62:3-6; Deposition of Ted McIntyre, dated March 14, 2017 ("McIntyre Depo"), 33:1-8.

Exs. 44-46.  Moreover, due to GFES's "high yield" debt, GE would not allow GFES to be involved in any ownership of the contemplated power opportunity.[13] *Id.*

On March 7, 2013, on GE's insistence of complete isolation between GE and GFES, Moreno formed TGS as a potential vehicle for any PowerGen business with GE.[14] Stoll Decl. Ex. 1, at ¶ 36; Ex. 50; Hosford Depo. 67:5-68:14.  On May 13, 2013, GEOG committed to invest $100 million into TGS, with the understanding that it would obtain a 50% equity stake in TGS following certain events. Stoll Decl. Ex. 55, at p. 1: Ex. 56, at p. 2-3. The first tranche of the investment came in the form of a $25 million loan from GE to TGS, and the parties drafted a term sheet (the "GE Term Sheet") concerning the on-going joint venture negotiations between the parties pending waiver from the GFES board. *Id.*  Intended as a short term note, the loan had a ninety-day payback period and was to be converted into equity in TGS. *Id.*  Armed with the GE Term Sheet, the GFES board waived their interest via the "Written Consent of the Stockholders and Directors of Green Field Energy Services, Inc." and GE provided the first tranche of $25 million.[15] Stoll Decl. Ex. 58.  These funds were immediately transferred to GFES to purchase surplus inventory of turbine engines. Stoll Decl. Ex. 19; McIntyre Depo. 171:3-18.

---

[13] GE specifically states that in their negotiations with Moreno and GFES, it never intended to allow GFES to be an owner of any PowerGen business. Deposition of Edoardo Padeletti, as Rule 30(b)(6) Corporation Representative of GE Oil and Gas, Inc., ("Padeletti Depo."), 96:5-8.

[14] Moreno wholly owned and controlled TGS through another limited liability company, MOR DOH Holdings, LLC ("MOR DOH"). Stoll Decl. Ex. 1, at ¶ 36; Ex. 50.

[15] The Waiver was executed by Frank Slavich, the attorney for GFES, who tracked down the GFES Board members on the day the Waiver was to be signed. Deposition of Mark Knight, dated December 8, 2016 ("Knight Depo."), 57:14-21, 58:2-10.  Neither a GFES Board meeting nor any discussion regarding the contents of the Waiver were held. *Id.*

The specific structure of the TGS deal is important.  To ensure GFES's upside on the potential PowerGen venture, Moreno caused GFES, TPT and TGS to enter into an "Agreement for the Manufacture and Sale of the Turbine Powered Generators" (the "Tri-Party Agreement"). Stoll Decl. Ex. 109.[16]  Under the Tri-Party Agreement: (i) TPT (with McIntyre as its principal) agreed to manufacture and develop the turbine power generators for TGS; (ii) GFES (with Moreno as its principal) agreed to sell its stock of turbine engines and act as the contract manager and oversee the production of the turbines; and (iii) TGS (with Moreno as its principal) agreed to remit deposits to GFES for its orders, which would then be paid to TPT upon completion of the work. Stoll Decl. Exs. 55, 109.  Under the Tri-Party Agreement, GFES was to deposit any monies received from TGS into a Chase account (the "Chase Contract Account") that would be kept segregated from the company's other accounts. Stoll Decl. Ex. 109, at § 3.02.  Through this structure, GFES stood to benefit from profit margins on the turbines it sold to TGS and through its 50% ownership of TPT. McIntyre Depo. 54:17-61:16, 17:3-18

Contemporaneous with the GE negotiations and the 2012 SPA issues, Moreno and his wife entered into a $25 million personal loan with Goldman Sachs Bank USA ("Goldman Sachs"). Moreno Depo 172:23-173:7; Stoll Decl. Ex. 72.  The purported purpose of the personal loan was to fund equity investments into both GFES and TGS. *Id.*  Goldman Sachs advanced Moreno the $25 million, but required that Moreno purchase

---

[16] This was a corollary to TPT's role as the "packager" for the proposed joint venture under the GE Term Sheet and provided a mechanism for GFES to make money as a result of the joint venture. Stoll Decl. Exs. 55, 109.

an additional $10 million of GFES preferred stock, pledge that stock to Goldman Sachs and certify that the preferred stock pledge occurred. Stoll Decl. Exs. 74, 77.

C.   The 2013 Share Purchase Agreement and GFES's Default

On May 2, 2013, pursuant to their requirements under the 2012 SPA, Blackwell sent a funding request to MOR MGH and MMR with respect to their collective purchase obligation of $4,464,626 for the first quarter of 2013.[17] Blackwell Depo. 34:8-23.  Neither MOR MGH nor MMR responded to such request, and the 2012 SPA requirements were not satisfied during the first quarter of 2013. Blackwell Depo. 38:22-39:25, 45:4-19.  This process was repeated for the second quarter of 2013, with MOR MGH and MMR not satisfying the funding request of $2,242,455. Blackwell Depo. 47:6-50:3, Stoll Decl. Exs. 68-70.

On June 28, 2013, with GFES once again needing additional equity investments, Moreno (acting in his capacity as CEO of GFES and Managing Member of MOR MGH), executed a new share purchase agreement (the "2013 SPA") (together with the 2012 SPA, the "SPAs"). Stoll Decl. Ex. 36, at ¶¶ 60, 154; Ex. 78.  Section 2.01 of the 2013 SPA required the initial purchase of $10 million for GFES preferred stock upon execution of the agreement. Stoll Decl. Ex. 78, at § 2.01.  As with the 2012 SPA, the bondholders demanded the 2013 SPA in an effort to ensure GFES's liquidity. Moreno Depo. 110:5-15.

---

[17] Pursuant to the 2012 SPA, MOR MGH was required to pay 88.89% of the funding requirements, with MMR funding the reaming 11.11%. Stoll Decl. Ex. 65; Blackwell Depo. 34:24-35:7.  As such, MOR MGH was responsible for $3,968,606 of the first quarter request, and MMR's responsibility was $496,020.

Contemporaneous with the execution of the 2013 SPA, Moreno signed a Certificate of Receipt of Green Field Energy Services, Inc. (the "Receipt") stating that the initial $10 million purchase had been made. Stoll Decl. Exs. 78-79.   Despite signing both the 2013 SPA agreement and the Receipt, however, MOR MGH did not buy the required $10 million of GFES preferred stock, and instead Moreno put the $10 million directly into MOR DOH. Stoll Decl. Exs. 80-81.   Facing financial difficulties, in June 2013, GFES failed to make its $2 million monthly amortization payment to Shell under the Shell contract. Stoll Decl. Ex. 31, at p. 8; Ex. 84.   In July and August, GFES again failed to make its monthly amortization payment to Shell. Stoll Decl. Ex. 31, at p. 8.   By failing to pay Shell, GFES had as of August 2013 defaulted on the SPAs, defaulted on the Shell Contract and failed to pledge $10 million in preferred stock to Goldman Sachs as required by their agreement.

The culmination of GFES's failure to satisfy several of their financial requirements forced Moreno to notify the Indenture Trustee of the defaults and publicly acknowledge the same in the Q2 2013 Quarterly Report. Stoll Decl. Ex. 31, at p.32; Exs. 85-86.   These public notifications rippled through GFES and ultimately triggered a cross-default under the Shell Amended Senior Credit Facility. Stoll Decl. Ex. 31, at pp8, 30.   Moreno issued another press release referencing the Shell Contract default, which caused GFES's Corporate Family Rating, Probability of Default Rating and Senior Secured Notes Due 2016 rating all to be downgraded.[18] Stoll Decl. Ex. 87.   On September 20, 2013, citing the

---

[18] Moody's Investor Services categorized the downgrades as follows: Corporate Family Rating, downgraded to Ca from Caa2; Probability of Default Rating, downgraded to Ca-PD/LD

public acknowledgement of the Indenture default and the downgrade in rating, GEOG

informed its staff and other GE employees to stop all communications with GFES, TPT

and Moreno, and to cease any work on current projects. Stoll Decl. Ex. 93-94. Less than a

month later, on October 8, 2013, Shell issued a notice of default to GFES. Stoll Decl. Ex.

92.  Failure to acquire the remainder of the GE joint venture and the notice of default from

Shell forced GFES to seek protection under Chapter 11 on October 27, 2013. *In re Green

Field Energy Services, Inc., et. al.*, No. 13-12783 D.I. 1 (Bankr. D. Del., October 27, 2103).

## III.  Alleged Preference Actions

During the pendency of the bankruptcy case, the Trustee discovered certain

transfers GFES made to four separate entities that he believed to be preferential under 11

U.S.C. § 547(b). Adv. D.I. 370, 371.  Specifically named the Trustee identified transfers

made to TGS, Aerodynamic, Casafin and Frac Rentals.

### A.  Turbine Generation Services

The TGS transfer arose from the Tri-Party Agreement. Declaration Jeffrey R. Fine,

dated June 30, 2017 ("Fine Decl.") Ex. 24.  Under the Tri-Party Agreement, TPT agreed to

serve as "Contractor," TGS was to act as the "Company" to whom services and products

were given and GFES acted as the "Contract Manager." *Id.*  As "Contract Manager," GFES

was responsible for managing TPT's production processes, providing back-office

accounting services to TPT and TGS and serving as Trustee for TPT on all payments made

by TGS. *Id.* at §§ 2.14, 3.1-3.3.  Specifically, TGS would transfer deposits to GFES, which

---

from Caa2-PD; and Senior Secured Notes Due 2016, downgraded to C (LGD 5 / 72%) from Caa2
(LGD 4 / 60%). Stoll Decl. Ex. 87.

would then remit to TPT for the manufacture of the PowerGen units (the "TGS Deposit Monies") upon receipt of invoices from TPT. Stoll Decl. Ex. 109, Appendix B.  Until receipt of an invoice from TPT, GFES was required under the contract to hold the TGS Deposit Monies in a dedicated and separate account. *Id.*  The Tri-Party Agreement explicitly stated that GFES was not to commingle the TGS Deposit Money with GFES's normal operating account.

On September 10, 2013, TGS transferred to GFES $2,210,883.76. On September 11, 2013, GFES issued a transfer back to TGS for the exact same amount (the "TGS Deposit"), with the deposit clearing GFES's bank account on the same day. Fine Decl. Exs. 25, 27. The transfer came directly from GFES's general operating account, despite being guided by the Tri-Party Agreement to refrain from such action. *Id.*

B.  Aerodynamic, LLC

Aerodynamic was a Learjet travel entity formed by Moreno on September 23, 2005. Moreno Decl. ¶7.  Aerodynamic's core purpose was to maintain an aircraft (specifically for Aerodynamic, a Learjet) and make it available for use to Moreno, his companies and other entities. *Id.*  The acquisition of the Learjet was financed through GE Capital, and Aerodynamic was obligated to make monthly lease payments to GE Capital in the amount of $55,397.88. Moreno Decl. ¶ 15.  Seeing that many of GFES's business opportunities would occur in obscure and remote locations throughout the United States,

GFES saw Aerodynamic as an opportunity to establish field offices in remote locations and meet with current and potential customers on short notice.[19] Moreno Decl. ¶ 9.

On June 1, 2011, Aerodynamic entered into a Non-Exclusive Aircraft Lease Agreement (the "Aerodynamic Lease") with GFES to pay a flat month rental payment of $55,000 to Aerodynamic for the right to use the Learjet on an unlimited, but non-exclusive, basis. Fine Decl. Exs. 6-7; Blackwell Depo. 177:18-178:14.   Despite paying Aerodynamic at irregular dates following the receipt of an invoice, GFES satisfied a majority of the invoices from Aerodynamic from 2011 to 2013. Stoll Decl. Ex. 115; Blackwell Depo. 130:21-136:19.  Between May 21, 2013, and October 2, 2013, GFES issued checks totaling $275,000 to Aerodynamic to satisfy invoices from March 2013 to July 2013 (collectively, the "Aerodynamic Transfers"). Stoll Decl. Ex. 115.

Following the filing of the Petition, Aerodynamic sold the Learjet and ceased further operations. Fine Decl. Ex. 18; Moreno Depo. 190:10-20.

C.  Casafin II, LLC

Substantially similar to Aerodynamic, Casafin was established on July 25, 2006, by Moreno, with a core purpose of maintaining an aircraft (specifically for Casafin, a Bombardier) and making it available for use by Moreno, his companies and other entities. Moreno Decl. ¶11.  The use of the Bombardier through Casafin was expected to provide

---

[19] GFES's headquarters were in Lafayette, Louisiana, which was only serviced by a small regional airport. Fine Decl. Ex. 7; Blackwell Depo. 156:12-157:22. Consequently, flying commercially to a place such as Oklahoma City could result in a two-day affair because the employees would have to fly to Dallas first before flying to Oklahoma City. *Id.* Comparatively, flying privately would allow the employees to leave immediately and take a direct flight to Oklahoma City, reducing the two-day trip to a matter of hours.

a net benefit to GFES through accessibility and speed of air travel. Blackwell Depo. 156:12-157:22, 159:2-24.

Casafin entered into a Non-Exclusive Aircraft Lease Agreement with GFES (the "Casafin Lease"). The Casafin Lease provided for a $4,500 monthly rental charge, minus the amount GFES paid for fuel during the month. Fine Decl. Ex. 13. Prior to the filing of the Petition, Casafin issued no less than 159 invoices to GFES for pre-petition services. Stoll Decl. Exs. 15-16. From May 14, 2013, to August 19, 2013, GFES issued checks satisfying a certain portion of those invoices in the amount of $618,397.95 (collectively, the "Casafin Transfers"). Stoll Decl. Ex. 117. Following the filing of the Petition, Casafin sold the Bombardier and ceased further operations. Fine Decl. Ex. 18; Moreno Depo. 194:14-18.

D. Frac Rentals, LLC

Frac Rentals was established on July 3, 2012, for GFES to use as a vehicle to provide additional peripheral equipment needed for fracking job sites. Fine Decl. Ex. 7; Blackwell Depo. 142:13-20. Frac Rentals was established and funded by its owners. Initially 80% was owned by MOR DOH, and 20% by Michael J. Smith, with Moreno acting as Manager for the entity.[20] Fine Decl. Ex. 7; Blackwell Depo. 143:22-144:3, 170:9-13. On July 10, 2012, Frac Rentals entered into a Master Service Agreement (the "Master Service Agreement")

---

[20] While Moreno served as Manager for Frac Rentals, the entity was operated by his brother, Jesus Moreno, and a group of experienced operators of fracking related equipment. Blackwell Depo. 143:22-144:3, 170:9-13.

with GFES to provide the requisite equipment and related services for a fee to be invoiced periodically upon completion of each task. Fine Decl. Ex. 20.

Between May 16, 2013, and October 22, 2013, GFES paid to Frac Rentals (the "Frac Rentals Transfers") a total of $593,966.18 for satisfaction of services rendered.[21] Fine Decl. Exs. 21-22; Stoll Decl. Ex. 119.

IV.   Moreno's Administrative Claims

Following the filing of the Petition, Moreno filed two proofs of claim against GFES and HCI for "contingent claim[s] for indemnification and/or reimbursement, subject to all defenses, with respect to that certain [Shell Contract], dated as of October 22, 2012, between Michel Moreno and his spouse Tiffany Moreno and [Shell]". Stoll Decl. Exs. 128, 129.

The first proof of claim for reimbursement and indemnification is in connection with a written guarantee entered into by Moreno and his wife Tiffany with Shell on October 22, 2102 (the "Shell Guarantee"). Stoll Decl. Ex. 198.  Pursuant to the Shell Guarantee, Moreno and his wife guaranteed GFES's obligation to Shell in connection with Shell's $94 million loan, Moreno assigned to Shell all of his rights against GFES's estate and Moreno waived his rights to obtain reimbursement, contribution and indemnification, or to seek to exercise any right or remedy against GFES. *Id.* at pp. 2-3. Relatedly, under the Liquidation Plan, Shell agreed to receive $5 million in cash on the

---

[21] Throughout the entirety of their contract, Frac Rentals billed GFES $1,195,926.53, and received total payment in the amount of $743,966.20.  Fine Decl. Exs. 21-22; Stoll Decl. Ex. 119.

effective date (the "Shell Secured Claim") in exchange for full satisfaction, settlement and release of its "secured" claims.[22] Stoll Decl. Ex. 97; Adv. D.I. 885-1, at § 5.03.

Moreno's second claim relates to administrative fees he suffered during the case. In order to respond to and properly defend against the Committee's allegations, Moreno hired the law firm of Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz"), along with Mesirow Financial Consulting, LLC ("Mesirow") as financial advisors. Stoll Decl. Ex. 130-131. Moreno felt the hiring of Cole Schotz and Mesirow was essential based upon his belief that the allegations against him were being brought in his capacity as an officer and director of GFES. Stoll Decl. Ex. 130.

Following the filing of the Second Amended Complaint on May 19, 2016, the Trustee and Defendants filed cross-motions for summary judgment. The Court's decision follows.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b) arising under the Bankruptcy Code.

---

[22] As of the time of the Trustee's Motion, Moreno has made no payment to Shell, pursuant to the Shell Guarantee or otherwise, nor has Shell sought to recover from Moreno on the Shell Guarantee. Moreno Depo. 210:2-16.

## Legal Standard

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56. The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where, as here, there are cross-motions for summary judgment, the Court must ensure that the nonmoving party on each theory has the inferences to be drawn from the underlying facts viewed in the light most favorable to it as the party opposing the motion. *Mitsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## Discussion

From 2011 to 2013, the Trustee argues that Moreno, in both his personal capacity and capacity as a director, manager or otherwise, continually acted in his best interest to the detriment of GFES, its affiliated entities and its creditors. Through these self-interested actions, Moreno allegedly caused significant harm to GFES by breaching contracts, making preferential transfers and using company funds and opportunities for his own personal gain. Defendants sternly object to the all allegations lodged against Moreno and the other entities, and in turn argue that the alleged preferential transfers are unavoidable. It should be noted that Defendants only filed a cross-motion for summary judgment ("Defendants' Motion"). With regard to the preferential transfer allegations

(Counts 19, 21, 23, and 24), with the remaining counts Defendants argue that the Trustee has not met his burden and that those issues should proceed to trial. For this reason, the Court finds it suitable to first address the cross-motions for preferential transfers before turning to the remainder of the Trustee's Motion.

## I.   Preferential Transfers

Section 547(b) of the Code sets forth the elements a party must prove to bring a successful preference claim. "[A]ny transfer of an interest of the debtor in property" is subject to avoidance if it was made:

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made – (A) on or within 90 days before the date of filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would if – (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The mechanism of Section 547(b) "prevents the debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy." *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990). If the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated. *Id.* Where there is no genuine issue of material fact as to these elements, a preference claim is ripe for summary judgment. *See, e.g., Argus Mgmt. Grp. V. J-Von N.A. (In re CVEO Corp.)*, 327 B.R. 724 (Bankr. D. Del. 2005). If all

elements are met, there are still certain affirmative defenses a defendant may raise to deem the transfer unavoidable as a matter of law.

One such defense is the ordinary course defense which demonstrates the transfer, despite meeting all the elements of Section 547(b), is still unavoidable. *See* 11 U.S.C. § 547(c)(2). Under Section 547(c)(2), the ordinary course defense permits a creditor to retain an otherwise preferential payment if: (1) such transfers were made for a debt incurred in the ordinary course of business of the parties; and either (2) the transfers were made in the ordinary course of business of the parties; or (3) the transfers were made in accordance with ordinary business terms. 11 U.S.C. § 547(c)(2). "In order to successfully demonstrate that the ordinary course of business exception applies, [defendants] must prove by a preponderance of the evidence that the transaction…meets two of the three subparts of [Section] 547(c)(2)." *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 110 (Bankr. D. Del. 2010).

Another defense to Section 547(b) is the subsequent new value defense. The purpose of subsequent new value is "to encourage creditors to work with companies on the verge of insolvency. In addition, it is designed to ameliorate the unfairness of allowing the trustee to avoid all transfers made by a debtor to a creditor during the preference period without giving any corresponding credit for advances of new value that benefitted the debtor." *Friedman's Inc. v. Roth Staffing Cos., L.P. (In re Friedman's Inc.)*, No. 09-10161 (CSS), 2011 WL 5975283, at *1 (Bankr. D. Del. Nov. 30, 2011) (citing Thomas A. Jackson, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 122-150 (1st ed. 1986)). To successfully invoke a subsequent new value defense in the Third Circuit, "the creditor

must establish two elements: (1) after receiving the preferential transfer, the creditor must have advanced new value to the debtor on an unsecured basis; and (2) the debtor must not have fully compensated the creditor for the new value as of the date that it filed its bankruptcy petition." *See Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D. Del. 2012) (internal citations omitted).

A. <u>TGS Transfer</u>

The Trustee alleges that when GFES executed the TGS Deposit on September 11, 2013, it constituted a preferential transfer under Section 547(b) of the Code. Defendants counter that the Trustee cannot prove that the $2,210,883.76 GFES received initially from TGS was ever property of the debtor because the money was, according to Texas law, held in trust for the benefit of TGS.[23] In the alternative, if the Court did find that the TGS Deposit was property of GFES, the transfer was subsequent new value and thus there is an affirmative defense to any preference claim.

"A bankruptcy estate includes all property of the debtor, but only to the extent of the debtor's equitable interest in such property." *In re Columbia Gas Systems Inc.*, 997 F.2d 1039, 1054 (3rd Cir. 1993) (citing 11 U.S.C. § 547(d)). If a debtor possesses only legal title to certain monies, those funds would not be deemed an asset of the bankruptcy estate. *Columbia Gas*, 997 F.2d at 1054. One such situation is when an entity acts as a trustee, having no equitable title, holding funds in trust on another's behalf. *Id.* at 1059-60. In

---

[23] The Tri-Party Agreement states that the contract "shall be governed by and construed under and in accordance with the laws of the State of Texas without regard to conflicts of law principles that would require application of any other law." Stoll Decl. Ex. 109, at § 6.1.

such a scenario, the beneficiary has an equitable interest in the trust property, while legal title is vested in the trustee. *Id.* at 1059.

Under Texas law, a party can demonstrate the existence of an express trust by: (1) identifying the beneficiary; (2) specifically describing the property subject to the trust; and (3) clearly defining the duties of the trustee such that a court of equity will be able to enforce them. *Gurly v. Lindsley*, 459 F.2d 268, 276 (5th Cir. 1972).  In determining whether the parties formed a trust, intent is a key indicator, which is consistent with Third Circuit precedent. *See In re Penn Central Transp. Co.*, 486 F.2d 519, 524 (3d Cir. 1973) (stating that a trust relationship exists when the parties manifest an intention to create same).

Based upon the language of the Tri-Party Agreement and the parties' actions surrounding the TGS Deposit, there is sufficient evidence to show the parties intended to form a trust.  Section 3.2 of the Tri-Party Agreement establishes the elements necessary under Texas law to demonstrate the existence of a trust.  The Tri-Party Agreement defines TPT as an identified beneficiary (defined as the "Contractor" in the agreement), states that all payments received by TGS (defined as the "Company" in the agreement) are to be held by GFES (defined as the "Contract Manager" in the agreement) *in trust* for the benefit of TPT and specifies the duties GFES holds, as trustee, under the Tri-Party Agreement. Stoll Decl. Ex. 109, §§ 2.1, 3.1-3.3 (emphasis added).  Under the standard provided by the *Gurly* court, the Tri-Party Agreement meets all elements to establish the existence of a trust. *See Gurly*, 459 F.2d at 276.

The Trustee argues that while the Tri-Party Agreement may delineate a trust relationship between the parties, GFES's actions surrounding the TGS Deposit

23

demonstrate otherwise. The Trustee first explains that merely including the language "in trust" in an agreement does not rise to the level of creating an express trust. *See Electroflux Fin. Corp. v. Grant (In re Grant)*, 325 B.R. 728, 734 (Bankr. W.D. Ky. 2005).[24]  Consequently, the Trustee believes the TGS Deposits should be analyzed as if they were transferred pursuant to a commercial contract with a fiduciary relationship established. *See Trianco, LLC v. Int'l Bus. Machines Corp.*, 271 F. App'x 198, 203 (3d Cir. 2008); *Tiare Int'l Inc. v. United Fixtures Co. (In re Interlake Material Handling, Inc.)*, 441 B.R. 437, 442 (Bankr. D. Del. 2011).

Absent, however, from the Trustee's argument are any cases referencing or interpreting Texas law.  This absence is key because Texas law interprets trust instruments the same as contracts, and under a more conservative approach, considers the four corners of the document to be determinative of intent absent ambiguous language. *See McCarty v. Montgomery*, 290 S.W.3d 525, 532 (Tex. App. Eastland 2009) (finding that courts may consider surrounding circumstances to determine the appropriate meaning of language chosen by the parties, but not to determine a party's subjective intent); *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996) (noting that if language in a contract is not ambiguous, it can be construed as a matter of law).  When interpreting the intent of the parties under Texas law, the overriding principle to be observed"[i]s the intention of the [parties] at the time of the creation…." *Lee v. Rogers Agency*, 2016 WL 7912460, at *3 (Tex. App. Texarkana Oct. 6,

---

[24] In support of his legal argument, the Trustee cites several other cases demonstrating the language "in trust" does not expressly create a trust.  Each of the cited cases case stands for the same proposition but none are a Texas opinion, a Third Circuit opinion or an opinion from this Court.  Therefore, in the interest of brevity, the Court only cites to one such case.

2016) (quoting *Coffee v. William Marsh Rice Univ.*, 408 S.W.2d 269, 273 (Tex. App.—Houston [1st Dist.] 1966, writ ref'd n.r.e.)).  The Tri-Party Agreement explicitly states and permits GFES to hold the monies received from TGS in trust, establishing that the parties contemplated and intended to create a trust relationship.

Next, the Trustee argues that GFES's inability to segregate the TGS Deposits indicates that the parties did not intend a trust relationship.  Per the Tri-Party Agreement, GFES was required to place the payments received from TGS into a separate and specific bank account.  However, for the TGS Transfer in question, GFES deposited the monies into its general bank account.  Defendants argue that despite the monies being transferred into the wrong account, the funds are readily traceable and do not constitute property of the estate.

"To establish that there exists a trust, a [party] must 'identify and trace the trust funds if they are commingled.'" *In re Manga Entm't Corp.*, 438 B.R. 380, 395 (Bankr. D. Del. 2010) (quoting *Goldberg v. N.J. Lawyers' Fund for Client Prot.*, 932 F.2d 273, 280 (3d Cir. 1991)).  When attempting to establish rights to commingled funds, "a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exists, and (2) identify and trace the trust funds if they are commingled." *Goldberg*, 932 F.2d at 273; *Columbia Gas*, 997 F.2d at 1063 ("[B]eneficiaries of trust funds bear the burden of identifying and tracing their trust property").  The first showing of a trust relationship is a question of state law, the second showing is exclusively a question of federal law. *Goldberg*, 932 F.2d at 273.

While the Third Circuit has not formally adopted a procedure to trace commingled funds, the lowest intermediate balance test ("LIBT") has routinely been applied by the Court and other federal courts around the country. *In re Catholic Diocese of Wilmington, Inc.*, 432 B.R. 135, 151 (Bankr. D. Del. 2010) (citing *In re Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619–620 (1st Cir. 1988)); *Columbia Gas*, 997 F.2d at 1063-64; *In re MJK Clearing, Inc.*, 371 F.3d 397, 401 (8th Cir. 2004); *In re Falcon Oil Co.*, 206 B.R. 715, 720 (Bankr.M.D.Pa.1996); and *In re Amp'd Mobile, Inc.*, 377 B.R. 478, 489–490 (Bankr. D. Del. 2007)). The LIBT, as a legal construct, "allows trust beneficiaries to assume that trust funds are withdrawn last from a commingled account." *Columbia Gas*, 997 F.2d at 1064. As such, if the amount of the commingled account remains at all times equal to or above the amount of the trust funds, the funds are readily traceable. *In re Dameron*, 177 F.3d 718, 724 (4th Cir. 1998). If, however, the amount of the commingled account falls below the amount of the trust funds, the funds fail to be traceable and become part of the estate.[25] *See Catholic Diocese of Wilmington*, 432 B.R. at 160-61; *Dameron*, 155 F.3d at 724.

Despite the Tri-Party Agreement requiring GFES to deposit any monies into the Chase Contract Account, GFES instead deposited the monies from TGS into its general banking account held by Regions Bank (the "Regions Bank Account"). Fine Decl. Ex. 29. Defendants concede that the funds were commingled when deposited into the Regions

---

[25] The amount of funds that become part of the estate is calculated by the amounts deposited (both trust fund and non-trust fund) and those withdrawn (both trust fund and non-trust fund). "[I]f the commingled fund has been depleted entirely, the trust is considered lost…if the commingled fund has been reduced below the level of the trust funds but not depleted, the claimant is entitled to the lowest intermediate balance in the account." *Dameron*, 155 F.3d at 724.

Bank Account. The issue remaining is whether or not the Regions Bank Account passes the LIBT for the period in question (September 10-11, 2013). For this showing, Defendants' have not met their burden.

Defendants suggest that the process of calculating the LIBT for the Regions Bank Account during the TGS Transfer is a simple calculation. TGS paid GFES the $2,210,883.76 on September 10, 2013, and GFES returned the TGS Transfer on September 11, 2013. Other than a single deposit of $8,712.55, the Regions Bank Account received no other intervening deposits, allegedly allowing the funds to be easily traced. Def. Br. Pg. 30-31, ¶ 77. Lying in a footnote to Defendants' argument, however, is a qualifier stating that "[w]hile the records show many other withdrawals during [September 10-11], those withdrawals are irrelevant if the balance never fell below $2,210,883.76, which it never did according to GFES's account reconciliation." Def. Br. Pg. 31. n. 84. The Court disagrees.

According to the bank reconciliation statement provided there were $313,992.78 worth of withdrawals on September 10, 2013, and $232,561.72 worth of withdrawals on September 11, 2013. The Court does not know, and what remains a factual issue to be determined, is the balance of the Regions Bank Account at the close of business on September 9, 2013. Under the LIBT, "[s]hould the amount on deposit be reduced below the amount of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account…." *Collier on Bankruptcy* ¶ 541.28 (16th ed. 2017). Important then to the Court is the amount in the bank account at the time of the TGS

Transfer.  To demonstrate the Court's concern, the following two hypothetical scenarios

are provided:

Scenario 1:

Assume at the close of business on September 9, 2013, that the Regions Bank
Account was at $387,894.16 (the amount of the deposits and withdrawals
from June 28, 2013, to September 9, 2013, according the bank reconciliation
provided to the Court).The $2,210,883.76 is deposited on September 10,
2013.  This raises the total of the Regions Bank Account to $2,598,777.92.  On
September 10 and September 11 withdrawals of $313,992.78 and $232,561.72
are made.  This brings the total amount in the Regions Bank Account to
$2,052,223.42.  Under the LIBT, non-trust fund monies are withdrawn *until
the amount is below the trust fund deposit*, any money withdrawn below the
trust fund deposit can only be pulled from trust fund monies. Thus, any
monies withdrawn below the $2,210,883.76 line are deemed to be trust fund
proceeds withdrawn.  In this scenario, it means that $158,659.62 of the non-
trust fund withdrawals pull from the trust fund deposit and become
property of the estate, ultimately limiting the protection in trust of the TGS
Transfer to $2,052,223.42.

Scenario 2:

Assume at the close of business on September 9, 2013, that the Regions Bank
Account was at $1,000,000 (an arbitrary amount chosen by the Court).
Following the deposit of the $2,210,883.76, the total in the Regions Bank
Account would be $3,210,883.76.  On September 10 and September 11
withdrawals of $313,992.78 and $232,561.72 are made.  This brings the total
of the Regions Bank Account to $2,664,329.26, a number above the trust
fund deposit.  Under the LIBT, since the total of the account never falls
below the amount of the trust funds deposited, the Court is bound to
assume the withdrawn funds pull from non-trust fund monies.  Therefore,
the entire $2,210,883.76 remains in trust and is not considered part of the
estate.

The above scenarios demonstrate that Defendants' presumption that the funds in

the Regions Bank Account never dropped below $2,210,883.76 may or may not be correct.

At this stage in the case, however, the evidence submitted by the parties does not permit

the Court to make a determination of such an issue.[26]  Therefore, while the funds were deposited in trust, the Court cannot identify and trace the commingled funds.  The Court therefore finds that the TGS Transfer is not part of the estate but denies summary judgment based upon the Court's inability to trace the funds.

B. Aerodynamic Transfer

Of the remaining preferential transfers in question, Defendants do not claim that each qualifies as a non-preferential transfer under Section 547(b).  Instead Defendants argue that despite all the elements being met, an ordinary course defense and a subsequent new value defense may be raised for each remaining preference claim.  The Court notes that regarding the subsequent new value defense, the Trustee concedes that $110,000 of the Aerodynamic Transfers constitutes new value as defined by Section 547(c)(4), reducing the Trustee's claim to $165,000.

To determine whether payments were made in the ordinary course of business, a creditor must show: (1) payment was on account of a debt incurred in the ordinary course of business; (2) payment was made in the ordinary course of business between the debtor and creditor; or (3) payment was made according to ordinary business terms. 11 U.S.C. § 547(c)(2).

---

[26] At oral argument, Defendants stated they possess bank statements which demonstrate the Regions Bank Account balance never fell below $2,210,883.76.  However, the Court has not found, nor was guided to, those bank statements by either party.  Deposits and withdrawals were clearly made into the Regions Bank Account prior to June 28, 2013, but without an indication of the balance as a whole the bank reconciliation statement is not entirely beneficial to the Court for the purposes of the LIBT. *See* Fine Decl. Exs. 6, 9, 10, 14, 19-25.

The first requirement is satisfied if the debtor-creditor relationship is strictly for ordinary business purposes and remains at arm's length. *In re NewPage Corp.*, No. 11-12804 (KG), 2016 WL 5787237, at * 4 (Bankr. D. Del. Sept. 30, 2016). The Court finds that Aerodynamic satisfies this element.[27]

The second requirement asks the Court to determine if the transaction was in the ordinary course between the parties by taking into account the length of time the parties have done business, the amount of the transfer, the method of payment, the action of accepting the payment and whether the creditor did anything to take advantage of a debtor. *See, e.g., Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 307 (Bankr. D. Del. 2010). Defendants contend that the payments made from GFES to Aerodynamic were in the ordinary course because the frequency and terms of payments (even including the recurring late payments) were consistent throughout the existence of the relationship. One factor the Court must take into account is the length of time and amount of transfers sufficient to establish an actual ordinary course. Defendants do not present a viable argument to counter the fact that there were only 9 total invoices paid through the issuance of 8 checks. The evidence of a mere 9 invoices over a two-year period in this case is insufficient to establish an ordinary course between the parties.

---

[27] Despite Moreno creating Aerodynamic (and similarly Casafin), the evidence shows that Blackwell, not Moreno, had control over GFES's involvement with Aerodynamic. Blackwell Depo. 135:25-136:8; Moreno Depo. 192:14-23. The evidence also shows that the rates charged to GFES and the other entities were deemed to be customary in the private jet industry. Blackwell Depo. 159:2-24.

Defendants further argue that if the actions of the parties do not demonstrate an ordinary course of payments, among themselves, the Aerodynamic Transfers were made according to ordinary business terms in the industry.  In support of their argument, Defendants point only to the Casafin Transfers (discussed *infra*) and how those transfers were nearly identical to the Aerodynamic Transfers.  The Court does not find that the business practices of only one other private jet company, owned by nearly identical owners, satisfies what the business practices of the entire private jet industry may be. Defendants have not met their burden to show that an ordinary course defense to the Aerodynamic Transfers exists.  The Court thus finds that the Aerodynamic Transfers are avoidable in the amount of $165,000.

C.  Casafin Transfer

To begin, the Court notes that regarding the subsequent new value defense, the Trustee concedes that $151,983.01 of the Casafin Transfers constitutes new value as defined by Section 547(c)(4), reducing the Trustee's claim to $466,414.94.  Moving to the ordinary course defense, the Court finds that the transactions were made at arm's length and the first element is satisfied.[28]

In seeking to show that the parties executed the Casafin Transfers in an ordinary course of business, Defendants argue that this case is similar to the Court's decision in *NewPage*.  In *NewPage*, the litigation trustee sought to avoid $413,411.48 worth of transfers made to satisfy invoices sent by the defendant, a manufacturer and designer of

---

[28] *See* n. 27 *supra*.

equipment used in the pulp and paper industry. *NewPage*, 2016 WL 5787237 at *1, 3.  At issue were roughly 180 invoices that were billed over a three-month period. *Id.* at *3.  The defendant argued that the transfers were made in the ordinary course of business and that the defendant could prove this by demonstrating that the historical period of payment and the preference period of payment were substantially similar despite large variances in how many days it would take to pay an invoice. *Id.*  The Court analyzed 1,275 invoices and hundreds of payments made before the transfers in question (the "historical period"), noting the average, median, mode, and range of each payment; and then compared these findings to the average, median, mode and range of each payment made on the invoices during the time of the transfers in question (the "preference period").[29] *Id.* at *4. The Court found that the historical period payments were nearly identical to the preference period payments and the Court was satisfied that the defendant met its burden of showing the payments were made in the ordinary course. *Id.* at *4-5.

The present case is not analogous to *NewPage*.  The historical period in *NewPage* had over 1,200 invoices and hundreds of payments on those invoices.  The historical period for the Casafin Transfers had 118 invoices with, more importantly, only 18 payments.  The preference period in *NewPage* consisted of approximately 180 invoices with at least 89 separate payments.[30] *Id.* at n. 4.  The preference period for the Casafin

---

[29] In each calculation, the Court excluded any statistical "outliers," representing less than 3% of the transfers in question. *See New Page*, 2016 WL 5787237, at *3.

[30] This number is according to the Affidavit of Brad Kruzan in Support of Kadant Solutions Motion for Summary Judgment provided in *NewPage*.  Mr. Kruzan's Declaration included a list

Transfers included only 29 invoices with, more importantly, only 8 payments.  The key under Section 547(c)(2) is showing the payments, not the invoices, followed the ordinary course of business.  Unlike *NewPage* where there were many payments to analyze, the Court was presented with only 18 historical period payments and 8 preference period payments.  Such evidence is not enough "to establish the existence of an ordinary course of business."[31] *See Sierra Concrete Design*, 463 B.R at 306 (finding that seventeen checks over approximately 68 invoices within less than a year was not enough to prove an ordinary course defense).  The Court thus finds that the Casafin Transfers are avoidable in the amount $466,414.94.

D.  Frac Rentals Transfers

The Court first notes that Defendants do not dispute the Frac Rentals Transfers constituted a preferential transfer under Section 547 of the Code.  Instead, Defendants raise two affirmative defenses, an ordinary course defense and a subsequent new value defense.

Beginning with subsequent new value, Defendants claim that the Frac Rentals Transfers, which occurred from May 16, 2013, to December 31, 2013, constitute new value

---

of all the alleged transfers with the invoice number and the check number provided to satisfy the invoice.  From this information the Court took each unique check number and determined that Kadant had written at least 89 different checks, i.e. 89 separate payments.

[31] Key in arguments by the Trustee and Defendants was the arbitrary number in which to eliminate outliers from the historical and preference period calculation.  The disagreement furthers the Court's findings that there is not enough evidence.  In *NewPage*, the Court removed payment outliers to make its final calculations. *NewPage*, 2016 WL 5787237 at *4-5.  The Court was afforded that opportunity because of the volume of data it had at its disposal and it could accurately calculate which payments were truly outliers.  With only 18 and 8 payments, the Court cannot determine if any outliers exist.

under Section 547(c).  To calculate subsequent new value, the Court has adopted Judge

Sontchi's process explained in *Sierra Concrete Design*. *See id.*  In *Sierra Concrete Design*,

Judge Sontchi outlined a formula to determine a party's preference exposure when

multiple preference payments are made, and several instances of new value are issued.

*Id.* at 307.  Looking at a hypothetical set of transfers and payments, Judge Sontchi

concluded that the formula for determining new value is the value of the first transfer,

less the value of the services provided, plus the value of the second transfer (and so on

and so forth). *Id.*  In essence, the formula can be summed up as: [(value of transfer 1)-

(new value provided)+(value of transfer 2)]. *See In re Proliance Int'l, Inc.*, 514 B.R. 426, 437

(Bankr. D. Del. 2014).  In applying this formula, the Court need not "link specific invoices

to specific payments.  Rather, [the Court] need only track the debits and credits

generally." *Sierra Concrete Designs*, 463 B.R. at 307.

Defendants, using *Sierra Concrete Designs*, argue that Frac Rentals provided GFES

with new unsecured credit, which remained unpaid and unavoidable as of the Petition

Date with a net exposure of no more than $69,137.97.[32]  The Trustee counters that each

invoice provided to GFES (the new value) is linked to a credit memo, which indicates that

the amounts provided were not due and owed to Frac Rentals.[33]  Absent from the

---

[32] In Defendants' calculations, it is clear that the new value provided exceeds the preference exposure from prior transfers.  Many courts "have not analyzed what happens when the new value exceeds the preference exposure."  *Proliance Int'l*, 514 B.R. at 436 n.42.  However, neither party addressed this issue specifically, so "out of an abundance of caution…the Court will assume that without such consideration, the net result would be [the same]." *Id.*

[33] The Trustee cites Collins English Dictionary and an AccountTools website to define "credit memo" in support of its position. Pl. Rep. Br. Pg. 58.

Trustee's argument is additional evidence suggesting the Frac Rental Transfers were anything other than Frac Rentals addressing an outstanding receivable balance. Without any substantive evidence to counter the data provided by Defendants, the Trustee cannot meet his burden of challenging the new value provided to GFES, reducing the amount recoverable to $69,137.97.

To further argue the Frac Rentals Transfers' unavoidability, Defendants argue the remaining $69,137.97 is unavoidable under the ordinary course defense. As set forth in the Aerodynamic and Casafin transfers, Defendants present evidence of the number of days it took to pay the invoices to demonstrate the payment methods were made in the ordinary course among the parties. Defendants also present the Casafin and Aerodynamic transfers as further evidence that the transfers were made in the ordinary course. Both of Defendants' arguments fail. For the Frac Rentals Transfers the Court is only presented with ten invoices. As previously discussed, there are not enough transfers to establish an ordinary course among the parties. Furthermore, Defendants reference to Casafin and Aerodynamic is inappropriate. Section 547(c)(2)(A) allows an affirmative defense for the creditor asserting the defense, not other creditors a debtor may have. The Court cannot consider Casafin or Aerodynamic under this subsection. Section 547(c)(2)(B) also allows for an affirmative defense for following industry standards. Casafin and Aerodynamic are not in the same industry as Frac Rentals, so the Court will not consider evidence under Section 547(c)(2)(B). Here, Defendants have not met their burden of showing the transfers were made in the ordinary course. The Court thus finds that the Frac Rentals Transfers are avoidable in the amount of $69,137.97.

II.    Contractual Issues

Before moving on to the substantive analysis, the Court notes that only the Trustee has moved for summary judgment on the remaining counts.  The standard, therefore, is that of a simple motion for summary judgment, and the burden is solely placed on the Trustee to "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Bailey v. United Airlines*, 279 F.3d 194, 198 (3d Cir. 2002).

Regarding contractual issues, New York law governs both the 2012 SPA and the 2013 SPA.  Stoll Decl. Ex. 34, at § 3.04; Ex. 78, at § 3.04.  As the contract expressly states New York law governs, and the causes of action arise out of the rights, duties, and obligations created by the Agreement, the Court will apply New York law to the Agreement. *See Arby Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1048 (Del. Ch. 2006).

A.    Breach of Contract

Under New York law, "[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage." *Clearmont Prop., LLC v. Eisner*, 872 N.Y.S.2d 725, 728 (N.Y. App. Div. 2009).  Regarding the final element of damages, the non-breaching party may be "entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 182 (2d Cir. 2000).  Here, the formation of the SPAs and

performance by GFES are uncontested, so the Court's analysis focuses on Defendants' failure to perform and any resulting damages.

### 1. Defendants' Failure to Satisfy the SPAs Requirements

Beginning with the 2012 SPA, the Trustee alleges that although MOR MGH made the initial $10 million purchase and additional purchase at the end of the fourth fiscal quarter in 2012, MOR MGH breached the 2012 SPA by failing to make the required purchases for each of the first two quarters of 2013. Defendants argue that a factual issue exists because Moreno stated he did make certain obligation payments and recalls instructing his family office to make the 2012 SPA required payments. Moreno Depo. 149:11-20. Defendants' allegation is contradicted by their own answer (and amended answer) to the Complaint.

When a party is asserting that a fact is genuinely disputed, it must support the assertion by "citing to particular parts of materials in the record, including depositions…admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1). If that party fails to properly address another party's assertion of fact, the court may consider that fact undisputed. Fed. R. Civ. P. 56(e)(2). "In response to a well-supported motion for summary judgment, 'the non-moving party must adduce more than a mere scintilla of evidence in its favor.'" *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 117 (Bankr. D. Del. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Paragraph 55 of the Complaint states:

> However, despite funding requests from GFES under Section 2.03(e) for each of the first three fiscal quarters of fiscal 2013, MOR MGH and MMR did not purchase any of the preferred stock that they were obligated to purchase. In total, MOR MGH was obligated to purchase preferred stock in the amount of $9,594,298 on account of these three quarters, *but did not*, and MMR was obligated to purchase $1,199,152, *but did not*.

Stoll Decl. Ex. 99, at ¶ 55 (emphasis added). In response, Defendants answered:

> [Defendants] *admit that MOR MGH and MMR did not purchase preferred stock in GFES in fiscal 2013*. The remaining allegations in Paragraph 55 are denied.

*Id.* (emphasis added). The response was filed on September 21, 2015, and repeated in their amended answer on October 7, 2015. *Id.*; Stoll Decl. Ex. 100, at ¶ 55. Defendants admit here, and reaffirm in their amended answer, that they breached the 2012 SPA. In addition, the Trustee cites to other submissions by Moreno, statements by Blackwell in his deposition, and documents regarding the 2012 SPA that indicate Defendants admit they breached the 2012 SPA. *See* Stoll Decl. Ex. 36, at ¶ 59; Ex. 35, at ¶ 29; Blackwell Depo. 39:8-25, 45:13-19.

On March 23, 2017, the parties took Moreno's deposition, where he testified that he met his obligations and instructed his family to pay the SPAs. Moreno's declarations, however, are not enough to contradict Defendants' own admissions (which they admitted to twice) that MOR MGH did not purchase the preferred stock in 2013. Defendants attempt to support Moreno's statements by documenting over $50,000,000 in contributions and deposits by Moreno and MOR MGH to GFES, and indicate they may

have been misclassified.  But again, this lone statement does not overcome Defendants' own admissions that they breached the 2012 SPA.

The Court finds this evidence sufficient to satisfy the Trustee's claim that the 2012 SPA was breached and that MOR MGH and MMR did not make their required purchases for each of the first two quarters of 2013.

Turning to the 2013 SPA, the Trustee, as with the 2012 SPA, has properly alleged the facts by once again pointing to admissions by Defendants of their failure to satisfy the requirements under the 2013 SPA. *See* Blackwell Depo. 74:7-75:15; Stoll Decl. Ex. 36, at ¶ 62; Ex. 99, at ¶ 58; Ex. 100, at ¶ 58.  Defendants argue again that Moreno made many contributions and that they may have been mislabeled or mishandled.[34]  As the Court has already discounted Defendants' argument with reference to the 2012 SPA, and Defendants set forth the same argument, the Court reaches the same conclusion for the 2013 SPA.  The Trustee has alleged sufficient evidence to show that MOR MGH never made the $10,000,000 purchase under the 2013 SPA, as required.

2. Damages

The Trustee asserts that GFES was harmed in the amount of $5,961,923 and $10,000,000 by MOR MGH and MMR not performing their obligations of the 2012 SPA and 2013 SPA, respectively.  Defendants counter that GFES was not harmed by MOR

---

[34] In Defendants' Reply Brief, they do not distinguish between the 2012 SPA and 2013 SPA in supporting their legal argument instead referring to them simply as the SPAs, even when addressing obligations of the parties.

MGH and MMR failing to satisfy the SPAs because Moreno was still infusing GFES with liquidity.

"Under New York law, the normal measure of damages for breach of contract is expectation damages-the amount necessary to put the aggrieved party in as good a position as it would have been had the contract been fully performed." *McKinley Allsopp, Inc. v. Jetborne Int'l., Inc.*, 1990 WL 138959, at *8 (S.D.N.Y. Sept. 19, 1990); *see also Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 261 (S.D.N.Y. 2005) ("Damages for a breach of contract are normally limited to the amount necessary to put the plaintiff in the same economic position plaintiff would have occupied had the breaching party performed the contract."); *In re Residential Capital, LLC*, 533 B.R. 379, 407 (Bankr. S.D.N.Y. 2015) (explaining that expectation damages "offer the broadest remedy" and represent the "amount necessary to put [a] plaintiff in as good of a position" had there been no breach by a defendant) (citations and internal quotation marks omitted).

The Trustee's breach of contract claims are founded upon the failure of GFES to receive the payments promised in the SPAs. Missing from the argument, however, is how the failure to pay affected GFES's economic position. The Trustee points out that Defendants' argument regarding Moreno's additional personal contributions outside the SPAs may be misstated, with many of those contributions not being "personal" at all, but instead requirements under the Tri-Party Agreement or the 2012 SPA. At this stage in the proceeding, the Court is unsure of how funneling the monies used for the Tri-Party Agreement to pay the SPAs would have otherwise benefitted GFES. From facts cited by each party, it is clear that in 2012 the fracking industry began to deteriorate, causing GFES

to face substantial difficulties and to seek additional funding through the SPAs to provide the company with much needed liquidity.  This pattern continued after the SPAs were signed (and even breached).  During GFES's effort to achieve liquidity, Moreno, wearing several hats for several different entities, sought funding in different ways.  The Court is unsure what the consequences would have been had MOR MGH and MMR satisfied the SPAs.  If, for example, MOR MGH and MMR satisfied the 2012 SPA, would GFES have been better off, or would the company have nevertheless been harmed by those monies being drawn from another related entity such as TPT?

The corporate structure of GFES and its interplay with Defendants is complicated. While the Court agrees with the Trustee that certain monies were not paid as required by the SPAs, the Trustee has not presented enough evidence to show that awarding damages would make GFES whole.

The Trustee has not met his burden in showing that GFES was damaged by Defendants' failure to satisfy the requirements under the SPAs and summary judgment is therefore denied.

B.  Tortious Interference

The Trustee also asserts that Moreno in his personal capacity tortiously interfered with the performance by MOR MGH of the SPAs.  To adequately plead tortious interference with contract under New York law, a plaintiff must show: (1) a valid contract; (2) defendants knowledge of the contract; (3) defendant's intentional interference with the contract and a resulting breach; and (4) damages. *Pelosi v. Schwab Capital Markets, L.P.,* 462 F. Supp. 2d 503, 526 (S.D.N.Y. 2006).

Undisputed in this case is that valid contracts existed between GFES and MOR MGH/MMR.  Also, Moreno had knowledge of the contracts.

Furthermore, there exists a question of fact as to the extent of Moreno's intent in interfering with the SPAs.  The Court understands "[t]he issue of intent is 'particularly inappropriate for resolution by summary judgment because evaluating state of mind often requires the drawing of inferences from the conduct of parties about which reasonable persons might differ.'" *Justofin v. Metropolitan Life Ins. Co.*, 372 F.3d 517, 523-24 (3d Cir. 2004) (quoting *Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 24 (3d Cir. 1985)).  That being said, relevant case law in this Circuit does not "mandate trial or denial of a motion under Rule 56" on matters involving intentional torts, but instead allows an inquiry on a case by case basis. *Chase Bank USA, N.A. v. Hess*, 2013 WL 867542, at *3 n.35 (D. Del. Mar. 7, 2013).

Throughout his opening brief and reply brief, the Trustee spends many pages describing Moreno's actions from 2010 to 2013, and arguing how those actions were contrary to the best interests of GFES.  These facts (many of which are disputed) may demonstrate Moreno's performance, but absent in the Court's view is evidence of malicious behavior and a similar state of mind surrounding such actions. Despite a thorough recitation of the facts, the Court is not satisfied at this time that Moreno acted with malicious intent to breach the SPAs.  A more complete and fully developed record is necessary to determine this element.  Summary judgment relating to tortious interference is denied.

III.    Moreno's Bankruptcy Claims

In the bankruptcy proceedings, Moreno filed two proofs of claim against GFES, one being an administrative expense claim in the amount of $1,539,029 and the second being a contingent liability claim arising from the Shell Agreement and Shell Guarantee in the amount of $80,000,000.

A.    Administrative Expense

Moreno seeks $1,539,029 in administrative expenses relating to the fees and expenses he incurred in connection with the examiner process of the bankruptcy. Stoll Decl. Ex. 130-131.  Moreno claims that these costs were necessary to defend against any allegations raised by the Committee in their attempt to appoint an examiner and to respond to any submissions by the examiner and the Committee regarding claims against him.[35]  The Trustee argues that under both 503(b)(1)(A) and 503(b)(4) Moreno's claim fails because it arises from pre-petition conduct and there is no benefit to the estate.

Under Section 503(b)(1)(A), an administrative expense includes "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."  "Generally, Section 503(b) priorities should be narrowly construed to maximize the value for the estate for all creditors." 4 COLLIER ON BANKRUPTCY ¶ 503.06[2] (16th ed., rev. 2017). To qualify under Section 503(b)(1)(A), the applicant must prove (i) the expense arose from

---

[35] It was not specified in Moreno's filings (nor clarified by Defendants in their briefing) which specific statute the claims fell under, but the Court understands Sections 503b(1)(A) and 503(b)(4) to be the statutory basis for such claims.

a post-petition transaction between the creditor and the debtor, and (ii) the expense must have been "actual and necessary" to preserve the estate. *See In re New Century TRS Holdings, Inc.*, 446 B.R. 656, 661 (Bankr. D. Del. 2011).  When referencing indemnification clauses, specifically, "courts have held that an indemnification claim based upon pre-petition services or conduct is not a cost or expense" despite services being rendered after the commencement of a case. *In re Summit Metals, Inc.*, 379 B.R. 40, 56 (Bankr. D. Del. 2007).

Moreno's indemnification clause arose from pre-petition conduct.  The type of actions that Moreno seeks protection from, and to be indemnified for, are actions that occurred prior to the Petition Date.  The fact that the defense of such actions occurred post-petition is inconsequential.  *See In re Mid-Am. Waste Sys., Inc.*, 228 B.R. 816, at 822-23 (Bankr. D. Del. 1999) ("[I]ndemnification claims are merely claims for prepetition compensations for services rendered, not unlike salary or other benefits.").  The actions in question occurred pre-petition while Moreno was serving in his capacity as an officer and director, and the GFES bylaws containing the indemnification clause were enacted pre-petition.  Based upon these facts, Moreno's expenses do not arise from a post-Petition transaction.

Moreno's expenses are additionally not "actual and necessary" to preserve the estate.  To satisfy the actual and necessary test, the benefit of any action must directly and substantially benefit the estate. *Mid-Am. Waste*, 228 B.R. at 821.  A substantial benefit may include expenditures for operating the business, storage of property, rent and goods and services to protect or maintain the estate. 4 COLLIER ON BANKRUPTCY at ¶ 503.06[1].

The Trustee has explained, and Defendants have failed to rebut, the fact that Moreno's actions relating to the indemnification clause were to insure his protection against any claims that may be filed against him.  No facts have been presented to demonstrate that even a favorable result for Moreno would have resulted in a substantial benefit to GFES.

An essential element under Section 503(b)(4) is that the work be "actual and necessary" (which the Court has found Moreno's expenses were not).  Therefore, no claim under 503(b)(4) is permissible, and summary judgment seeking to overturn Moreno's administrative claim is granted in favor of the Trustee.

### B.  Reimbursement and Declaratory Judgment

Moreno seeks reimbursement and declaratory judgment in regard to the $80,000,000 in contingent liability arising from the Shell Agreement and Shell Guarantee.  However, Pursuant to Section 2.5 of the Shell Guarantee, Moreno assigned all of his rights against GFES to Shell.  Defendants have not established sufficient evidence demonstrating that Moreno could circumvent the Shell Guarantee and be entitled to the money. As such, the Court awards summary judgment regarding Counts 30, 34 and 35 in favor of the Trustee.

### C.  Preference Claim

The Trustee argues against Moreno's preference claims pertaining to TGS, Aerodynamic, Casafin and Frac Rentals.  Under Section 502(d), summary judgment for the Trustee can only be granted if the Trustee is successful in his motion to deny those specific preference claims.  As discussed above, the Court did not grant the Trustee

summary judgment on his preference claim, and thus summary judgment on count 29 is denied.

## Conclusion

For the foregoing reasons, the Court finds as follows:

1.      The Court denies the Trustee summary judgment on breach of the 2012 SPA and 2013 SPA (Counts 11 and 12).

2.      The Court denies the Trustee summary judgment on Moreno's tortious interference with contract (Count 14).

3.      The Court grants summary judgment on the Frac Rentals Transfers (Count 19) to the Trustee in part in the amount of $69,137.97; and grants summary judgment in part to Defendants with the remaining amount of $524,828.21 being unavoidable.

4.      The Court denies the Trustee summary judgment on the TGS Transfer (Count 21).

5.      The Court grants summary judgment on the Aerodynamic Transfers (Count 23) to the Trustee in part in the amount of $110,000; and in part to Defendants with the remaining amount of $165,000 being unavoidable.

6.      The Court grants summary judgment on the Casafin Transfers (Count 24) to the Trustee in part in the amount of $466,414.94; and in part to Defendants with the remaining amount of $151,983.01 being unavoidable.

7.      The Court denies the Trustee summary judgment on Moreno's objection to the preference claims (Count 29) pursuant to Section 502(d).

8.      The Court grants the Trustee summary judgment on Moreno's reimbursement and declaratory judgment claims (Counts 30, 34, and 35).

9.      The Court grants the Trustee summary judgment on Moreno's administrative claims (Count 31).

The Court will issue an order giving effect to its ruling.


Dated:    January 24, 2018

_____
KEVIN GROSS, U.S.B.J.